# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

JOHN DOE

     Plaintiff,

     vs.

TEXAS CHRISTIAN UNIVERSITY,

VICTOR J. BOSCHINI, JR,
*in his official capacity.*

     Defendants.

Civil Action No.: 4:22-cv-00297-y

## BRIEF IN SUPPORT OF EMERGENCY MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

Table of Contents ...................................................................................................... i

Index of Authorities ................................................................................................ iii

Introduction ............................................................................................................. 1

Background ............................................................................................................... 2

    1.    TCU's Policies ..................................................................................... 2

    2.    Roe Files a Title IX  Complaint ......................................................... 3

    3.    The Hearing ......................................................................................... 4

    4.    Disciplinary Process and Outcomes.................................................. 6

    5.    Gender Bias During the Title IX Proceeding................................... 7

    6.    TCU's Express Policy is to "Believe Survivors" - Gender Bias in Favor of Women and Accusers of Sexual Assault................................. 9

Standard of Review................................................................................................. 10

Argument ................................................................................................................ 11

    I.    Doe is Likely to Succeed on the Merits of His Title IX Claim under the Erroneous Outcome Test and in Light of the *Purdue* Standard...................... 11

        A.    Articulable Doubt as to the Accuracy of the Proceeding.......................... 13

            1.    Evidentiary Weaknesses of Roe's Case and the Strength's of Doe's Defense ......................................................... 13

            2.    Roe's Motivations to Lie ................................................................. 14

            3.    Procedural Flaws Affecting the Proof........................................... 14

        B.    Gender Bias Was a Motivating Factor in the Erroneous Outcome................................................................................................. 17

    II.    Doe is Likely to Succeed on the Merits of His Breach of Contract Claim............................................................................................................. 20

    III.    Without Injunctive Relief, Does Will Suffer Irreparable Injury............................ 20

    IV.    Doe's Injury Outweighs any Potential Harm to TCU............................................ 22

i

V.     Granting the Injunctive Relief Will Serve the Public Interest ............................ 22

Request to Waive Bond ........................................................................................................ 22

Prayer for Relief .................................................................................................................... 23

Certificate of Service ............................................................................................................ 24

# INDEX OF AUTHORITIES

## Cases

*C.W. v. James Zirus*, No. SA-10-CA-1044-XR, 2012 WL 12919097 (W.D. Tex. Aug. 7, 2012) ........................................................................ 15

*City of Meridian, Miss. v. Algernon Blair, Inc.*, 721 F.2d 525 (5th Cir. 1983) ..................................................................................................... 20

*Clark v. Prichard*, 812 F.2d 991 (5th Cir. 1987) ............................. 10

*Deerfield Medical Center v. City of Deerfield Beach*, 661 F.2d 328 (5th Cir. 1981) ......................................................................................... 20

*Doe v. Purdue*, 928 F.3d 652 (7th Cir. 2019) ...................... 11, 18, 19

*Doe v. Regents of Univ. of California*, 23 F.4th 930 (9th Cir. 2022)............. 12

*Doe v. Univ. of Connecticut*, No. 3:20CV92 (MPS), 2020 WL 406356 (D. Conn. Jan. 23, 2020) ............................................................... 20, 21

*Doe v. Univ. of Denver*, 1 F.4th 822 (10th Cir. 2021) .................... 12

*Doe v. Valencia Coll.*, 903 F.3d 1220 (11th Cir. 2018).................... 11

*Fisher v. Tex.*, 556 F. Supp. 2d 603 (W.D. Tex. 2008).................... 20

*Fla. Med. Ass'n, Inc. v. U. S. Dep't of Health, Ed. & Welfare*, 601 F.2d 199 (5th Cir. 1979)......................................................................... 10

*Gordon v. City of Houston, Tex.*, 79 F. Supp. 3d 676 (S.D. Tex. 2015).......... 23

Haight v. State, 103 S.W.3d 498 (Tex. App.—San Antonio 2003)................. 15

*Klocke v. Univ. of Tex. at Arlington*, 938 F.3d 204 (5th Cir. 2019) ............... 11

*Knights of Ku Klux Klan, Realm of La. v. E. Baton Rouge Par. Sch. Bd.*, 578 F.2d 1122 (5th Cir. 1978) ............................................................ 11

*Ladd v. Livingston*, 777 F.3d 286 (5th Cir. 2015).......................... 10

*Mathews v. Eldridge*, 424 U.S. 319 (1976).................................. 22

*Oliver v. Univ. of Tex. Sw. Med. Sch.*, No. 3:18-CV-1549-B, 2019 WL 536376 (N.D. Tex. Feb. 11, 2019).................................................. 12

*Plummer v. Univ. of Houston*, 860 F.3d 767 (5th Cir. 2017)................ 11, 18, 22

*See Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624 (5th Cir.1996) ........................................ 22

*Valley v. Rapides Parish School Bd.*, 118 F.3d 1047 (5th Cir. 1997) ............................ 22

*Yusuf v. Vassar Coll.*, 35 F.3d 709 (2d Cir. 1994) ............................................................ 13

## Statutes

20 U.S.C. § 1681 .................................................................................................................. 11

20 U.S.C. 1681 ................................................................................................................. 1, 11

## Rules

34 C.F.R. 106.45 (b) (4) .................................................................................................. 4, 15

Fed. R. Civ. P. 65 (c) ........................................................................................................... 22

<u>INTRODUCTION</u>

Plaintiff, John Doe ("Doe"), submits this Brief in Support of Emergency Motion for Temporary Restraining Order and Preliminary Injunction under Rule 65 (a-b) of the Federal Rules of Civil Procedure and Local Rule 7.2. Doe has sued Defendants Texas Christian University ("TCU") and Victor J. Boschini, Jr. ("Boschini" and collectively with TCU, the "Defendants") under 20 U.S.C. 1681, *et seq.* ("Title IX") and for breach of contract. **Doe seeks emergency relief restraining Defendants from suspending Doe from TCU less than one (1) month before the end of the semester**.

Until Friday, April 8, 2022, Doe was enrolled as a junior at TCU. Doe's ex-girlfriend, Jane Roe ("Roe"), vindictively and falsely accused him of sexually assaulting her on two occasions during the fall semester of 2020 (the "Allegations"). For the first false allegation ("Allegation 1"), Roe claimed that on August 19, 2020, Doe digitally penetrated her vagina without her consent while in her dorm room in Colby Hall on TCU's campus. For the second false allegation ("Allegation 2"), Roe claimed that on October 3, 2020, Doe inserted his penis in her vagina without her consent while in Austin. Roe waited over a year after Allegation 1 to make any complaint to TCU.

TCU conducted a Title IX panel hearing on January 28, 2022, via Zoom to determine whether the Allegations violated TCU's Policy 1.008, the Policy on Prohibited Discrimination, Harassment, Sexual Misconduct, and Retaliation (the "Policy"). The hearing panel issued their Deliberative Report on February 2, 2022, and concluded that (1) Doe engaged in conduct that violates the Policy for Allegation 1; and (2) Doe **did not** violate the Policy for Allegation 2.

As the penalty, the hearing panel suspended Doe "effective immediately" and stated that he is eligible to reenroll in classes for the 2023 Maymester. The hearing panel also directed Doe

1

to attend therapy and counseling and to complete online Title IX training prior to reenrollment. In addition, Doe is to remain on "conduct probation" for the remainder of his time at TCU. Doe timely appealed the hearing panel's decision on Allegation 1 to the Vice Chancellor for Student Affairs. Michael Russel, the Assistance Vice Chancellor of Student Affairs, wrongfully upheld the hearing panel's decision with respect to Allegation 1.

**BACKGROUND**

The Appendix to Brief in Support of this Emergency Motion for Temporary Restraining Order and Preliminary Injunction (referred to herein the "App.") is being filed under seal pursuant to a Motion for Leave to File Appendix Under Seal.

**1.      TCU's Policies**

TCU is a private university that receives federal funding. TCU has several policies that govern its relationships with students and faculty. Those policies include, without limitation, the Policy, "Policy 1.009" (herein so called) titled Responding to Reports of Prohibited Discrimination, Harassment, Sexual Misconduct, and Retaliation" the Student Code of Conduct (the "Code"), and the Student Bill of Rights and Responsibilities (the "Bill of Rights"). *See* Exh. 3, Policy (App. 13-22); Exh. 33, Policy 1.009 (App. 345-359); Exh. 4, Code (App. 23-58); Exh. 5, Bill of Rights (App. 59-60).

The Policy governs, in part, allegations of sexual assault under Title IX. Exh. 3, Policy (App. 13-22). Policy 1.009 and the Code set forth, among other things, the processes by which Title IX proceedings are handled and the rights of the parties involved. Exh. 33, Policy 1.009 (App. 345-359); Exh. 4, Code (App. 48-57). Sections I A.-B. of the Bill of Rights address a student's right to access higher education at TCU and his or her right to use all appropriate facilities and

services of TCU. Exh. 5, Bill of Rights (App. 30). Section II A. of the Bill of Rights gives students

the right to register for and attend any class for which he or she has met the prerequisites. *Id.*

### 2.    Roe Files a Title IX  Complaint

On September 15, 2021—over a year after the date of Allegation 1—Roe submitted a report

to TCU's Office of Institutional Equity ("OIE") and accused Doe of sexually assaulting her. Then,

on October 4, 2021, Roe subsequently filed a "Formal Complaint" with the OIE naming Doe as a

respondent and alleging sexual misconduct. Exh. 12 (App. 126-129).

Leigh Holland performed the initial investigation and submitted a preliminary report on

November 12, 2021. Exh. 13 (App. 130-133). In the preliminary investigative report, Ms. Holland

indicated that Roe failed to cooperate. *Id.* (App. 132). Doe and Roe were given an opportunity to

submit responses and addenda to the preliminary report. Doe submitted his response on November

30, 2021, through his Title IX advisor. Exh. 14 (App. 134-138). Roe likewise submitted what she

considered her "official response" to the Preliminary Investigative Report on November 30, 2021

(the "November 30th Letter"). Exh. 15 (App. 139-164). The November 30th Letter included new

alleged "details" of the Allegations that Roe previously failed to disclose. *Id.* (App. 140-143).

Those new "details," however, severely misstated the facts and were false. *See e.g.* Exhs. 6-11

(App. 61-125).

Ms. Holland completed and submitted a final investigation report on December 7, 2021.

Doe submitted his response to the final investigation report by the deadline on January 24, 2022,

and included dozens of exhibits he intended to use as rebuttal evidence. *See* Exh. 34 (App. 360-

360); Exh. 18 (App. 174-177). Some of the exhibits included exculpatory text messages between

Roe and Doe, including the "Exculpatory Texts" ("I don't think it's rape"), as well as photographs

of Roe and Doe taken after the Austin incident. *See* e.g. Exh. 7 (App. 83); Exh. 10 (App. 115-119); Exh. 1, Doe Aff. ¶ 27 (App. 6).

### 3.    The Hearing

Prior to the hearing, Doe raised questions regarding TCU's jurisdiction to investigate matters that occurred off campus (i.e., Austin) under the auspices of Title IX. *See* Exh. 17 (App. 170-173); Exh. 18 (App. 174-177). Doe did not contest that TCU could investigate the off-campus allegation, just that it may not do so through their Title IX department and further that it may not consolidate the Title IX case with a non-Title IX case. *Id.* Doe and his adviser further notified TCU that federal regulations prohibit consolidating two incidents that do not arise out of the same set of facts and circumstances. *See* 34 C.F.R. 106.45 (b) (4)[1]; *Id.*  Nevertheless, TCU moved forward with the hearing as scheduled on January 28, 2022.

Section 1.19 of the Code states that Title IX panel members "may include an appointed panel chair and/or panelists who are not members of the TCU community to ensure fairness for the Complainant and Responding Student and compliance with applicable law." Exh. 4, Code (App. 27). TCU's Dean of Students Office, however, appointed the three panelists all of whom were members of the TCU community. Those hearing panelists included (1) Reece Harty, Clark Hall Dormitory Director; (2) Dr. Clark Jones, College of Science and Engineering Faculty; and (3) Laura Shaw, Director of Student Affairs Business and Operations. Exh. 20, Deliberative Report (App. 247).

---

[1] "Consolidation of formal complaints. A recipient may consolidate formal complaints as to allegations of sexual harassment against more than one respondent, or by more than one complainant against one or more respondents, or by one party against the other party, where the allegations of sexual harassment arise out of the same facts or circumstances...."

4

The hearing panelists were essentially the "jury" as they were tasked with determining the truthfulness of the Allegations and Doe's fate. Unlike voir dire of a jury panel in a court of law, however, TCU does not have a procedure in place that allows the parties involved, like Doe, to determine whether any of the panel members hold biases and could be fair and impartial panelists. *See, e.g.*, Exh. 3, Policy (App. 13-22); Exh. 4, Code (App. 23-58).

At the beginning of the hearing, Hon. Ignazio J. Ruvolo ("Judge Ruvolo"), the Panel Chair and a retired California state judge, excluded relevant information, including the Exculpatory Texts and other texts, from the hearing panel's consideration because he determined that the exhibits "were not shown to be unavailable at the time of the investigation . . . and because any relevance of the proffered evidence was more prejudicial than probative of a material fact." Exh. 20, Deliberative Report (App. 253); Exh. 1, Doe Aff. ¶ 27 (App. 6). The exhibits excluded by Judge Ruvolo were crucial to Doe's defense. Exh. 1, Doe Aff. ¶ 27 (App. 6). The excluded exhibits primarily consisted of text messages, including the Exculpatory Texts and the December 8, 2020 texts evidencing that Roe told Doe "I want to fuck you" (the "December 8th Texts"). *Id.* However, Judge Ruvolo also excluded significant pictures, including pictures of Doe and Roe happily together on her birthday (November 4, 2020), months after Allegation 1 and weeks after Allegation 2. *Id.*; Exh. 10 (App. 115-119).

The hearing panel was required to apply TCU's definitions of sexual assault and non-consensual sexual intercourse to determine whether Doe violated the Policy. Exh. 20, Deliberative Report (App. 246). Ultimately, the panel concluded that Doe violated the Policy as to Allegation 1, but concluded that Doe did not violate the Policy as to Allegation 2. *Id.* (App. 248). Specifically, the panel found in favor of Doe for Allegation 2 because (1) in the car ride on the way back to Fort Worth from Austin the following day, Roe did not say anything to her best friend (the "Best

Friend") about her interaction with Doe nor did she ask for any assistance; and (2) "after this visit to Austin, the two continued to reach out to one another and had consensual sex for some time thereafter" including "having intimate sexual contact with [Roe] in early November on or near [Roe's] birthday." *Id.* (App. 248-252).

The panel found in favor of Roe for Allegation 1 because of the putative "admissions" Doe sent Roe after the Colby Hall incident and messages Doe sent to the Best Friend in December 2020 or January 2021. *Id.* (App. 252-253). The logic of the panel, however, makes no sense because the very same reasons the panel found in favor of Doe with respect to Allegation 2 should have also been applied in reaching their conclusion for Allegation 1.

### 4.    Disciplinary Process and Outcomes

As the penalty, the hearing panel suspended Doe "effective immediately" and stated he is eligible to reenroll in classes for the 2023 Maymester. *Id.* (App. 248). The hearing panel also directed Doe to attend therapy/counseling and complete online Title IX training prior to reenrollment. *Id.* In addition, Doe is to remain on "conduct probation" for the remainder of his time at TCU. *Id.*

Although (1) the panel found that Roe lied about Allegation 2 by concluding she was not raped and had consensual sex with Doe; and (2) Roe lied and severely misled the hearing panel in the November 30th Letter, neither TCU nor the panel disciplined Roe despite Roe's violation of Section IV. H. of the Policy for providing false information and filing a false complaint. *Id.*; Exh. 3, Policy (App. 19).

Doe timely appealed the hearing panel's decision on Allegation 1 to the Vice Chancellor for Student Affairs. Exh. 21 (App. 256-275). On April 8, 2022, Jessica Ledbetter, the Assistant Dean of Students and Co-Procedural Chair, emailed Doe the Appeal Determination issued by

Michael Russel, TCU's Associate Vice Chancellor of Student Affairs. Exh. 22 (App. 273-275); Exh. 23 (App. 276-279). The Appeal Determination upheld the hearing panel's decision in all respects. *Id.* Ms. Ledbetter commanded in her email that "**Suspension from TCU is immediately in effect upon receipt of this notice**…. **Because Suspension is effective immediately, you are no longer permitted to attend classes, barred from enrollment at TCU until the 2023 Maymester, and banned from all TCU property for the duration of your Suspension**. TCU Police will be contacting you very soon regarding the issuance of a criminal trespass order against you as a result of the determination in this case." (Emphasis original). Exh. 22 (App. 274).

### 5. Gender Bias During the Title IX Proceeding

Doe wanted to enroll at Southern Methodist University for the Spring 2022 semester and was accepted subject to SMU's receipt of a letter of good standing. Exh. 1, Doe Aff. ¶ 22 (App. 5). However, Section 5.8.7. of the Code of Student Conduct states, 'Students are not in good standing with the University upon receiving suspension. Exh. 4, Code (App. 52). Despite the presumption of innocence, Section 5.3.13 of the Code prohibits a <u>respondent</u> from receiving a transcript prior to the completion of a hearing for mere *allegations* of "sexual harassment" and "sexual assault" among other allegations under the Policy. *Id.* (App. 43).

In early January of 2022, Doe met with Jeremey Steidl, one of TCU's Assistant Dean of Students and a Co-Panel Chair at the hearing, and discussed enrollment at TCU for the Spring 2022 semester. Exh. 1, Doe Aff. ¶ 23 (App. 5). Mr. Steidl falsely told Doe that he was prohibited from enrolling for the Spring 2022 semester because of the pending Title IX investigation. *Id.* After receiving a letter from Doe's attorney, and <u>on the day of the deadline</u> to enroll, Doe learned he could in fact enroll at TCU contrary to Mr. Steidl's misrepresentations, and he did. *Id.*

7

Also in January of  2022, Roe complained to Mr. Steidl that one of Roe's and Doe's male friends (the "Male Friend") texted Roe and told her it would not be a good idea for her to come to a get-together he and his roommates were having at their rent house. *Id.* ¶ 24 (App. 5).  Mr. Steidl's secretary contacted the Male Friend and arranged a Zoom meeting between Mr. Steidl and the Male Friend. *Id.* During the Zoom meeting, Mr. Steidl asked the Male Friend why he told Roe it would be a good idea if she did not attend his get together. *Id.* The Male Friend explained that he and his roommates had decided they would not drink at their house around underage kids. *Id.* Without explaining why, Mr. Steidl asked the Male Friend to sign a no-contact order in favor of Roe, but the Male Friend elected not to do so. *Id.*

At the "Pre-Hearing Meeting" (herein so called) on January 25, 2022, Ms. Ledbetter told Doe and his adviser that re-direct and re-cross examination of witnesses was prohibited at the hearing because "frankly we worry about **re-traumatization** of the individuals who are involved." Exh. 1, Doe Aff. ¶ 26 (App. 6). Ms. Ledbetter also stated during the Pre-Hearing Meeting that she and one of the panel members, who is one of her friends, went to lunch together earlier that day. *Id.* Ms. Ledbetter stated that her panel member friend told her he had already begun a review of the documents submitted in the case. *Id.*

After the panel hearing, Doe discovered that at least one panel member, Reece Harty, may have bias in favor of women and women accusers in light of tweets he posted on Twitter between September and November of 2018 (the "Harty Tweets"), which is around the same time as Justice Kavanaugh's highly contentious confirmation hearing. For example, on October 5, 2018, Mr. Harty retweeted Time Magazine's tweet, which states "**The best way to help women survivors be heard? Elect more women.**" Exh. 24, Harty Tweets (App. 280-284) (emphasis added).

6.    **TCU's Express Policy is to "Believe Survivors" - Gender Bias in Favor of Women and Accusers of Sexual Assault**

On February 15, 2022, TCU's Campus Advocacy, Resource and Education ("CARE") department posted a picture of what appears to be Mr. Harty on its Facebook and Instagram pages showing his participation in a "Pancake Palooza" in support of CARE. Exh. 29 (App. 317). CARE's "mission is to advocate and support survivors of sexual violence," and as explained and evidenced below, CARE is severely biased in favor of accusers of sexual assault. *Id*.

TCU's website also evidences bias in favor of a complainant. The OIE's Title IX webpage includes a "Complainant Information" tab and a "Respondent Information" tab. The "Complainant Information" page equates complainants with "survivors" of sexual assault, explains how they can navigate the process, and provides "Do's and Don'ts" when helping and listening to a "survivor." Exh. 25 (App. 285-294); Exh. 26 (App. 295-299). For example, one of the  "Dos and Don'ts" states, "Do not blame a survivor for what happened or make them feel guilty for what happened. It is important to understand that no matter what happened, it is not the survivor's fault." Exh. 26 (App. 296-299). The Respondent Information page provides information for persons accused of sexual misconduct. Exh. 27 (App. 300-309); Exh. 28 (App. 310-314). It also has a "Do's and Don'ts" section for helping and handling a respondent who has been accused of sexual assault, **but that section is *verbatim* of the Complainant Information "Do's and Don'ts" page**—i.e., helping "survivors" of sexual assault. Exh. 28 (App. 311-314).

TCU's news, website and social media pages, including those pertaining to CARE, further show the female and accuser-biased backdrop against which Title IX proceedings are conducted and the attitude of the TCU community towards alleged sexual assaults, which is believe the accuser no matter what! *See* Exhs. 25-32 (App. 285-345). Undoubtedly, universities like TCU should have departments like CARE to support victims of sexual assault, but it is the practice of

9

CARE, and therefore, TCU to <u>always</u> believe the accuser regardless of the truth. TCU touts the

hashtag, #Listen**believe**support. *See* Exh. 29 (App. 318-327) (emphasis added).

TCU's Chief Inclusion Officer who was previously the Title IX coordinator, Darron

Turner, and Ms. Carnahan opposed the new changes to Title IX that ensure due process for accused

students and which took effect in 2020. Exh. 32 (App. 335-345). Mr. Turner made the comment

in a TCU 360 news article that "the single investigator model, which involves one-on-one

conversations with the **survivor, respondent and witnesses**, is more accurate because of its

intimate interpersonal dynamic." *Id.* (App. 336) (emphasis added). In that same article, Ms.

Carnahan opposed implementing the new Title IX procedural protections because "the outcome of

an academic disciplinary system, which deals with access to education, is different from the

purpose of the criminal justice system…. 'It wouldn't stop someone living their life free of jail

time.'" *Id.* (App. 340).

S<span style="font-variant:small-caps">TANDARD OF</span> R<span style="font-variant:small-caps">EVIEW</span>

To obtain a temporary restraining order or preliminary injunction, Plaintiffs must establish:

"(1) a likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the

threatened injury if the injunction is denied outweighs any harm that will result if the injunction is

granted; and (4) that the grant of an injunction will not disserve the public interest." *Ladd v.

Livingston*, 777 F.3d 286, 288 (5th Cir. 2015); *see also Clark v. Prichard*, 812 F.2d 991, 993 (5th

Cir. 1987). "[F]inding a substantial likelihood that movant will ultimately prevail on the merits

does not contemplate a finding of fixed quantitative value. Rather, a sliding scale can be employed,

balancing the hardships associated with the issuance or denial of a preliminary injunction with the

degree of likelihood of success on the merits." *Fla. Med. Ass'n, Inc. v. U. S. Dep't of Health, Ed.

& Welfare*, 601 F.2d 199, 203 n.2 (5th Cir. 1979) (citation and quotation marks omitted). "Where

10

one or more of the factors is very strongly established, this will ordinarily be seen as compensating for a weaker showing as to another or others." *Knights of Ku Klux Klan, Realm of La. v. E. Baton Rouge Par. Sch. Bd.*, 578 F.2d 1122, 1125 (5th Cir. 1978).

<u>**ARGUMENT**</u>

**I.      Doe is Likely to Succeed on the Merits of His Title IX Claim under the Erroneous Outcome Test and in Light of the *Purdue* Standard**

Plaintiff asserts a claim against Defendants for violation of Title IX, 20 U.S.C. 1681, *et seq.* Title IX states in part, "**No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance**." 20 U.S.C. § 1681, *et seq*. (emphasis added).

Title IX bars the imposition of university discipline where gender bias is a motivating factor in the university's decision to discipline. *Plummer v. Univ. of Houston*, 860 F.3d 767, 777 (5th Cir. 2017). The Supreme Court has not established a framework for analyzing Title IX challenges to university disciplinary proceedings. *Doe v. Valencia Coll.*, 903 F.3d 1220 (11th Cir. 2018). Circuit courts have therefore adopted various tests to identify gender bias in the context of university discipline. *See Doe v. Purdue*, 928 F.3d 652, 667 (7th Cir. 2019). Amongst those tests include the **"erroneous outcome"** and "selective enforcement" tests, which have been adopted by the Fifth Circuit. *See  Id.*; *Klocke v. Univ. of Tex. at Arlington*, 938 F.3d 204, 210 (5th Cir. 2019).

Under the "erroneous outcome" test, a plaintiff must set forth (1) facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding and (2) a particularized causal connection between the flawed outcome and gender bias. *Klocke*, 938 F.3d at 210.  To show an articulable doubt, a plaintiff may point to particular evidentiary weaknesses behind the finding of an offense such as a motive to lie on the part of a complainant or witnesses,

particularized strengths of the defense or particular procedural flaws affecting the proof. *Id.* A plaintiff may further illustrate gender bias by, among other things, identifying statements by members of the disciplinary tribunal, statements by pertinent university officials or patterns of decision-making that also tend to show the influence of gender. *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994); *Oliver v. Univ. of Tex. Sw. Med. Sch.*, No. 3:18-CV-1549-B, 2019 WL 536376, at *18 (N.D. Tex. Feb. 11, 2019) (citing *Yusuf*, 35 F.3d at 715).

In addition to the erroneous outcome and selective enforcement tests, the Court should take notice of and consider the relatively new and simplified "***Purdue* Standard**" adopted and applied by the Seventh Circuit. In 2019, the *Purdue* opinion—authored by Justice Amy Coney Barrett—found "no need to superimpose doctrinal tests on the [Title IX] statute" because "all of these categories simply describe ways in which a plaintiff might show that sex was a motivating factor in a university's decision to discipline a student." *Id.* at 667. Rather, one should "ask the question more directly: do the alleged facts, if true, raise a plausible inference that the university discriminated against John 'on the basis of sex?'" *Purdue*, 928 F.3d at 667-68.

Along with *Purdue,* the following cases exemplify courts protecting a male student's Title IX claim asserted against a university after being disciplined pursuant to allegations of sexual assault: *Oliver v. Univ. of Tex. Sw. Med. Sch.*, No. 3:18-CV-1549-B, 2019 WL 536376 (N.D. Tex. Feb. 11, 2019) (denying university's 12(b)(6) motion to dismiss Title IX claim because the student's complaint contained "particularized facts to satisfy his pleading burden of showing that gender was a motivating factor in this erroneous outcome"); *Doe v. Regents of Univ. of California*, 23 F.4th 930 (9th Cir. 2022) (reversing and remanding trial court's order granting university's 12(b)(6) motion to dismiss because the male student adequately alleged discrimination on basis of sex in Title IX disciplinary proceeding); *Doe v. Univ. of Denver*, 1 F.4th 822 (10th Cir. 2021)

(reversing and remanding trial court's order granting university's motion for summary judgment because student made prima facie showing that university's investigation into female student's accusation of sexual assault and its ultimate decision to expel him was motivated by sex and fact issues remained on that issue); *Yusuf v. Vassar Coll.*, 35 F.3d 709 (2d Cir. 1994) (student established claim that college discriminated against him on account of his gender based on allegation that he was erroneously found to have harassed roommate's girlfriend).

### A. Articulable Doubt as to the Accuracy of the Proceeding.

TCU is a private university that receives federal funding. Evidentiary weakness, Roe's motivations to lie, the particularized strengths of Doe's defense, and the procedural flaws affecting the proof establish articulable doubt as to the accuracy of the proceeding against Doe.

### 1. Evidentiary Weaknesses of Roe's Case and the Strength's of Doe's Defense

Roe's biggest evidentiary weakness is the fact that (1) her story is non-sensical; and (2) she admitted that, "I don't think it's rape." For example, why would Roe call her purported rapist (Doe) to calm her and pick her up from the hotel in Austin (where she was safe with her best friends) in the midst of having a panic attack about being drugged and raped? Exh. 19 (App. 182). Why, on December 8, 2020, would she send a message to Doe, her purported rapist, that says "I want to fuck you?" See Exh. 11 (App. 120-125). Why would Roe be jealous seeing Doe with another girl after allegedly being raped by him? Exh. 8 (App. 94-95).

Moreover, Roe waited over a year after Allegation 1 to file the Title IX complaint, her November 30th Letter contains significant misrepresentations and she could not describe any details surrounding how Doe putatively inserted his fingers into her vagina. *See* Exh. 12 (App. 126-129); Exhs. 6-11 (App. 61-125); Exh. 1, Doe Aff. ¶¶ 8-9 (App. 3). Rather, Roe's exclusive evidence of Allegation 1 were text messages from Doe. However, Roe took Doe's text messages entirely out of context, and those text messages do not say that he inserted his fingers into Roe's

vagina. To the contrary, the Exculpatory Texts constitute Roe's own admission of "I don't think it's rape." Exh. 7 (App. 83).

Further, the reasons the panelists gave for finding that Roe lied about Allegation 2—i.e., she failed to tell her best friend about the alleged assault the following day and continued having sex with Doe—should have also applied to Allegation 1. Exh. 20, Deliberative Report (App. 248-255). But, the panelists failed to give weight to those same reasons in deciding Allegation 1 and instead adhered to TCU's "Believe Survivors" policy. *Id.* The panelists likewise failed to give weight to Doe's explanation of the putative "admission" texts and the pattern in which he handled Roe, yet they believed other things he said that Roe denied. *Id.* It is also non-sensical to believe that Doe would lie about and deny digitally penetrating Roe's vagina while at Colby Hall altogether, yet admit to inserting his penis into Roe's vagina while in Austin.

### 2.   Roe's Motivations to Lie

Roe is a woman scorned. After unsuccessfully attempting to reconcile her relationship with Doe, Roe felt rejected and betrayed, resulting in retaliation against Doe and his Girlfriend. The evidence shows that Roe became jealous after the Coly Hall and Austin incidents when she saw Doe with other women, like when she saw Doe with another girl at the TCU tailgate. Exh. 8 (App. 94-95). The harassing and bullying manner in which Roe and her Best Friend have targeted the Girlfriend further evidence Roe's motivation to "get back at" and retaliate against Doe and the Girlfriend. *See e.g.*, Doe Aff. ¶ 21 (App. 5). Instability, jealousy and vengeance are the underpinnings of Roe's motive to falsely accuse Doe of sexually assaulting her.

### 3.   Procedural Flaws Affecting the Proof

TCU's procedural flaws throughout Doe's Title IX process resulted in the hearing panel "splitting the baby" and hindered Doe's ability to defend himself. First, TCU consolidated the Allegations so that both would be heard and considered by the panel at the same time. The

Allegations resulted from completely unrelated and separate events and the hearing panel should not have considered Allegation 2 under their Title IX framework because Allegation 2 occurred in Austin and had nothing to do with TCU. *See* 34 C.F.R. 106.45 (b) (4) . That improper consolidation made it likely that the panel found Doe in violation of the Policy with respect to Allegation 1. For example, the Court in *Haight v. State* explains the dangers of consolidation in criminal trials:

> By choosing severance, the defendant runs the risk of facing consecutive sentences if he is found guilty of both offenses, **but he may improve his chances of acquittal by defending against only one offense at a time**. **The dangers of a consolidated trial include the risk that the jury will label the defendant as a bad person who deserves punishment because of the other offenses he or she has committed and the risk that the jury will infer that the defendant committed the offense charged because he or she also committed other offenses**. See *Llamas v. State*, 12 S.W.3d 469, 471–72 (Tex. Crim. App. 2000). Also, in a consolidated trial, **evidence of both offenses is admitted automatically, whereas in a trial for one offense, evidence of another offense committed during the same transaction may or may not be admitted as res gestae of the first offense**. Finally, **the mere presence of formal charges for multiple offenses may influence the jury**.

103 S.W.3d 498, 505 (Tex. App.—San Antonio 2003), rev'd on other grounds, 137 S.W.3d 48 (Tex. Crim. App. 2004) (some citations omitted); *see also C.W. v. James Zirus*, No. SA-10-CA-1044-XR, 2012 WL 12919097, at *4 (W.D. Tex. Aug. 7, 2012) (considering the risks of prejudice and possible confusion of a consolidated trial).

Next, Section 5.7.10 of the Code effectively prohibits the introduction of rebuttal evidence, and Judge Ruvolo precluded Doe from submitting rebuttal evidence prior to and during the hearing. Exh. 4 (App. 49); Exh. 20, Deliberative Report (App. 253). The exclusion of the evidence amounts to procedural flaws in TCU's rules which effectively shift the burden of proof to respondents by requiring them to produce evidence to prove their innocence during the investigation stage. Failure to provide sufficient proof of innocence during the investigation phase results in the exclusion of relevant evidence during the hearing, even if it is exculpatory.

But, perhaps more importantly, TCU's evidentiary rules set forth in Policy 1.009 and the Code are confusing and incomprehensible. The rules do not indicate at which point the "investigation" phase ends and the rules do not give any concrete evidence deadlines. Instead, the rules create confusion by providing for two ten-day response periods in which the parties can provide a response and evidence they would like "considered." Exh. 33, Policy 1.009 (App. 351); Exh. 4 ¶ 5.7.10 f., Code (App. 49); *see also* Exh. 34 (App. 362). The investigator does not "consider" anything under the new rules though, only the panel does. Additionally, the Code provides that only "new evidence" submitted during the hearing will be considered by the panel chair for admissibility. Exh. 4 ¶ 5.7.10 f., Code (App. 49).

The Federal regulations changed in August of 2020, but TCU failed to adequately recognize how those changes affected its own evidentiary rules. Under the new rules, the investigator no longer makes a decision on responsibility as all cases now go to a hearing. In this framework, having strict rules on the admission of evidence and particularly the timing of providing it does not correlate to a just process. *See* Exh. 33, Policy 1.009 (App. 351); Exh. 4, Code (App. 49). Because the investigator is not "investigating" to make a decision him/herself, a deadline for evidence for the investigator to consider in unnecessary. The deadline TCU attempts to enforce is the initial ten-day period to respond to the preliminary investigation report as evidenced by the fact that Judge Ruvolo excluded the evidence Doe submitted as part of the ten-day response period to the final report. Again, that does not make sense because panel members determine the outcome.

Moreover, the flawed new rules allow a complainant to continue to add details and allegations up until the response to the final investigation report, yet preclude respondents from introducing rebuttal evidence. Exh. 4 ¶ 5.7.10 f., Code (App. 49). TCU enabled such inequity by

enforcing outdated evidentiary rules that are not compatible with the new ones—further evidence of gender bias. The excluded evidence Doe submitted would not have "surprised" Roe as she was a party to the texts and in the pictures. Instead, Roe was allowed to submit incomplete records that did not include her own admission that Doe did not rape her and when Doe attempted to submit the complete conversation, it was excluded by the hearing officer.

TCU also failed to allow Doe to fully and completely defend himself by not giving him sufficient notice of all the allegations against him until the hearing began, contrary to the provisions of Section 5.3.13 of the Code. Exh. 4, Code (App. 43). Specifically, TCU and Judge Ruvolo allowed Doe to give new "details" of the Allegations the week of and during the hearing. Nevertheless, Judge Ruvolo precluded Doe from introducing text messages and pictures to rebut the new details of Roe's allegations. Exh. 20, Deliberative Report (App. 253); Exh. 1, Doe Aff. ¶ 27 (App. 6).

Further, TCU's Dean of Students Office (which includes Mr. Steidl and Ms. Ledbetter) selected other staff members at TCU to be the panelists, when they could have chosen persons outside of the TCU community as suggested by Section 1.19 of the Code in order to ensure "fairness." Exh. 4, Code (App. 27). TCU likewise lacks a voir-dire type process that would have allowed Doe to determine whether the hearing panelists had biases or beliefs that could impede their ability to be fair and impartial decision makers. *Id.* (App. 23-58).

**B. Gender Bias Was a Motivating Factor in the Erroneous Outcome.**

TCU and the persons who participated in the Title IX panel hearing have adopted and promote the philosophy of "Believe Survivors" as they automatically equate accusers like Roe with "survivors." Consequently, Doe—a man—stood no chance of successfully defending himself against both allegations in TCU's gender biased and procedurally unfair Title IX proceeding.

Gender bias was a motivating factor behind the erroneous finding as demonstrated by, among other things, the following: (a) the exclusion of Doe's rebuttal evidence; (b) Jeremy Steidl's false statement to Doe that he (Doe) could not enroll at TCU because of the pending Title IX investigation; (c) Mr. Steidl's request that the Male Friend sign a no-contact order; (d) Jessica Ledbetter's statement at the Pre-Hearing Meeting that TCU prohibits re-direct and re-cross examination of witnesses because "frankly we worry about re-traumatization of the individuals who are involved"; (e) Ms. Ledbetter's discussion of Doe's Title IX case with another panel member prior to the hearing; (f) TCU's "Respondent Information" page and "Complainant Information" pages that equate complainants to "survivors" focus on helping "survivors"; (g) TCU and its CARE program's mentality of "believe the woman," "believe survivors" and "never blame the victim"; (h) Panelist Reece Harty's biased tweets and involvement with CARE; (i) the Dean of Students' selection of TCU community panelists despite Section 1.19 of the Code; (j) TCU's lack of a voir-dire-like process; (k) TCU's failure to discipline Roe for lying about Allegation 2; and (l) TCU's use of the "preponderance of the evidence" standard in a quasi-criminal sexual assault case, as opposed to a higher standard (clear and convincing or beyond a reasonable doubt), favors an accuser. *See Plummer v. Univ. of Houston*, 860 F.3d 767, 782 (5th Cir. 2017) (Jones, J., dissenting) (opining that preponderance of the evidence standard in Title IX proceeding involving alleged sexual misconduct was fundamentally flawed).

Under the *Purdue* Standard, the foregoing evidence of gender bias further makes it plausible that the panel members, each of whom was a member of the "TCU community," chose to believe Roe because she is a woman and to disbelieve Doe because he is a man. *See Purdue*, 928 F.3d at 667-68 ("do the alleged facts, if true, raise a plausible inference that the university discriminated against John 'on the basis of sex?'"). In *Purdue*, the Court held that "John's"

allegations raise a plausible inference that he was denied an educational benefit on the basis of sex, and therefore, his Title IX claim should have made it past the pleading stage. *Id.* at 670. Similar to the "Believe Survivors" social media posts posted by TCU's CARE department (Exh. 29 (App. 317-327)), Purdue's CARE department posted on its Facebook page—and therefore "advertised to the campus community"— an article from the *Washington Post* titled, "Alcohol isn't the cause of sexual assault. Men are." *Id.* at 669-70. The *Purdue* Court found that post "strengthened" the plausibility that Purdue denied John an educational benefit on the basis of sex because it could be understood to blame men as a class for the problem of campus assault. *Id.* Likewise, TCU's references to <u>all</u> complainants as "survivors" and its express policy to "Believe Survivors" can be understood as deeming all men accused of sexual assault as <u>guilty</u> and all accusers as honest. *See* Exhs. 25-32 (App. 285-345). TCU's express gender-biased policies, taken together with the doubt as to the accuracy of the proceedings and the specific instances of gender bias expressed by Mr. Steidl, Ms. Ledbetter and Mr. Harty, creates a plausible inference that TCU denied Doe his education because he is a male.

Furthermore, and as mentioned above, TCU' s evidentiary rules are unclear at best and confusing and misleading at worst. Given this context, when given a chance to resolve this ambiguity equitably, Judge Ruvolo, instead of giving the accused the benefit of the doubt, ruled that Doe's relevant evidence was untimely, more prejudicial than probative and not "new." Exh. 20, Deliberative Report (App. 253). When a female makes a claim that someone raped her but admits in a text that it was not rape, the exclusion of that text on the grounds that it was more prejudicial than probative leads one to believe that the judge is biased in favor of the female's claim. One cannot imagine a more relevant piece of evidence than a text message in which the

complainant admits that what she was complaining about was not the case. For someone acting on TCU's behalf to exclude that evidence under any theory is direct evidence of gender bias.

**II.        Doe is Likely to Succeed on the Merits of His Breach of Contract Claim.**

Upon enrolling at TCU, Doe entered into a contract with TCU comprised of the policies and procedures promulgated by TCU as applicable to all students in exchange for tuition. These policies included, without limitation, the Policy, the Code and the Bill of Rights. *See* Exh. 4, Code (App. 23-58); Exh. 5, Bill of Rights (App. 59-60). TCU's policies promised Doe specific, enforceable rights. TCU breached each of the express promises that are embodied in its policies and contracts with Doe. Doe has been irreparably harmed by Roe's allegations against him and the subsequent investigation, hearing, and suspension from TCU. He has suffered reputational harm and emotional distress, his freedom has been restricted and he will suffer diminished income and career opportunities as a result of his suspension for which Defendants are liable.

**III.       Without Injunctive Relief, Does Will Suffer Irreparable Injury**

Doe is asking for a preliminary injunction to avoid irreparable injuries that would otherwise accrue during the pendency of the litigation. "'An injury is 'irreparable' only if it cannot be undone through monetary remedies.'" *City of Meridian, Miss. v. Algernon Blair, Inc.*, 721 F.2d 525, 529 (5th Cir. 1983) (quoting *Deerfield Medical Center v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981); Delayed admission or enrollment at a university can likewise cause irreparable injury. *See Fisher v. Tex.*, 556 F. Supp. 2d 603 (W.D. Tex. 2008) (noting that a "delay in obtaining school admission can constitute irreparable injury" and "[d]elayed admission to a university can cause irreparable injury when the person harmed has no comparable opportunities elsewhere"); *see also Doe v. Univ. of Connecticut*, No. 3:20CV92 (MPS), 2020 WL 406356, at *2 (D. Conn. Jan. 23, 2020) (granting Temporary Restraining Order against university and allowing student to

20

enroll and register for classes after being suspended for sexual misconduct under university's Title IX process).

Doe has approximately one-month left to finish the Spring 2022 semester, and final exams are quickly approaching. Doe is likely to suffer irreparable harm by losing credit for coursework he has completed prior to his mid-semester suspension and having to repeat the semester if the suspension continues. The delay in Doe's education does not merely threaten lost wages. It also threatens to fundamentally change the opportunities he has to begin his career. Doe will not receive the same offers from companies, the same interview opportunities or the same career connections if he either is required to delay the completion of his degree at TCU or if he is required to obtain his degree from another institution. Because TCU will not issue a letter of good standing, Doe will likewise encounter issues enrolling at other universities, like SMU. *See Univ. of Connecticut*, No. 3:20CV92 (MPS), 2020 WL 406356, at * 2 (stating, "[f]or a college student poised to graduate in a few months, it is highly likely that a two-year suspension and a sanction for sexual assault would indeed 'forever change[ ]' the trajectory of his education and career.").

In addition to preserving his educational status, Doe has an interest in preserving his reputational status. By suspending Doe and ordering him to therapy and counseling and to complete online Title IX training, TCU has effectively (and wrongfully) labeled Doe as a sex offender. Although Doe's reputation has already suffered as a result of Roe's false allegations, allowing Doe to continue his education at TCU, without suspension, will help preserve what little of his reputation that he has left. To the contrary, TCU suffers no injury by being required to maintain the status quo during the pendency of the litigation. Doe's enrollment at TCU is the status quo.

IV.     **Doe's Injury Outweighs any Potential Harm to TCU**

In contrast to direct and immediate harm to Doe, neither TCU nor Roe will suffer any harm. Whether the threatened injury outweighs potential harm to the non-movant is a fact question that requires the court to balance the interests of the opposing parties. *Valley v. Rapides Parish School Bd.*, 118 F.3d 1047, 1056 (5th Cir. 1997).

TCU has never claimed or asserted that it has been harmed by Doe—the only allegations of "harm" are those false allegations asserted by Roe. However, Roe did not complain about the Allegations for over a year after Allegation 1. For most of this time, including after they ended their relationship at the end of 2020, Doe and Roe coexisted on campus without incident and continued to interact with each other. Neither Roe nor Doe are in any of the same classes, and a "No-Contact Order" remains in place preventing Roe and Doe from interacting with each other. Therefore, Doe's injury in the suspension of his education outweighs any potential harm to TCU.

V.      **Granting the Injunctive Relief Will Serve the Public Interest**

Public interest favors granting Doe's requested injunctive relief. Public interest favors universities being held to account for unlawfully disciplining students and protecting students' procedural due process right where allegations of quasi-criminal sexual misconduct arise. *See Plummer v. Univ. of Houston*, 860 F.3d 767, 779 (5th Cir. 2017) (Jones, J., dissenting); *see also Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S. Ct. 893, 902, 47 L. Ed. 2d 18 (1976) ("The 'right to be heard before being condemned to suffer grievous loss of any kind, even though it may not involve the stigma and hardships of a criminal conviction, is a principle basic to our society.'").

<u>REQUEST TO WAIVE BOND</u>

Because there is no risk of monetary loss to TCU resulting from an injunction, Doe requests that the Court waive the requirement that Doe post a security bond under Fed. R. Civ. P. 65 (c). *See Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir.1996) (holding that a court, in the

proper exercise of its discretion, "may elect to require no security at all" in an appropriate case); *Gordon v. City of Houston, Tex.*, 79 F. Supp. 3d 676, 695 (S.D. Tex. 2015), ("Because there is no risk of monetary loss to the defendants as a result of this preliminary injunction, and because defendants have not responded to Gordon's request that the bond be waived, Gordon's request that the bond be waived will be granted.").

<u>**P**RAYER FOR **R**ELIEF</u>

Doe respectfully prays that the Court preserve the status quo by allowing him to continue attending classes and continue his education at TCU. For the reasons stated above, the Court should grant the Motion and enter an order restraining Defendants from suspending Doe from TCU.

Respectfully submitted:

*/s/ Brian Roark*
Brian Roark
State Bar No. 00794536
brian@brianroark.com
BOTSFORD & ROARK
1307 West Avenue
Austin, Texas 78701
Telephone: (512) 476 – 1900
Fax: (512) 479 – 8040
(***admission for pro hac vice pending***)

*/s/ Bryan D. Bruner*
Bryan D. Bruner
State Bar No. 03252475
bbruner@bjplaw.com
Lynne B. Frank
State Bar No. 24087215
Lfrank@bjplaw.com
BRUNER & BRUNER, P.C.
3700 W. 7th Street
Fort Worth, Texas 76107
Telephone: (817) 332-6633
Facsimile: (817) 332-6619

23

*/s/ H. Dustin Fillmore, III*
H. Dustin Fillmore, III
State Bar No. 06996010
dusty@fillmorefirm.com
THE FILLMORE LAW FIRM, L.L.P.
201 Main Street, Suite 801
Fort Worth, Texas 76102
Telephone: (817) 332-2351
Facsimile: (817) 870-1859
**ATTORNEYS FOR JOHN DOE**

### CERTIFICATE OF SERVICE

The undersigned certifies that on April 12, 2022, a true and correct copy of the foregoing document was served on Defendants by emailing the document to Defendants' general counsel, Lee Tyner, at LEE.TYNER@tcu.edu.

*/s/ Brian Roark*

24