UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOHN DOE,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | Civil Action No. 4:22-CV-00297 |
| | § | |
| **TEXAS CHRISTIAN UNIVERSITY and** | § | |
| **VICTOR J. BOSCHINI, JR., in his official** | § | |
| **capacity,** | § | |
| | § | |
| *Defendants.* | § | |

**DEFENDANTS' RESPONSE AND BRIEF IN OPPOSITION TO
PLAINTIFF'S EMERGENCY MOTION FOR TEMPORARY
<u>RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>**

Defendants Texas Christian University ("TCU" or the "University") and Victor J.

Boschini, Jr., ask this Court to deny Plaintiff John Doe's request for a temporary restraining order

and preliminary injunction—extraordinary remedies reserved for exceptional cases in limited

circumstances.  For the reasons discussed in detail below, this is clearly not such a case.

## TABLE OF CONTENTS

I.  INTRODUCTION ........................................................................................................... 1

II.  FACTUAL BACKGROUND ......................................................................................... 2

III.  ARGUMENT & AUTHORITIES ................................................................................. 6

   A.  Temporary Restraining Orders and Preliminary Injunctions are Disfavored, Extraordinary Remedies. ................................................................................................................. 6

   B.  Plaintiff has Failed to Plead and is Unable to Show Substantial Likelihood of Success on the Merits. .................................................................................................................... 7

      1.  Plaintiff's Title IX "Erroneous Outcome" Claim is Meritless. ..................................... 8

      2.  Plaintiff's Breach of Contract Claim is Likewise Meritless. ...................................... 15

   C.  Plaintiff Cannot Show Irreparable Injury. ....................................................................... 16

   D.  Granting Injunctive Relief Would Harm the University, Roe, and Potentially Other Students and Would Be Contrary to the Public Interest. ......................................................... 19

IV.  CONCLUSION ............................................................................................................. 20

# TABLE OF AUTHORITIES

Cases

*Austin v. Univ. of Oregon*,
   205 F. Supp. 3d 1214 (D. Or. 2016) ................................................................. 14

*Bluefield Water Ass'n, Inc. v. City of Starkville, Miss.*,
   577 F.3d 250 (5th Cir. 2009) ........................................................................... 18

*Byrum v. Landreth*,
   566 F.3d 442 (5th Cir. 2009) ............................................................................. 7

*Caiola v. Saddlemire*,
   2013 WL 1310002 (D. Conn. 2013) ................................................................ 17

*Cannon v. Univ. of Chi.*,
   441 U.S. 677 (1979) ........................................................................................... 8

*Carter v. Heard*,
   593 F.2d 10 (5th Cir. 1979) ............................................................................. 16

*Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*,
   526 U.S. 629, (1999) .......................................................................................... 8

*Doe 2 by & through Doe 1 v. Fairfax Cty. Sch. Bd.*,
   384 F. Supp. 3d 598 (E.D. Va. 2019) ............................................................... 9

*Doe v. Cummins*,
   662 F. App'x 437 (6th Cir. 2016) .................................................................... 14

*Doe v. Louisiana State University*,
   2020 WL 4193473 (M.D. La. 2020) .......................................................... 17, 19

*Doe v. Texas A&M University*,
   2021 WL 257059 (S.D. Tex. 2021) ............................................................ 17, 19

*Doe v. Univ. of Connecticut*,
   2020 WL 406356 (D. Conn. 2020) .................................................................. 18

*Doe v. Univ. of Denver*,
   952 F.3d 1182 (10th Cir. 2020) ....................................................................... 14

*Doe v. Univ. of St. Thomas*,
   240 F. Supp. 3d 984 (D. Minn. 2017) ............................................................. 15

*Exhibitors Poster Exchange, Inc. v. National Screen Service Corp.*,
   441 F.2d 560 (5th Cir. 1971) ............................................................................. 6

*Fisher v. Texas*,
   556 F. Supp. 2d 603 (W.D. Tex. 2008) ........................................................... 18

*Haight v. State*,
   103 S.W.3d 498 (Tex. App.—San Antonio 2003) .......................................... 10

*Haley v. Va. Commonwealth Univ.*,
   948 F. Supp. 573 (E.D. Va. 1996) ................................................................... 14

*Hodges v. Bd. of Supervisors of Louisiana State Univ. & Agric. & Mech. Coll.*,
   2020 WL 5017665 (E.D. La. 2020) ................................................................. 17

*Janvey v. Alguire*,
   647 F.3d 585 (5th Cir. 2011) ........................................................................... 16

*Jones v. Tex. Dep't of Criminal Justice*,
  880 F.3d 756 (5th Cir. 2018) ............................................................ 7
*Justin Inds., Inc. v. Choctaw Secs., L.P.*,
  920 F.2d 262 (5th Cir. 1990) ........................................................... 16
*King v. DePauw Univ.*,
  2014 WL 4197507 (S.D. Ind. 2014) ................................................ 14
*Klocke v. Univ. of Tex. at Arlington*,
  938 F.3d 204 (5th Cir. 2019) ............................................................ 9
*Lake Charles Diesel Inc., v. Gen. Motors Corp.*,
  328 F.3d 192 (5th Cir. 2003) ........................................................... 19
*Martinez v. Mathews*,
  544 F.2d 1233 (5th Cir. 1976) .......................................................... 7
*Mountain Med. Equip., Inc. v. Healthdyne, Inc.*,
  582 F. Supp. 846 (D. Colo. 1984) .................................................... 18
*Pacheco v. St. Mary's Univ.*,
  2017 WL 2670758 (W.D. Tex. 2017) ................................................ 9
*Pham v. Univ. of Louisiana at Monroe*,
  194 F. Supp.3d 534 (W.D. La. 2016) ............................................... 18
*Planned Parenthood Ass'n of Hidalgo Cty. Tex., Inc. v. Suehs*,
  692 F.3d 343 (5th Cir. 2012) ............................................................ 7
*Plummer v. Univ. of,*
  *Hous.*, 860 F.3d 767 (5th Cir. 2017) .............................................. 8, 9
*Roark v. Individuals of Fed. Bur. of Prisons, Former and Current*,
  558 F. App'x. 471 (5th Cir. 2014) .................................................... 7
*Schrier v. Univ. of Colo.*,
  427 F.3d 1253 (10th Cir. 2005) ........................................................ 7
*Southwell v. Univ. of Incarnate Word*,
  974 S.W.2d 351 (Tex. App.—San Antonio 1998, pet. denied) .......... 16
*Tom Doherty Associates Inc. v. Saban Entm't Inc.*,
  60 F.3d 27 (2d Cir. 1995) ................................................................. 7
*USAA Texas Lloyds Co. v. Menchaca*,
  545 S.W.3d 479 (Tex. 2018) ........................................................... 16
*Wood v. Strickland*,
  420 U.S. 308 (1975) ......................................................................... 8
*Yusuf v. Vassar Coll.*,
  35 F.3d 709 (2d Cir. 1994) ............................................................ 8, 9
*Z.J. v. Vanderbilt Univ.*,
  355 F. Supp. 3d 646 (M.D. Tenn. 2018) .......................................... 13

Statutes

20 U.S.C. § 1681(a) ............................................................................ 8
Tex. Educ. Code § 51.287 ................................................................. 15

Regulations

34 C.F.R. § 106.30 ................................................................................................................ 2

85 Fed. Reg. 30026-01 ........................................................................................................ 4

## I.      INTRODUCTION

No issue in the field of higher education law has generated more regulatory activity and litigation over the last decade than institutional Title IX obligations when one student accuses another student of sexual misconduct.  When such a report is made, colleges and universities have obligations to both the student reporting the sexual misconduct and the student accused of sexual misconduct (as well as an obligation to the broader campus community).  Suffice it to say that following an institutional adjudication of a report of sexual misconduct, it has become increasingly common for the student who obtains an unfavorable result—and there is always at least one—to initiate litigation challenging the University's handling of the matter.  Indeed, a plethora of lawsuits have been filed across the country by students like Plaintiff who were disciplined for violating institutional sexual misconduct policies.  As detailed below, Plaintiff's lawsuit is perhaps the weakest in this line of cases.

Specifically, TCU student Jane Roe made two allegations of sexual misconduct against Plaintiff.  Roe's reports were handled pursuant to institutional policies that prohibit sexual misconduct.  Following an investigation and multi-day hearing chaired by a former judge, Plaintiff was found responsible for engaging in prohibited sexual misconduct for one of the allegations and not responsible for the other.  The one responsibility finding against Plaintiff was largely based on Plaintiff's own contemporaneous written statements (or as Plaintiff repeatedly refers to them, his "putative 'admissions'"), which included the following: "it was difficult for me hearing that i am a rapist again but it is true and i am very sorry for the pain that that has caused you."

Defendants intend to file a Motion to Dismiss Plaintiff's lawsuit pursuant to Federal Rule of Civil Procedure 12(b)(6) because Plaintiff has failed to adequately plead a cause of action under Title IX or for breach of contract.  Instead, his lawsuit is merely a baseless invitation for this Court

to intervene and second-guess a lengthy internal student disciplinary decision of a private university.  It is bereft of meaningful allegations of sex discrimination, deviations from institutional policy, or even a plausible argument that the University "got it wrong" when it found Plaintiff responsible for one of the incidents reported by Roe.

Even if Plaintiff had stated a claim that could survive a motion to dismiss (and he has not), he clearly fails to meet the higher burden to justify the extraordinary relief he requests of this Court, *i.e.*, to force the University to overturn its disciplinary decision and immediately return Plaintiff to the University community (with Roe) despite an exhaustive investigation, hearing, and appeal process that ended with an institutional determination that Plaintiff violated the University's code of conduct.  As explained below, indeed, Plaintiff cannot satisfy even one of the four elements necessary to warrant injunctive relief.  For these reasons, Plaintiff's request must be denied.

## II.        FACTUAL BACKGROUND

The facts regarding this matter are straightforward.  On October 4, 2021, TCU student Jane Roe submitted a "formal complaint"[1] to TCU's Office of Institutional Equity ("OIE") that she was sexually assaulted by Plaintiff on two occasions during the Fall 2020 semester.[2]  Her report implicated the University's Interim Code of Student Conduct[3] and TCU's Policy on Prohibited Discrimination, Harassment, Sexual Misconduct, and Retaliation (the "Policy").[4]  According to the Interim Code of Student Conduct, "[r]eports alleging violations of the University's [Policy] . . . shall be directed to the Office of Institutional Equity for an initial inquiry, the implementation of any appropriate interim measures, and when appropriate, an investigation, as provided in the

---

[1]  A "formal complaint" is a term of art under recently promulgated Title IX regulations that refers to a document filed by a complainant or signed by the Title IX Coordinator alleging sexual harassment against a respondent and requesting that the recipient investigate the allegation of sexual harassment.  *See* 34 C.F.R. § 106.30.
[2]  *See* Dkt. No. 15, Ex. 12 (App. 127).
[3]  *Id.*, Ex. 4 (App. 23).
[4]  *Id.*, Ex. 3 (App. 13).

University's Responding to Reports of Prohibited Discrimination, Harassment, Sexual Misconduct, and Retaliation Policy (Policy 1.009)."[5]

Here, TCU's Office of Institutional Equity ("OIE") conducted an investigation, and both Jane Roe and Plaintiff were afforded an opportunity to provide the University with relevant evidence during that investigation. In addition to being interviewed, Roe provided the OIE investigator with text messages and Snapchat messages, including messages where Plaintiff apologized to Roe and admitted to being "a rapist."[6]

While Plaintiff provided a written statement to the OIE investigator,[7] Plaintiff's former counsel instructed him "not to answer any questions . . . " during his OIE interview.[8] Other than the written statement, Plaintiff initially did not provide any other information or evidence to OIE, including, not surprisingly, his incriminating text messages.[9]

A preliminary report regarding the investigation was provided to both Roe and Plaintiff on November 12, 2021.[10] At this time, Plaintiff was given access to the text messages and Snapchat messages submitted by Roe in an electronic content management system called "the TCU Box." Both Roe and Plaintiff were afforded an opportunity to respond and to provide additional evidentiary materials. On November 30, 2021, the only response Plaintiff submitted was a one-page letter from his former lawyer[11] and polygraph examination results.[12]

---

[5] *Id.*, Ex. 4 (App. 39).
[6] *Id.*, Ex. 15 (App. 147).
[7] *Id.*, Ex. 13 (App. 131).
[8] *Id.*
[9] *Id.* at App. 132.
[10] *Id.* at App. 131.
[11] *Id.*, Ex. 14 (App. 135).
[12] *Id.* at App. 136.

One week later, the OIE investigator prepared and submitted a Final Investigative Report.[13] Under the Policy, completion of the Final Investigative Report marked the conclusion of the investigation.[14]  Prior to the January 28–29, 2022 hearing, both Roe and Plaintiff were afforded the opportunity to comment on the Final Investigation Report.  Plaintiff's response was submitted four days before the Title IX Hearing and included a significant number of exhibits, including text messages and photos that were being introduced for the first time.[15]

Not surprisingly, the University establishes deadlines on when new information can be included for consideration at a hearing, and the University's Policy only allows new evidence to be submitted if that evidence was not available at the time of the investigation.  *See* Dkt. No. 15, Ex. 4 (App. 49) ("Any new evidence, which a party would like admitted to the hearing, that was not included in the investigation by the Office of Institutional Equity, will be considered by the panel chair at the beginning of the Title IX Conduct Panel hearing.  Only evidence that was not available at the time of the investigation will be eligible for admission.").[16]

A Title IX Hearing Panel (the "Panel") was appointed by the Dean of Students' Office, and a hearing was held over two days (the "Hearing").  The Panel included Clark Hall Director, Reece

---

[13]  *Id.*, Ex. 16 (App. 166).
[14]  *Id.*, Ex. 33 (App. 351).
[15]  *Id.*, Ex. 18 (App. 174).
[16]  The 2020 Title IX Rule's preamble addresses this issue:

> The Department appreciates commenters' concerns that based on experience holding hearings, a hearing model was abandoned by particular recipients in favor of an investigatory model, but ***the Department disagrees that properly conducted hearings will become a springboard to introduce new evidence*** . . . .  The Department reiterates that recipients may adopt rules to govern a Title IX grievance process in addition to those required under § 106.45, so long as such rules apply equally to both parties.  Thus, ***recipients may decide whether or how to place limits on evidence*** introduced at a hearing that was not gathered and presented prior to the hearing, and rules controlling the conduct of participants to ensure that questioning is done in a respectful manner.

Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30026-01, at 30357 (emphasis added).

Harty; College of Science and Engineering Faculty, Dr. Clark Jones; and Director of Student Affairs Business and Operations, Laura Shaw.[17]   The University brought in an outside former judge, The Honorable Ignazio J. Ruvolo, to serve as the Panel Chair and preside over the Hearing.[18]

As to Roe's Allegation 1, which involved an alleged sexual assault in Roe's room in Colby Hall, Plaintiff was found responsible.[19]   As the Deliberative Report makes plain, critical to the Panel's finding were Plaintiff's very own contemporaneous messages where he admitted to sexual misconduct in violation of the Policy:

> Roe:
> **"I never said yes once that whole time and how many times did you do it**
> **"I realize I don't push u off but I said no loudly and I never once said yes"**
>
> Plaintiff replied:
> "i'm so sorry [Roe]
> **"i feel really bad about how i behaved and i'm really really sorry"**
>
> Roe responded:
> **"I mean self control? Like rapists say the same thing"**
>
> * * *
>
> Plaintiff:
> "Okay well thank you for looking out for me"
>
> Roe:
> "What do u mean"
>
> Plaintiff replied:
> "by telling me that
> "it's to

---

[17] *See* Dkt. No. 15, Ex. 20 (App. 247).
[18] *Id.*  Assistant Dean of Students, Jessica Ledbetter, Ed.D., J.D., and Assistant Dean of Students, Jeremy Steidl, were also present for the Hearing, but did not participate in any questioning or decision-making.
[19] *Id.* at App. 248.

> **"I'm sorry for responding at first the way I did and**
> **"i did because it was difficult for me hearing that i**
> **"am a rapist again but it is true and i am very sorry**
> **"for the pain that that has caused you"**[20]

As to Allegation 2, involving an alleged sexual assault in Austin, the Panel was faced with a case with less evidence and ultimately did not find Plaintiff responsible for this second allegation.[21]

Following the Panel's finding that sexual misconduct occurred in Roe's room in Colby Hall, Plaintiff was suspended, effective immediately, and is eligible to reenroll in classes for the 2023 Maymester but will remain suspended until then.[22]

Following the Hearing and the Panel's decisions, Plaintiff was given another opportunity to dispute the findings through an institutional appeal process.[23]  After thoughtful consideration of the appeal, Associate Vice Chancellor for Student Affairs, Michael Russel, Ed.D., upheld the Panel's decisions and recorded his findings and reasoning in writing.[24]

## III.        ARGUMENT & AUTHORITIES

### A.    Temporary Restraining Orders and Preliminary Injunctions are Disfavored, Extraordinary Remedies.

A temporary restraining order ("TRO") and preliminary injunction are extraordinary remedies designed to preserve the status quo and prevent irreparable harm until the respective rights of the parties can be ascertained during a trial on the merits.  *See Exhibitors Poster Exchange, Inc. v. National Screen Service Corp.*, 441 F.2d 560, 561 (5th Cir. 1971).  Notably, though, Plaintiff does not seek to preserve the status quo via TRO or injunction here—instead,

---

[20] *Id.* at App. 250.
[21] *Id.* at App. 248.
[22] *Id.*
[23] *Id.* at App. 254.
[24] *Id.*, Ex. 23 (App. 277).

Plaintiff asks this Court to upset the status quo and compel TCU to vacate Plaintiff's suspension and immediately return him to campus.

As the Court is well aware, to prevail on this extraordinary request, Plaintiff must clearly satisfy all four of the following elements: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest. *Jones v. Tex. Dep't of Criminal Justice*, 880 F.3d 756, 759 (5th Cir. 2018) (per curiam) (quoting *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009)); *see also Planned Parenthood Ass'n of Hidalgo Cty. Tex., Inc. v. Suehs*, 692 F.3d 343, 348 (5th Cir. 2012).

Additionally, where, as here, Plaintiff seeks to **alter the status quo** as opposed to preserve it, Fifth Circuit precedent is clear that a preliminary injunction "is particularly disfavored" and "should not be issued unless the facts and law clearly favor the moving party." *Roark v. Individuals of Fed. Bur. of Prisons, Former and Current*, 558 F. App'x. 471, 472 (5th Cir. 2014) (quoting *Martinez v. Mathews* 544 F.2d 1233, 1243 (5th Cir. 1976)).[25]   As discussed below, Plaintiff does not even state a viable cause of action, much less satisfy the heightened standard for injunctive relief.

## B.    Plaintiff has Failed to Plead and is Unable to Show Substantial Likelihood of Success on the Merits.

As stated above, Defendants intend to file a Motion to Dismiss Plaintiff's lawsuit because it is clear that Plaintiff has failed to adequately plead a violation of Title IX or a breach of contract claim.   Plaintiff's brief appears to be geared more to defending this forthcoming Rule 12(b)(6)

---

[25] *See also Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258–59 (10th Cir. 2005); *Tom Doherty Associates Inc. v. Saban Entm't Inc.*, 60 F.3d 27, 34 (2d Cir. 1995).

motion than clearly demonstrating the "substantial likelihood of success on the merits" required to justify injunctive relief. Indeed, as discussed below, Plaintiff's briefing is bereft of meaningful arguments that he has even stated a viable claim, much less that he is substantially likely to prevail.

### 1.    _Plaintiff's Title IX "Erroneous Outcome" Claim is Meritless._

Title IX is straightforward legislation that prohibits intentional sex discrimination in education programs and activities that receive federal financial assistance.[26] The law's text does not contain an explicit right of action; however, the Supreme Court held over 40 years ago that it is "enforceable through an implied private right of action." _Cannon v. Univ. of Chi._, 441 U.S. 677, 690–93 (1979). As the Supreme Court also repeatedly made plain, though, Title IX is not a vehicle for courts to merely "second-guess the disciplinary decisions made by school administrators." _Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ._, 526 U.S. 629, 648, (1999). "It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking in wisdom or compassion." _Plummer v. Univ. of Hous._, 860 F.3d 767, 772 (5th Cir. 2017) (quoting _Wood v. Strickland_, 420 U.S. 308, 326 (1975)).

In _Yusuf v. Vassar Coll._, 35 F.3d 709, 715 (2d Cir. 1994), the Second Circuit identified two doctrinal tests to identify sex-based bias in the context of university student discipline. In what has come to be called the "erroneous outcome" category, the plaintiff must show that he "was innocent and wrongly found to have committed the offense." _Id_. The other category, "selective enforcement," requires a plaintiff to prove that "regardless of [his] guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender."

---

[26] 20 U.S.C. § 1681(a).

*Id.*; *see also Plummer*, 860 F.3d at 777–78 (resolving the case by reference to the *Yusuf* framework); *Klocke v. Univ. of Tex. at Arlington*, 938 F.3d 204, 210 (5th Cir. 2019) (same).[27]

For purposes of his request for injunctive relief, Plaintiff relies on the "erroneous outcome" theory; however, Plaintiff cannot succeed in obtaining injunctive relief because he fails to adequately plead (much less clearly establish a likelihood of prevailing on) the two key elements of an erroneous outcome claim: (1) "particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding"[28] and (2) "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Yusuf*, 35 F.3d at 715.

Because a Title IX claim must be tied to intentional discrimination "on the basis of sex," Plaintiff must demonstrate a "causal connection between the flawed outcome and gender bias." *Klocke*, 938 F.3d at 210. To satisfy this element, a plaintiff must do more than merely rely on "a conclusory allegation of gender discrimination . . . ." *Yusuf*, 35 F.3d at 715. "Such evidence includes 'particular evidentiary weaknesses behind the finding such as motive to lie on the part of complainant or witnesses, particularized strengths of the defense,' 'procedural flaws,' or 'statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Pacheco v. St. Mary's Univ.*, 2017 WL 2670758, at *15 (W.D. Tex. 2017).

---

[27] As the Seventh Circuit has observed, though, there may be "no need to superimpose doctrinal tests on the statute" as "these categories simply describe ways in which a plaintiff might show that sex was a motivating factor in a university's decision to discipline a student." *Doe v. Purdue Univ.*, 928 F. 3d 652, 667–668 (7th Cir. 2019). Rather, "[w]e prefer to ask the question more directly: do the alleged facts, if true, raise a plausible inference that the university discriminated against [the plaintiff] 'on the basis of sex'?" *Id.*

[28] "The first element [of the erroneous outcome inquiry] can be satisfied by (1) pointing to procedural flaws in the investigatory and adjudicative process, (2) identifying inconsistencies or errors in the findings, or (3) challenging the overall sufficiency and reliability of the evidence." *Doe 2 by & through Doe 1 v. Fairfax Cty. Sch. Bd.*, 384 F. Supp. 3d 598, 607 (E.D. Va. 2019), *aff'd*, 832 F. App'x 802 (4th Cir. 2020).

Plaintiff has none of this evidence.  For starters, this is the remarkable case where the University's determination that Plaintiff engaged in sexual misconduct was based on Plaintiff's **own contemporaneous "putative 'admissions'"**[29] to Roe where he admitted to sexual misconduct in violation of the Policy.  *See, e.g.,* Dkt. No. 15, Ex. 15 (App. 147) ("it was difficult for me hearing that i am a rapist again ***but it is true*** and i am very sorry for the pain that that has caused you.") (emphasis added).  While Plaintiff has understandably tried to explain away his own written admission that "i am a rapist" (*i.e.*, he volunteered via text that he was a rapist because Roe "was fragile, insecure, unpredictable and immature"), any rational decisionmaker was free to credit Plaintiff's own cotemporaneous written statements in finding against him.  Put simply, it is difficult to cast articulable doubt on the accuracy of an outcome that relies on your own written admissions, and Plaintiff has fallen well short in this regard.

Faced with the remarkable challenge of casting doubt on the accuracy of a proceeding that relied on his own admission that he engaged in Policy-violating misconduct, Plaintiff obfuscates by citing purported procedural flaws, which were, in fact, not flaws at all.  Plaintiff first contends that the two allegations against him should not have been consolidated in the Hearing because, according to the criminal cases he cites (which are not relevant to a student disciplinary proceeding), there was a "risk that the jury will label the defendant as a bad person who deserves punishment because of the other offenses he or she has committed . . . ."[30]  This argument is incomprehensible because the Panel ***found in favor of Plaintiff*** for one of the two allegations, despite the consolidation.  In any event, consideration of the two incidents during the same student-

---

[29]  Plaintiff refers to his contemporaneous texts and Snapchat messages as "putative" and puts quotation marks around the word "admissions" throughout his briefing in an apparent attempt to excuse or call into question his statements. But lawyerly adjectives and quotations marks do not change the fact that Plaintiff was clearly (and repeatedly) apologizing to Roe and admitting to being "a rapist" in those messages.

[30]  *See* Dkt. No. 7 at 20 (quoting *Haight v. State*, 103 S.W.3d 498, 505 (Tex. App.—San Antonio 2003), *rev'd on other grounds*, 137 S.W.3d 48 (Tex. Crim. App. 2004)).

conduct hearing was both allowed under the Policy and wise given they involved the same parties, similar allegations, and shared a corpus of background information about the history of Plaintiff and Roe's relationship (ironically, a point underscored by Plaintiff's own briefing here).[31]

Plaintiff's chief complaint throughout his briefing is the Panel's exclusion of his late-submitted evidence, which he also considers a "procedural flaw[] affecting the proof."[32]  This evidence included a text message where Roe stated, "I don't think it's rape."[33]  For starters, it is worth noting that these allegedly "exculpatory" text messages would have not affected the outcome in the first instance—whether Roe "thought" Plaintiff digitally penetrating her vagina without her consent was "rape" has no bearing on whether Plaintiff's conduct was actually a violation of TCU's Policy.  Also, it should not be lost on this Court that these claimed "exculpatory" text messages occurred *prior to* Plaintiff's Snapchat messages admitting, "i am a rapist," Dkt. No. 15, Ex. 15 (App. 147)—perhaps shedding light on why Plaintiff's former counsel did not submit these text messages in the first instance.

In any event, in assessing the admission of this evidence at the hearing, TCU followed its process as outlined in the Policy.  To that end, both students were given multiple opportunities to submit evidence in support of their respective positions.  Plaintiff had an attorney present with him at all stages of OIE's initial investigation.  In that process, Plaintiff provided a written statement to the OIE investigator but refused, at his counsel's instruction, to answer any interview questions. He also refused to provide the text messages he now protests were unfairly excluded from the hearing in this matter.

---

[31] *See* Dkt. No. 15, Ex. 3 (App. 14).
[32] *See* Dkt. No. 7 at 14–22.
[33] *Id.* at 18.

Additionally, Plaintiff and his counsel were given OIE's preliminary report and provided access to text messages and Snapchat messages submitted by Roe (containing his own admissions). At that point, he was again provided with an opportunity to respond and submit his own evidence. Plaintiff's former counsel responded to the preliminary report on behalf of Plaintiff with a one-page letter, which included polygraph examination results, but again, no text messages. In short, Plaintiff had ample opportunity to submit the text messages in question during the investigation phase of this case but chose not to (whether by his own choice or following the advice of counsel).

The Panel Chair's decision to exclude the evidence (submitted for the first time four days before the scheduled hearing) was consistent with TCU's Policy that only allows new evidence that was not available at the time of the investigation. Further, this policy of only allowing new evidence that was unavailable during the investigation was equally applied to Roe—a fact tellingly left out of Plaintiff's briefing.[34]

Again, TCU followed its Policy at all relevant times. There is nothing on the face of the Policy or that process that is inherently discriminatory. Both parties were similarly informed and had access to evidentiary material during the investigation. Both parties received guidance regarding the investigation and hearing process. Plaintiff was represented by counsel throughout the process. Witnesses of both genders were interviewed. The Deliberative Report clearly reveals that the Panel considered credibility challenges for both Roe and Plaintiff and explained why it ultimately found Roe less credible for one allegation and Plaintiff less credible for the other, for reasons entirely unrelated to gender.[35] The rationales for the Panel's decisions show absolutely no sign of discrimination against Plaintiff because he is a male. Plaintiff may be displeased with

---

[34] *See* Dkt. No. 15, Ex. 20 (App. 249–53).
[35] *Id.* at App. 249.

the outcome of the hearing and corresponding sanction, but it does not change the fact that TCU followed its process without "procedural flaws."

Even if Plaintiff clearly demonstrated that the University reached the wrong result—and he has not—he has failed entirely to clearly demonstrate that he was found responsible ***because of his sex***.  Plaintiff has neither pleaded nor referred to any pattern of decision-making tending to show the influence of gender.  While he generally alleges that the University "chose to believe Roe because she is a woman,"[36] he does not show "any statistics, patterns, or anecdotal evidence" regarding gender bias in decision-making.  *See Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646, 682–83 (M.D. Tenn. 2018) (holding that a "single case of an individual who is subjectively displeased with the result of a disciplinary proceeding . . . cannot constitute a 'pattern of decision-making' that makes plausible an erroneous outcome claim.").

Indeed, and remarkably, the outcome in Plaintiff's own hearing undercuts Plaintiff's very argument.  Plaintiff's contention that the University "chose to believe Roe because she is a woman and to disbelieve Doe because he is a man" is impossible to square with the fact acknowledged by Plaintiff that the more serious allegation of sexual misconduct brought against Plaintiff was resolved ***in favor of Plaintiff***.  In other words, assuming the University had a policy of "believe the woman," it was a policy not followed in Plaintiff's very own case.  Of course, the University does not have such a policy, and Plaintiff's only conclusory evidence in support of this position— a social media post posted by TCU's CARE department (which played no role in the investigation or hearing of this matter)—completely and unequivocally contradicts his assertion.  *See* Dkt. No. 15, Ex. 29 (App. 323) ("MALE, FEMALE, or NON-BINARY, We believe you.").

---

[36] *See* Dkt. No. 7 at 23.

At most, Plaintiff seems to suggest an "institutional bias" in favor of "all complainants" and a practice of deeming "all accusers as honest."[37]  Setting aside the critical fact that this did not happen in Plaintiff's own case, it is worth noting that courts have routinely rejected this exact theory in erroneous-outcome cases, holding that alleged bias against people accused of sexual misconduct is not tantamount to bias on the basis of sex.  *See, e.g.*, *Austin v. Univ. of Oregon*, 205 F. Supp. 3d 1214, 1225 (D. Or. 2016), *aff'd*, 925 F.3d 1133 (9th Cir. 2019) (merely alleging that the University is biased against "alleged perpetrators" "does not implicate gender discrimination simply because those alleged perpetrators are typically male" because "survivors and perpetrators alike may be male or female.").[38]

Plaintiff also fails to show that a member of the disciplinary tribunal harbored such a bias or made discriminatory statements.  To that end, Plaintiff takes issue with Jeremy Steidl's statement to Plaintiff that Plaintiff could not enroll for the Spring 2022 while the investigation was pending and statement to Plaintiff's friend about signing a no-contact order, and chalks these up to "gender bias during the Title IX proceeding."[39]  Plaintiff also cites Jessica Ledbetter's discussion of the case with a Panelist prior to the Hearing as evidencing gender bias, without asserting that any inappropriate communication about the case occurred nor any indication that Ledbetter influenced the Panelist.[40]  Obviously fatal to Plaintiff's arguments is the fact that neither Steidl nor Ledbetter were part of the Hearing Panel and neither participated in the decision-making.

---

[37]  *See* Dkt. No. 7 at 24.
[38]  *See Doe v. Cummins*, 662 F. App'x 437, 453 (6th Cir. 2016) ("a disciplinary system that is biased in favor of alleged victims and against those accused of misconduct . . . does not equate to gender bias because sexual-assault victims can be both male and female."); *King v. DePauw Univ.*, 2014 WL 4197507, at *10 (S.D. Ind. 2014) ("is not responsible for the gender makeup of those who are accused by other students of sexual misconduct."); *Doe v. Univ. of Denver*, 952 F.3d 1182, 1196 (10th Cir. 2020) (collecting cases holding that "evidence of a school's anti-respondent bias does not create a reasonable inference of anti-male bias."); *Haley v. Va. Commonwealth Univ.*, 948 F. Supp. 573, 579 (E.D. Va. 1996) (stating that "a bias against people accused of sexual harassment and in favor of victims . . . indicate[s] nothing about gender discrimination").
[39]  *See* Dkt. No. 7 at 12.
[40]  *Id.* at 13.

Plaintiff also cites the fact that TCU refused to provide him a transcript prior to adjudication of the reports against him as evidence of bias.  Such a policy, however, is specifically required by Texas state law.  *See* Tex. Educ. Code § 51.287.

As a seemingly last-ditch effort, Plaintiff points to one Panelist's political retweets—all from 2018—that read, "Elect more women," that discuss legislation that will require companies "to have at least one woman on their board of directors," and that discuss abortions—in an attempt to show the Panelist exhibited gender bias in the Title IX Hearing.  This assertion is absurd. Plaintiff has failed to allege that the tweets were even the Panelist's own statements (they were retweets of other Twitter accounts), much less that, over two years later, the Panelist was compelled to reach the finding he reached because he believed we should "Elect more women."

Notably, courts across the country have dismissed comparable Title IX claims asserting only speculative and conclusory allegations of sex discrimination in student disciplinary proceedings.  *See, e.g.*, *Doe v. Univ. of St. Thomas*, 240 F. Supp. 3d 984, 990–93 (D. Minn. 2017) (collecting cases dismissing Title IX claims).  If Plaintiff's claims cannot even withstand minimum federal pleading standards, they certainly cannot demonstrate the "substantial likelihood of success on the merits" standard for a TRO or injunction.

Once again, Plaintiff's burden is not to show that his claim is plausible:  He also must show that he is substantially likely to succeed on the merits.  He has done neither.

2.    *Plaintiff's Breach of Contract Claim is Likewise Meritless.*

Plaintiff claims that "[u]pon enrolling at TCU, [Plaintiff] entered into a contract with TCU comprised of the policies and procedures promulgated by TCU as applicable to all students in exchange for tuition."  *See* Dkt. No. 7 at 20.  Under Texas law, a plaintiff asserting a breach-of-contract claim must prove: (1) the existence of a valid contract; (2) that the plaintiff performed or

tendered performance; (3) that the defendant breached the contract; and (4) that the plaintiff was damaged as a result of the breach. *Southwell v. Univ. of Incarnate Word*, 974 S.W.2d 351, 354–55 (Tex. App.—San Antonio 1998, pet. denied); *USAA Texas Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n.21 (Tex. 2018).

Plaintiff appears to be claiming that the Policy created a valid contract between Plaintiff and TCU and that TCU breached that contract.  Defendants are not aware of any Texas case holding that the promulgation of a solitary university policy, as opposed to comprehensive student bulletins or handbooks, creates a contract.  Even assuming the Policy did create a contract between Plaintiff and TCU, though, TCU followed the Policy and there is no breach.

Put simply, not only has Plaintiff failed entirely to demonstrate a "substantial likelihood" of succeeding on his claims, but both of Plaintiff's claims are due to be dismissed for failure to state a claim.

## C.    Plaintiff Cannot Show Irreparable Injury.

A plaintiff seeking a TRO or preliminary injunction must show that irreparable injury will occur during the pendency of the litigation unless a TRO or preliminary injunction issues. *Justin Inds., Inc. v. Choctaw Secs., L.P.*, 920 F.2d 262, 268 (5th Cir. 1990).  A harm is irreparable where there is no adequate remedy at law, such as monetary damages. *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011).  A showing of a speculative injury is not sufficient—there must be more than an unfounded fear. *Id*. (*citing Carter v. Heard*, 593 F.2d 10, 12 (5th Cir. 1979)).

Despite Plaintiff's assertions that "[d]elayed admission or enrollment at a university," coupled with the possibility that Plaintiff may "encounter issues enrolling at other universities" would "threaten[] to fundamentally change the opportunities he has to begin his career" and "can

constitute irreparable injury,"[41] the Fifth Circuit has never recognized irreparable harm under such circumstances. *See generally Doe v. Louisiana State University*, 2020 WL 4193473, at *7 (M.D. La. 2020). And courts across the country addressing the issue have rejected this proposition as speculative. *See, e.g.*, *Doe v. Texas A&M University*, 2021 WL 257059, at *7–8 (S.D. Tex. 2021) (rejecting Plaintiff's request for preliminary injunction in Title IX case and holding that ability to graduate on a particular timeframe and potential harm to "future educational and employment practice" are speculative and insufficient to meet the irreparable harm element of an injunction claim); *see also id.* at *8 n.1 (collecting numerous cases in federal courts across the country rejecting nearly identical claims for injunctive relief).

Notably, as the court explained in *Doe v. A&M*, should Plaintiff ultimately prevail in this suit, any alleged injuries are "compensable with monetary damages." *See id.* at *7 ("Many courts have found that similar harms are compensable in damages.") (citing *Hodges v. Bd. of Supervisors of Louisiana State Univ. & Agric. & Mech. Coll.*, 2020 WL 5017665, at *4 (E.D. La. 2020) ("Numerous courts have reached the same conclusion in . . . cases involving delayed education and potential reputational damage, finding that the delay was compensable and the reputational damage was compensable and/or speculative."); *Caiola v. Saddlemire*, 2013 WL 1310002, at *2 (D. Conn. 2013) (rejecting the plaintiff's claim that stigma of expulsion could interfere with his career as "speculative" and noting that "[i]n order to demonstrate that he will suffer irreparable injury, plaintiff must show that a monetary award will not adequately compensate him for his injuries")). Ultimately, while Plaintiff "will likely suffer educational delay and resulting harm while this case is adjudicated on the merits, [] that harm is compensable in damages," and,

---

[41] *See* Dkt. No. 7 at 25-26.

therefore, Plaintiff has failed to show that he will suffer an irreparable injury warranting a TRO or preliminary injunction.[42]  *See id.* at *8.

The court's decision in *Pham v. Univ. of Louisiana at Monroe*[43] is also instructive here.  In *Pham*, an expelled pharmacy student brought a lawsuit against his university for the failure to comply with due process before his expulsion.  *Pham*, 194 F.Supp.3d at 548.  He also requested a preliminary injunction.  Like Plaintiff's case here, the district court found that since plaintiff had already been expelled at the time he filed his suit, there was "no threat of irreparable injury or reason to preserve the status quo because the status quo is not what is desired" and "[t]his weighs against granting a preliminary injunction."  *Id.* at 548 (citing *Mountain Med. Equip., Inc. v. Healthdyne, Inc.*, 582 F. Supp. 846, 848 (D. Colo. 1984)) ("Harm that has already occurred cannot be remedied by an injunction."); *see also Bluefield Water Ass'n, Inc. v. City of Starkville, Miss.*, 577 F.3d 250, 253 (5th Cir. 2009) ("We have cautioned repeatedly that a preliminary injunction is

---

[42]  Plaintiff's reliance on *Fisher v. Texas*, 556 F. Supp. 2d 603 (W.D. Tex. 2008) and *Doe v. Univ. of Connecticut*, 2020 WL 406356 (D. Conn. 2020) in support of his position that "[d]elayed admission or enrollment at a university," coupled with the possibility that Plaintiff may "encounter issues enrolling at other universities" would "threaten[] to fundamentally change the opportunities he has to begin his career" and "can constitute irreparable injury"  is misplaced.  In *Fisher*, the court found that the plaintiffs failed to establish a substantial threat of irreparable injury.  *Fisher*, 556 F. Supp. 2d at 609–10.  While the court noted that "[d]epending on the circumstances, a delay in obtaining school admission can constitute irreparable injury," the court differentiated between school admission to a "public grade school," which it held can cause irreparable injury because "every child is required by law to attend grade school until a certain age," and school admission to a university.  *Id.*  The court held that "[t]he interests involved in attending a university differ more significantly from the interests involved in attending a grade school" because "[m]any people never attend college," and found that "the Plaintiffs have failed to establish a substantial threat of irreparable injury."  *Id.* at 610.

Neither does *Univ. of Connecticut* support Plaintiff's proposition.  In that case, the Connecticut federal district court found that the plaintiff would suffer irreparable harm because, following his two-year suspension, he would have to "apply for readmission," his "readmission to the University [was] not guaranteed," and his reacceptance into the business school was "at the discretion of the [business] school."  *Univ. of Connecticut*, 2020 WL 406356 at *2.  Further, the university would "not accept credits earned at another institution during a period of suspension."  *Id.*  Here, Plaintiff is eligible to reenroll in classes for the 2023 Maymester without having to be readmitted or reaccepted to the University.  *See* Dkt. No. 15, Ex. 20, Deliberative Report (App. 248).  This is not the kind of irreparable harm contemplated by the court in *Univ. of Connecticut*, where the possibility of plaintiff "not [being] permitted to enroll" after his suspension was clearly at issue.

[43]  *Pham v. Univ. of Louisiana at Monroe*, 194 F. Supp.3d 534 (W.D. La. 2016), *aff'd sub nom. Dung Quoc Pham v. Blaylock*, 712 F. App'x 360 (5th Cir. 2017).

an extraordinary remedy which should not be granted unless the party seeking it has 'clearly carried the burden of persuasion' on all four requirements.") (quoting *Lake Charles Diesel Inc., v. Gen. Motors Corp.*, 328 F.3d 192, 195–96 (5th Cir. 2003)).

**D.      Granting Injunctive Relief Would Harm the University, Roe, and Potentially Other Students and Would Be Contrary to the Public Interest.**

Any alleged harm that Plaintiff may suffer because of denial of his Motion not only fails to be irreparable, but "does not outweigh the harm to the University and the public interest that would result from undermining the result" of TCU's disciplinary proceedings. *Doe v. A&M*, 2021 WL 257059, at \*8. TCU is a private, selective institution that has crafted rules it expects all its community members to comply with, as well as processes for the University to utilize when assessing whether those rules have been violated. In large measure, these conduct standards are reflective of community and institutional values—however, with respect to sexual misconduct, they are also obviously reflective of legitimate concerns regarding the safety of the University community. This latter concern is especially significant in Texas as has been memorialized in various state laws that identify effectively dealing with campus sexual misconduct as a public policy priority for universities in the state. *See* Tex. Edu. Code §§ 51.251–.260 ("Reporting Incidents of Sexual Harassment, Sexual Assault, Dating Violence, and Stalking"); 51.281–.295 ("Sexual Harassment, Sexual Assault, Dating Violence, and Stalking"); *c.f. Doe v. Louisiana State Univ.*, 2020 WL 4193473, at \*5 ("[T]he University has a strong interest in the educational process, including maintaining a safe learning environment for all its students, while preserving its limited resources.") (internal citations omitted).

Here, compelling the University to immediately return a student it determined engaged in serious sexual misconduct in violation of the University's conduct rules would undermine the University's right to police its own community, potentially endanger the safety of other students

on campus, and would run afoul of the spirit of Texas legislative efforts to curb campus sexual violence.  The balance of interests thus weighs in favor of denial of Plaintiff's Motion.

## IV.   CONCLUSION

Boiled down to essentials, all Plaintiff is inviting this Court to do is second guess the decisions of TCU that Plaintiff violated TCU's conduct rules.  For all the reasons stated above, the Court should decline this invitation and deny Plaintiff's Motion.

Dated:  April 18, 2022                    Respectfully submitted,

**HUSCH BLACKWELL LLP**

By: */s/ Scott D. Schneider*
    Scott D. Schneider, *pro hac vice*
    Texas Bar No. 24054023
    scott.schneider@huschblackwell.com
    Samuel P. Rajaratnam, *pro hac vice*
    Texas Bar No. 24116935
    sammy.rajaratnam@huschblackwell.com
    Caidi Davis, *pro hac vice*
    Texas Bar No. 24121557
    caidi.davis@huschblackwell.com

111 Congress Avenue, Suite 1400
Austin, Texas 78701
(512) 472-5456
(512) 479-1101 (fax)

    Alex E. Brakefield
    Texas Bar No. 24105523
    alex.brakefield@huschblackwell.com

1900 N. Pearl Street, Suite 1800
Dallas, Texas 75201
(214) 999-6173
(214) 999-6170 (fax)

**ATTORNEYS FOR DEFENDANTS**

## <u>CERTIFICATE OF SERVICE</u>

      I certify that this document was served on the below-listed counsel of record via the Court's CM/ECF electronic filing system in accordance with the Federal Rules of Civil Procedure on April 18, 2022.

Brian Roark
brian@brianroark.com
BOTSFORD & ROARK
1307 West Avenue
Austin, Texas 78701
Telephone: (512) 476 – 1900
Fax: (512) 479 – 8040

Bryan D. Bruner
bbruner@bjplaw.com
Lynne B. Frank
State Bar No. 24087215
Lfrank@bjplaw.com
BRUNER & BRUNER, P.C.
3700 W. 7th Street
Fort Worth, Texas 76107
Telephone: (817) 332-6633
Facsimile: (817) 332-6619

H. Dustin Fillmore, III
dusty@fillmorefirm.com
THE FILLMORE LAW FIRM, L.L.P.
201 Main Street, Suite 801
Fort Worth, Texas 76102
Telephone: (817) 332-2351

                                         */s/ Samuel P. Rajaratnam*
                                         Samuel P. Rajaratnam