## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOHN DOE,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:22-cv-00297-O** |
| | § | |
| **TEXAS CHRISTIAN UNIVERSITY &** | § | |
| **VICTOR J. BOSCHINI, JR.,** | § | |
| | § | |
| **Defendants.** | § | |

### OPINION & ORDER ON PRELIMINARY INJUNCTION

Before the Court are Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (ECF Nos. 6–7), filed April 12, 2022; Defendants' Response (ECF No. 26), filed April 18, 2022; Plaintiff's Reply (ECF No. 27), filed April 19, 2022; and Plaintiff's Motion to Amend the Motion for Temporary Restraining Order (ECF No. 22), April 15, 2022. On April 26, 2022, the Court held an evidentiary hearing and oral argument on the motions. Having considered the motions, arguments, and evidence, the Court **GRANTS** the Motion to Amend (ECF No. 22) and **GRANTS** the motion for Temporary Restraining Order (ECF No. 6).

### I.        BACKGROUND

John Doe is a student at Texas Christian University ("TCU"). Doe and another TCU student, Jane Roe, dated in high school. At TCU, they maintained an on-and-off romantic and sexual relationship. Some time after their relationship ended, Roe filed a complaint with TCU accusing Doe of sexually assaulting her on two separate occasions. The complaint proceeded to an investigation and a hearing, in which a Title IX panel found in favor of Roe on one allegation and in favor of Doe on the other. The panel immediately suspended Doe until May 2023. Doe claims that the panel improperly suspended him simply because he is a man. He filed this lawsuit against

TCU and Victor J. Boschini, Jr., the Chancellor of TCU, alleging violations of Title IX and breach of contract. The same day, he moved for a preliminary injunction to lift TCU's suspension.

### A.  The Allegations

The first incident occurred in August 2020 when Doe visited Roe in her dorm room. Their stories conflict. Roe alleges that Doe digitally penetrated her vagina without her consent.[1] She says she repeatedly said "no" and told him to stop, but Doe forcefully persisted.[2] Doe disputes her version of the events. According to Doe, she began grinding on him in a manner that led him to believe they were going to have sex.[3] He began to move his hand down her pants toward her vagina, but Roe told him to stop.[4] Doe says that he immediately removed his hand and never touched her vagina.[5]

The two exchanged text messages shortly after the incident. Doe apologized, saying he knew they "weren't going to hook up," and that he "just [has] no self control."[6] Roe responded, "I never said yes once that whole time and how many times did u do it — I realize I don't push u off but I said no loudly and I never once said yes."[7] Doe continued to apologize and said he felt "really badly about how [he] behaved."[8] Roe said that "rapists say the same thing," to which Doe responded, "[O]h my god — i'm one of those aren't i."[9] Roe replied, "I don't think it's rape," and said she is "very used to [him] doing that."[10] Doe continued to offer apologies, and they eventually moved on from the issue.[11]

---

[1] Hearing Exs. at 140, ECF No. 37.
[2] *Id.*
[3] *Id.* at 3.
[4] *Id.*
[5] *Id.*
[6] *Id.* at 79, 81.
[7] Hearing Exs. at 82, ECF No. 37.
[8] *Id.*
[9] *Id.*
[10] *Id.* at 83.
[11] *Id.* at 83–85.

The second incident occurred in October 2020 in Austin, Texas. The two had traveled separately to Austin for a football game, though neither attended the game.[12] That night, Roe had been frightened by a nightmare about being raped, and she called Doe, who responded immediately.[13] Doe picked her up from her hotel and brought her back to the apartment where he was staying.[14] Their stories diverge about what happened at the apartment. According to Roe, she repeatedly rebuffed Doe's sexual advances while trying to sleep.[15] Doe, on the other hand, says that they had consensual sex and he drove Roe back to her hotel in the morning.[16]

The two continued to see each other over the next few months. They exchanged photos and messages, and they had consensual sex at least once more.[17] Doe also continued to apologize for his behavior. On one occasion, Doe said in a message to Roe, "[I]t was difficult for me hearing that i am a rapist again but it is true and i am very sorry."[18] Doe began dating someone else in January 2021, and he and Roe stopped seeing each other.[19]

### B. Title IX Process

About a year later, in October 2021, Roe filed a formal complaint with TCU's Office of Institutional Equity.[20] The complaint alleged sexual misconduct and named John Doe as the respondent.[21] After conducting interviews, TCU issued a preliminary investigative report noting that Roe "refused to provide detailed answers to questions poser in her interview."[22] Doe and Roe

---

[12] *Id.* at 252.
[13] Hearing Exs. at 252, ECF No. 37.
[14] *Id.*
[15] *Id.* at 252–53.
[16] *Id.* at 4.
[17] *Id.*
[18] *Id.* at 147, 250.
[19] Hearing Exs. at 5, ECF No. 37.
[20] *Id.* at 127–29.
[21] *Id.*
[22] *Id.* at 133.

submitted responses and addenda to the report.[23] Roe's response contained a more detailed statement and included text messages, photos, and emails as exhibits.[24] Doe's response requested that the complaint be dismissed because of Roe's failure to provide details supporting the allegations.[25] It included results from a polygraph examination but no other evidence.[26] TCU then issued a final investigative report, to which the parties submitted timely final responses,[27] and TCU scheduled a hearing.[28]

Judge Ignazio J. Ruvolo, a retired California state judge, presided over the hearing as the panel chair.[29] The panel itself was comprised of three members of the TCU community: Reece Harty, Clark Jones, and Laura Shaw. Assistant Deans Jessica Ledbetter and Jeremy Steidl served as co-procedural chairs throughout the hearing.[30] Before the hearing began, Judge Ruvolo excluded several large batches of evidence, including text messages and photos exchanged between Doe and Roe after the incidents.[31] Notably, Judge Ruvolo excluded a message Roe sent to Doe after the first incident in which Roe said, "I don't think it's rape."[32] He also excluded a message Roe sent after the second incident in which she told Doe, "I want to fuck you."[33] Judge Ruvolo said he excluded the additional texts and photos because (1) "they were not shown to be unavailable at the time of the investigation," and (2) their "relevance . . . was more prejudicial than

---

[23] *Id.* at 135–64.
[24] *Id.* at 140–64.
[25] Hearing Exs. at 135, ECF No. 37.
[26] *Id.* at 135–38.
[27] *Id.* at 175–244.
[28] *Id.* at 166–69.
[29] *Id.* at 247.
[30] *Id.* at 248.
[31] Hearing Exs. at 253–54, ECF No. 37
[32] *Id.* at 83.
[33] *Id.* at 4.

probative of a material fact."[34] Judge Ruvolo admitted some texts and evidence, but he excluded nearly all of the evidence offered by Doe.

The panel concluded that Doe violated TCU's sexual-harassment policy regarding the first allegation, but not the second. As to the first allegation, the panel gave weight to the texts immediately following the encounter in which Doe apologized and admitted to being a "rapist."[35] The panel also credited texts Doe had sent one of Roe's friends in which he confessed to being a "bad person" who had made "irredeemable mistakes."[36] Relying on these messages, the panel concluded that Doe "would not have made these statements and his profuse apologies" if he had not sexually assaulted Roe.[37]

As to the second allegation, the panel first determined that it lacked Title IX jurisdiction because the incident occurred off campus in Austin.[38] Because the incident still fell within TCU's student-conduct policy, however, they addressed the allegation.[39] On this count, the panel found that Doe had not violated the policy. The panel gave weight to the fact that during the car ride back to Fort Worth, Roe had said nothing about the sexual encounter to her friend.[40] The panel also found important that the couple continued to communicate and have sex with each other for several months after the incident.[41] The panel determined that it could not conclude by a preponderance of the evidence that Doe sexually assaulted Roe in Austin.[42]

---

[34] *Id.* at 253.
[35] *Id.* at 249–51.
[36] *Id.* at 251–52.
[37] Hearing Exs. at 252, ECF No. 37.
[38] *Id.* at 248.
[39] *Id.*
[40] *Id.* at 253.
[41] *Id.*
[42] *Id.*

In February 2022, Judge Ruvolo prepared a deliberative report detailing the panel's findings.[43] The panel members did not review the report.[44] The panel suspended Doe until May 2023, effective immediately.[45] The panel also ordered Doe to attend counseling and Title IX training, and it placed Doe on conduct probation for the rest of his time at TCU.[46] Doe appealed the panel's decision to the Vice Chancellor for Student Affairs, who issued a memo on April 1, 2022, upholding the panel's determination.[47] Doe has applied to different schools and been accepted to at least one.[48] But he remains unable to transfer while under suspension because TCU will not provide him a letter of good standing.[49]

On April 12, Doe sued TCU.[50] He asserts causes of action for violations of Title IX and for breach of contract.[51] The same day, Doe moved for a temporary restraining order and preliminary injunction.[52] The Court expedited briefing and held an evidentiary hearing on April 26, 2022. At the hearing, Ledbetter, Doe, Steidl, and Harty testified, and the Court heard argument on the motion, which is now ripe for determination.

## II.    LEGAL STANDARD

A preliminary injunction is an "extraordinary remedy" and will be granted only if the movant carries his burden on all four requirements. *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008). The Court should issue a preliminary injunction or temporary restraining order only if the movant establishes (1) a substantial likelihood of success on the merits; (2) a substantial

---

[43] Hearing Exs. at 246–55, ECF No. 37.
[44] Hearing Transcript (Harty), at 9–10.
[45] Hearing Exs. at 248, ECF No. 37.
[46] *Id.*
[47] *Id.* at 256–75.
[48] *Id.* at 5.
[49] *Id.* at 5, 43, 52.
[50] Compl., ECF No. 1.
[51] *Id.* at 27–33.
[52] Pl.'s Mot., ECF No. 6.

threat of irreparable harm; (3) that the balance of hardships weighs in his favor; and (4) that the issuance of the preliminary injunction will not disserve the public interest. *Daniels Health Servs., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013); *see also* Fed. R. Civ. P. 65. "The decision to grant or deny a preliminary injunction is discretionary with the district court." *Miss. Power & Light Co. v. United Gas Pipe Line*, 760 F.2d 618, 621 (5th Cir. 1985). The movant must make a clear showing that the injunction is warranted, and the issuance of a preliminary injunction "is to be treated as the exception rather than the rule." *Id.*

### III.      ANALYSIS

#### A.  Likelihood of Success on the Merits

Title IX prohibits educational institutions that receive federal funding, such as TCU, from discriminating "on the basis of sex." 20 U.S.C. § 1681. Title IX is "enforceable through an implied private right of action." *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 281 (1998). The Supreme Court has "consistently interpreted Title IX's private cause of action broadly to encompass diverse forms of intentional sex discrimination." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 169 (2005). For example, "Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline." *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994). The Fifth Circuit has adopted the Second Circuit's framework, recognizing two categories of claims attacking a university disciplinary proceeding on grounds of gender bias. *Klocke v. Univ. of Tex. at Arlington*, 938 F.3d 204, 210 (5th Cir. 2019). The first category is an "erroneous outcome" claim, which alleges that "gender bias was a motivating factor behind the erroneous finding." *Yusuf*, 35 F.3d at 715. The second category is a "selective enforcement" claim, which alleges that "regardless of the student's guilt or innocence," the severity of the penalty or the decision to initiate proceedings "was affected by the student's gender." *Id.*

Doe relies on an erroneous-outcome theory in support of his motion. "A plaintiff alleging an erroneous outcome must point to 'particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding.'" *Klocke*, 938 F.3d at 210. "The plaintiff must also demonstrate a 'causal connection between the flawed outcome and gender bias.'" *Id.*

### 1. Doe has demonstrated articulable doubt as to the accuracy of the outcome of the disciplinary proceeding.

First, Doe must show that the Title IX panel reached an erroneous conclusion. To do so, he must provide evidence "on the record before the disciplinary tribunal" that casts "articulable doubt" on the panel's decision. *Id.* (cleaned up). For example, "a motive to lie on the part of a complainant or witnesses, or particularized strengths of the disciplined student's defense" may indicate an erroneous decision. *Id.* (cleaned up).

The panel's decision is illogical. The panel found that Doe violated school policy as to the first allegation, but not as to the second. But in forming that conclusion, the panel arbitrarily applied evidence to one allegation that was clearly applicable to both allegations. For example, the panel provided two reasons for acquitting Doe of allegation two: (1) soon after the incident in Austin, Roe did not tell her friend what had happened or ask for assistance; and (2) for some time after the incident, Roe and Doe continued to talk to and have sex with each other.[53] Both of those facts are also true of the first allegation. Roe did not immediately talk to her friend about the first incident, and she and Doe continued to talk to each other and have sex.[54] Harty, the only panel member to testify at the hearing, explained that the panel thought it unlikely that Roe would

---

[53] Hearing Exs. at 253, ECF No. 37.
[54] *Id.* at 4, 253.

continue to see Doe and have sex with him if he had in fact sexually assaulted her.[55] But to the extent that is true, it is *necessarily* true of both allegations.

The panel's reasoning as to the first allegation is similarly illogical. The panel provided two reasons for concluding that Doe violated school policy regarding the first allegation: (1) Doe admitted to being a rapist in text messages to Roe; and (2) Doe admitted to being a bad person in messages to Roe's friend.[56] Again, the messages on which the panel relied were sent after both incidents, but the panel arbitrarily applied them only to the first incident. Doe said in a message to Roe after the second incident, "[I]t was difficult for me hearing that i am a rapist again but it is true and i am very sorry."[57] The panel applied that message against Doe only as to the first allegation, even though it occurred—and references—the second incident.[58] Likewise, Doe's messages to Roe's friend in which he confessed to being a "bad person," were sent months after the second incident.[59] But the panel either disregarded or overlooked those obvious facts.

The panel did rely on messages Doe sent the day after the first incident in which he apologized and confessed to being a rapist.[60] Doe "would not have made these statements and his profuse apologies," the panel said, if he had not sexually assaulted Roe.[61] Doe made nearly identical statements and apologies after the second incident—indeed, some of the very messages that the panel relied on—yet the panel chose to apply those statements only to the first allegation. In short, the panel concluded that the evidence demonstrated that Doe violated TCU's sexual

---

[55] Hearing Transcript (Harty), at 14.
[56] Hearing Exs. at 252, ECF No. 37.
[57] *Id.* at 147, 250.
[58] *Id.* at 250–51.
[59] *Id.* at 251–52.
[60] *Id.* at 249–50.
[61] *Id.* at 252.

assault policy, and that the very same evidence demonstrated he did *not* violate TCU's sexual assault policy. Concluding that a thing is both true and not true is, by definition, erroneous.

The panel also disregarded Roe's motive to lie. For several months after the second incident, Roe and Doe continued seeing and having sex with each other.[62] Their volatile relationship ended sometime in December 2020, and Doe began dating another woman.[63] Thereafter, Roe sent Doe messages indicating her jealousy of Doe's new girlfriend.[64] The record also indicates that Roe and her friend targeted and harassed Doe's girlfriend throughout 2021.[65] On one occasion, Roe approached Doe's girlfriend and told her not to go home with Doe.[66] Roe filed her initial report after these events—over a year after the first incident occurred.[67] The panel's disregard of "a motive to lie on the part of a complainant or witnesses" is evidence of an erroneous outcome. *Klocke*, 938 F.3d at 210.

The panel also disregarded the strength of Doe's case. The preliminary investigative report found that Roe "declined the initial investigative interview" and in her follow-up interview "declined to give detailed information" about either allegation.[68] Roe's response to that report is full of contradictions and false statements. For example, Roe incorrectly stated that the first incident in the dorm room occurred after the second incident in Austin.[69] Roe also falsely stated

---

[62] Hearing Exs. at 4, ECF No. 37.
[63] *Id.* at 5.
[64] *Id.* at 94–95.
[65] *Id.* at 5.
[66] *Id.*
[67] *Id.* at 141. TCU's own policies state:

> Reports of misconduct in violation of this Code . . . should be submitted as soon as possible after the incident takes place and under most circumstances, should be submitted within one (1) calendar year. Failure to make a timely Report may hinder the University's ability to effectively investigate and take disciplinary action against the Responding Student.

*Id.* at 39.
[68] Hearing Exs. at 132, ECF No. 37.
[69] *Id.* at 140.

that when Doe asked to come to her dorm room the night of the first incident, she told him no.[70] The text messages reveal that Roe invited Doe over to "watch a show with [her]" and expressly told him to come over.[71] At the hearing, Roe also broadened her claim, saying that Doe had raped her "hundreds" or "over a thousand times," because, retrospectively, she often did not want to have sex when they did, though she did not express her reluctance to Doe.[72] Roe's dishonest and inconsistent statements severely undermine her case. *See Klocke*, 938 F.3d at 210; *Yusuf*, 35 F.3d at 715. But the panel's deliberative report does not discuss these weaknesses. Contrary to TCU's assertion, the report does not "clearly reveal[]" that the panel weighed the parties' credibility.[73] And if the panel did consider this evidence, that makes its decision more perplexing, not less.

Finally, Judge Ruvolo excluded a significant amount of exculpatory evidence offered by Doe. For example, Roe sent a message to Doe the day after the first incident saying, "I don't think it's rape."[74] The couple also took pictures together and had a long history of amicable messages before and after both incidents.[75] In December 2020, Roe sent Doe a message saying, "I want to fuck you."[76] Doe also submitted texts that contextualized his apologies and their disagreements.[77] Doe offered all of that evidence, but because Judge Ruvolo excluded it, the panel did not consider it.[78] The exclusion of "compelling exculpatory evidence" from the decisionmakers is further evidence of an erroneous decision. *Doe v. Marymount Univ.*, 297 F. Supp. 3d 573, 585 (E.D. Va. 2018). TCU argues that Judge Ruvolo excluded the evidence because it was untimely.[79] But that

---

[70] *Id.*
[71] *Id.* at 76.
[72] Hearing Transcript (Doe), at 100–01.
[73] Defs.' Resp. Br. 17, ECF No. 26.
[74] Hearing Exs. at 83, ECF No. 37.
[75] *Id.* at 118–19, 253.
[76] *Id.* at 4.
[77] *Id.* at 257–58.
[78] *Id.* at 254.
[79] Defs.' Resp. Br. 17, ECF No. 26.

argument proves too much: Judge Ruvolo's decision violated Title IX regulations, as explained in the following section. In sum, the record casts "articulable doubt on the accuracy of the outcome of the disciplinary proceeding." *Klocke*, 938 F.3d at 210 (citation omitted).

### 2. Doe has demonstrated a causal connection between the flawed outcome and gender bias.

Doe must next show that gender bias caused the panel's erroneous decision. Evidence of bias comes in many varieties. For example, "statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender" can all demonstrate gender bias. *Yusuf*, 35 F.3d at 715. In addition, several circuits have held that multiple "procedural irregularities," when combined with other indicia, may support a finding of gender bias. *Doe v. Regents of Univ. of Cal.*, 23 F.4th 930, 940 (9th Cir. 2022) (collecting cases). Procedural irregularities are particularly relevant when they consistently favor the complainant. *E.g.*, *id.* at 941. So too are procedural irregularities that violate Title IX regulations, which are "intended to effectuate Title IX's prohibition against sex discrimination." Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026, 30,026 (May 19, 2020) (to be codified at 34 C.F.R. pt. 106). Much of the "bias" evidence overlaps with the "error" evidence because "some allegations . . . may suffice both to cast doubt on the accuracy of the disciplinary adjudication and to relate the error to gender bias." *Yusuf*, 35 F.3d at 715.

The first indicator of bias is the irrationality of the panel's decision. The panel arbitrarily applied evidence to one allegation that was equally applicable to the other allegation. The most plausible explanation for the panel's decision is that the panel wanted to hold Doe responsible for *something*, regardless of what the evidence showed. That the panel did not even attempt to explain the inconsistencies in its decision only bolsters Doe's claim of bias. In addition, the panel's

deliberative report ignored evidence on the record of Roe's dishonest and inconsistent statements. The Sixth Circuit held in a similar case that "the failure of the hearing panel even to comment on the flat contradiction . . . provide[d] strong support for Doe's claim of bias." *Doe v. Oberlin Coll.*, 963 F.3d 580, 587 (6th Cir. 2020).

TCU responds that any irregularities did not prejudice Doe because the panel ultimately acquitted him of the more serious allegation.[80] Courts have rejected that argument. "[T]hat the [school] ultimately found Doe not responsible for twelve of the thirteen allegations made against him does not make the allegations of irregularities in the proceedings any less relevant." *Regents of Univ. of Cal.*, 23 F.4th at 941 (collecting cases). The panel's consistent missteps running "against the substantial weight of the evidence" are at least some indication of bias against Doe. *Doe v. Univ. of Ark. - Fayetteville*, 974 F.3d 858, 864 (8th Cir. 2020). "[A]t some point an accumulation of procedural irregularities all disfavoring a male respondent begins to look like a biased proceeding despite the [school's] protests otherwise." *Regents of Univ. of Cal.*, 23 F.4th at 941.

The second indicator of bias is TCU's exclusion of exculpatory evidence in violation of its own policies and Title IX regulations. Judge Ruvolo excluded nearly all the evidence offered by Doe.[81] The most significant piece of evidence he excluded was a text Roe sent to Doe the day after the first incident saying, "I don't think it's rape."[82] Judge Ruvolo offered two reasons for his decision: (1) the evidence was "not shown to be unavailable at the time of the investigation," and (2) "any relevance of the proffered evidence was more prejudicial than probative of a material fact."[83] As to the first reason, Doe's evidence was not untimely under TCU's policies. Even if it

---

[80] *Id.* at 18.
[81] Hearing Exs. at 253–54, ECF No. 37.
[82] *Id.* at 83.
[83] *Id.* at 253–54.

were, Title IX regulations require that Doe be permitted to present it. As to the second reason, TCU has been unable to explain how the "relevance" of a clearly exculpatory text message is "more prejudicial than probative of a material fact."[84]

TCU's policies work differently on paper than in practice. After a student files a sexual-assault complaint, TCU investigates the allegations and prepares a preliminary investigative report.[85] The parties have ten days to respond to that report.[86] The investigator considers the responses and then prepares a final investigative report.[87] The parties may continue to submit written responses to the final investigative report, and to the other party's responses, up to forty-eight hours before the hearing.[88] Just before the hearing begins, the panel chair considers "[a]ny evidentiary responses made . . . during the investigation," and makes "relevancy determinations" about any disputed evidence.[89] Doe followed this procedure. He and Roe submitted timely responses to the preliminary investigative report.[90] TCU issued a final investigative report on December 8, 2021.[91] Four days before the hearing, Doe submitted his response to the final investigative report containing nearly all of the evidence he intended to present at the hearing.[92] Roe submitted a similar response.[93] Those responses were timely under TCU's policies, and Judge Ruvolo was permitted to make only "relevancy determinations" about that evidence.

---

[84] *Id.*
[85] *Id.* at 43, 350–51.
[86] *Id.* at 351.
[87] Hearing Exs. at 351, ECF No. 37.
[88] *Id.* at 48.
[89] *Id.* at 49.
[90] *Id.* at 168–69.
[91] *Id.* at 247.
[92] *Id.* at 175–77.
[93] Hearing Exs. at 179–244, ECF No. 37.

TCU reads their policies differently. According to TCU, the final investigative report ends the "investigation."[94] After that, any "new evidence" that a party wants to present at the hearing is admissible only if it "was not available at the time of the investigation."[95] TCU provides no textual support for its interpretation that the final investigative report terminates the investigation.[96] Read more naturally, the investigation terminates after the parties have submitted their responses to the final investigative report. "New evidence" is thus evidence that a party seeks to admit for the first time at the hearing. The parties may submit responses "1) to the final Investigative Report or 2) to the other party's responses to the investigative materials and the preliminary Investigative Report" up to forty-eight hours before the hearing.[97] That rule would be meaningless—or at least severely restricted—if parties could respond to the final report and each other's responses only with "new evidence." Under TCU's interpretation, the parties would have ten days after the preliminary investigative report to gather and submit *all* evidence they wish to present at a hearing that will occur months later. The rest of the investigative process would seem to serve little purpose. TCU's interpretation is particularly troubling in this case because the preliminary investigative report stated that Roe "declined the initial investigative interview" and "refused to provide detailed answers" in her follow-up interview.[98] TCU's policies do not require a student to gather and submit all evidence in his defense within ten days of receiving unsubstantiated allegations. That TCU strenuously argued otherwise is even more troubling.

Title IX regulations support the Court's interpretation of TCU's policies. The Department of Education passed a final rule in August 2020 concerning institutions' responses to formal

---

[94] Defs.' Resp. Br. 8–9, ECF No. 26.
[95] Hearing Exs. at 49, ECF No. 37.
[96] Defs.' Resp. Br. 8–9, ECF No. 26.
[97] Hearing Exs. at 48, ECF No. 37.
[98] *Id.* at 132–33.

complaints of sexual harassment. *See* 34 C.F.R. § 106.45 (2021). In general, an institution's grievance process must "[r]equire an objective evaluation of all relevant evidence." *Id.* § 106.45(b)(1)(ii). And "[w]hen investigating a formal complaint and throughout the grievance process, a recipient must . . . [n]ot restrict the ability of either party to discuss the allegations under investigation or to gather and present relevant evidence." *Id.* § 106.45(b)(5)(iii). TCU does not contend that Doe's evidence was irrelevant, yet it undoubtedly restricted his ability to present that relevant, exculpatory evidence. TCU's argument that it may exclude evidence submitted after it has closed the "investigation" ignores the plain text of the regulation: "When investigating a formal complaint *and throughout the grievance process*," TCU must not "restrict the ability of either party to . . . gather and present relevant evidence." *Id.* (emphasis added).

The commentary to the regulations confirms that they require institutions to permit parties to present all relevant evidence submitted prior to the hearing. "Relevance is the standard that these final regulations require, and any evidentiary rules that a recipient chooses must respect this standard of relevance." Nondiscrimination on the Basis of Sex, 85 Fed. Reg. at 30,248. Judge Ruvolo excluded Doe's exculpatory evidence in part because it was prejudicial, but an institution "may not adopt a rule excluding relevant evidence because such relevant evidence may be unduly prejudicial." *Id.* Likewise, institutions may "place limits on evidence introduced at a hearing that was not gathered and presented prior to the hearing," but the regulations do not contemplate excluding evidence introduced prior to the hearing, as Judge Ruvolo did. *Id.* at 30,360. Doe was not attempting to *introduce* evidence at the hearing. He merely wished to present evidence that he had already introduced.

TCU policies, Title IX regulations, and Department of Education commentary all point in the same direction. TCU's indefensible decision to exclude nearly all of Doe's evidence—

including key exculpatory messages—severely prejudiced Doe's defense. And TCU cannot plausibly claim an innocent mistake, as Doe's counsel informed TCU of these regulatory violations prior to the hearing.[99] The exclusion of "compelling exculpatory evidence" from the decisionmakers is evidence of an erroneous decision. *Marymount Univ.*, 297 F. Supp. 3d at 585. Much more so, then, is the exclusion of such evidence in violation of federal law and a school's own policies. Title IX regulations exist "to effectuate Title IX's prohibition against sex discrimination." Nondiscrimination on the Basis of Sex, 85 Fed. Reg. at 30,026. Circumventing those regulations to Doe's detriment is solid evidence of gender discrimination.

The third indicator of bias is that TCU consolidated the two allegations into a single proceeding in violation of the Title IX regulations. The hearing panel concluded it lacked Title IX jurisdiction over the second allegation because the incident had occurred off campus.[100] The regulations permit institutions to "consolidate formal complaints as to allegations of sexual harassment against more than one respondent, or by more than one complainant against one or more respondents, or by one party against the other party, where the allegations of sexual harassment arise out of the same facts or circumstances." 34 C.F.R. § 106.45(b)(4). TCU suggests that the two incidents arise out of the same facts because Doe and Roe had been in a prior relationship and much of the evidence was applicable to both incidents.[101] But that is true of virtually all allegations by "one party against the other party." *Id.* The provision does not allow consolidation of *all* allegations between the same parties. The allegations must also "arise out of the same facts or circumstances." *Id.* TCU's interpretation renders that limitation redundant. The two incidents occurred over a month apart, in different cities, and they arise out of different facts

---

[99] *Id.* at 171–74.
[100] *Id.* at 248.
[101] Hearing Transcript (Harty), at 13.

and allegations. The panel lacked Title IX jurisdiction over the second allegation for those very reasons.

TCU also argues that, even if improper, consolidation was harmless because the panel acquitted Doe of the allegation that it had no Title IX jurisdiction to consider.[102] That argument ignores the other half of the panel's decision finding Doe liable for the first allegation. As already discussed, that the panel found in Doe's favor on one of two allegations "does not make the allegations of irregularities in the proceedings any less relevant." *Regents of Univ. of Cal.*, 23 F.4th at 941. Indeed, the panel's incomprehensible reasoning readily demonstrates the dangers of consolidating such allegations.

The fourth indicator of bias consists of statements by Ledbetter, the co-procedural chair of the hearing. "[S]tatements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender" may all indicate gender bias. *Yusuf*, 35 F.3d at 715. At the evidentiary hearing, Ledbetter testified about her recent doctoral dissertation entitled *Moral Identity, Implicit Theory, and Moral Behavior: Untangling the Web of Connected Characteristics in Student Conduct*. The Court admitted the dissertation into evidence.[103] Ledbetter conducted a study of TCU students "to understand the link between a student's moral mindset, moral identity, and subsequent moral decisions, particularly as they pertain to student perspectives about the code of conduct."[104] The study indicated that "[m]ale students tend to have lower moral identity internalization and symbolization," and that "being a male student significantly predicted lower moral behavior

---

[102] Defs.' Resp. Br. 15–16, ECF No. 26.
[103] Hearing Exs. at 381–608, ECF No. 37.
[104] *Id.* at 407.

intentionality and consciousness, as well as more negative code of conduct policy evaluations."[105] Standing alone, the results of the study are purely descriptive.

Ledbetter's normative commentary, however, says more. "Unfortunately," Ledbetter says, the results of the study are "unsurprising . . . given some of the available academic literature."[106] In explaining the results, Ledbetter wonders, "[C]ould it be that institutional messaging, both implicit and explicit, resonate [sic] more closely with female gender norms?"[107] Or, Ledbetter speculates, "It is possible that male students simply desire to fit in and be perceived as strong in stark contrast with the female norm of care and empathy, which could be viewed as weak."[108] To address the problem of male students' "lower moral internalization and symbolization," Ledbetter suggests that "male students need context to understand why their behavior is harmful to their peers and to their community."[109] She recommends "targeted programming" that is "informed by gender norms which dictate perceptions about what classifies as appropriate male behavior."[110] "This programming is needed regardless of the male student's moral learning disposition . . . ."[111]

Ledbetter's dissertation is evidence of gender bias. "Well-established Supreme Court precedent demonstrates that archaic assumptions [about gender] constitute intentional gender discrimination." *Pederson v. La. State Univ.*, 213 F.3d 858, 881 (5th Cir. 2000). TCU responds that any bias on the part of Ledbetter is irrelevant because she was not on the panel.[112] That argument is unpersuasive. Ledbetter played a significant role in the disciplinary process. She was

---

[105] *Id.* at 555.
[106] *Id.*
[107] *Id.* at 575.
[108] *Id.* at 556.
[109] Hearing Exs. at 565, ECF No. 37.
[110] *Id.* at 565–66.
[111] *Id.* at 565.
[112] Defs.' Resp. Br. 19–20, ECF No. 26.

a constant point of communication with the parties,[113] she made key procedural decisions,[114] and she was present at the hearing—including deliberations.[115] Ledbetter even testified that she wrote some of the very policies that Doe says led to the erroneous decision.[116] Courts have thus rejected similar arguments that only decision-maker bias can support a Title IX violation. *See, e.g.*, *Doe v. Columbia Univ.*, 831 F.3d 46, 58–59 (2d Cir. 2016). Rather, "statements by pertinent university officials" such as Ledbetter can demonstrate gender bias. *Yusuf*, 35 F.3d at 715. Moreover, even if Ledbetter were not associated with the process herself, her writing hypothesizes that the reason male students have "lower moral internalization" could be because TCU's "institutional messaging, both implicit and explicit," resonates "more closely with female gender norms."[117] In a nutshell: TCU's policies—according to those who make them—may be biased in favor of women.

Doe has shown that he is likely to succeed on the merits of his Title IX claim. He has provided "particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding" and has demonstrated a "causal connection between the flawed outcome and gender bias." *Klocke*, 938 F.3d at 210 (citation and internal quotation marks omitted). Given that Doe has shown a likelihood of success regarding his Title IX claim, the Court need not address the merits of his breach of contract claim.

### B.  Irreparable Harm

Doe must also show that he is likely to suffer irreparable harm if the Court does not grant the injunction. "In general, a harm is irreparable where there is no adequate remedy at law, such

---

[113] Hearing Exs. at 171–77, 274–75, 361–62, ECF No. 37.
[114] *Id.* at 364–66.
[115] Hearing Transcript (Ledbetter), at 76–77.
[116] *Id.* at 33.
[117] Hearing Exs. at 575, ECF No. 37.

as monetary damages." *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2011). The injury must be more than "speculative," that is, "there must be more than an unfounded fear on the part of the applicant." *Daniels Health Scis.*, 710 F.3d at 585 (citation and internal quotation marks omitted).

Doe argues that he will suffer irreparable harm in the form of lost economic opportunity and reputational damage.[118] If TCU does not lift Doe's suspension, he will be unable to take his exams, will not receive credit for his courses this semester, and will have to repeat the semester.[119] That delay will result, he says, in lost opportunities, interviews, and wages.[120] In addition, Doe argues that TCU's suspension and mandatory counseling effectively label Doe a sex offender.[121] The gap in his transcript will be visible to every employer and institution to which he applies.[122] Even if Doe ultimately prevails on the merits, when asked to explain the gap, "a truthful explanation would seriously hinder his prospects." *Doe v. Univ. of Conn.*, No. 3:20-cv-92, 2020 WL 406356, at *2 (D. Conn. Jan. 23, 2020).

Doe faces irreparable injury. Courts have granted preliminary injunctions in similar cases after finding irreparable injury would otherwise result:

> The Court finds it inevitable that he would be asked to explain either situation by future employers or graduate school admissions committees, which would require him to reveal that he was found guilty of sexual misconduct by DePauw. Successfully seeing this lawsuit to its conclusion could not erase the gap or the transfer; the question will still be raised, and any explanation is unlikely to fully erase the stigma associated with such a finding. Money damages would not provide an adequate remedy at that point; DePauw's disciplinary finding—even if determined to have been arbitrary or made in bad faith—would continue to affect him in a very concrete way, likely for years to come.

---

[118] Pl.'s Br. 26, ECF No. 7.
[119] Hearing Exs. at 274–75, ECF No. 37.
[120] Pl.'s Br. 26, ECF No. 7.
[121] *Id.*
[122] Pl.'s Reply Br. 9, ECF No. 27.

*King v. DePauw Univ.*, No. 2:14-cv-70, 2014 WL 4197507, at *13 (S.D. Ind. Aug. 22, 2014); *see also, e.g., Doe v. Univ. of Mich.*, 325 F. Supp. 3d 821, 829 (E.D. Mich. 2018) ("Money damages cannot compensate Plaintiff for the reputational harm he has already suffered and will continue to suffer as a consequence of sexual assault allegations."), *vacated and remanded sub nom. Doe v. Bd. of Regents of Univ. of Mich.*, No. 18-1870, 2019 WL 3501814 (6th Cir. Apr. 10, 2019); *Ritter v. State of Okla.*, No. CIV-16-0438, 2016 WL 2659620, at *3 (W.D. Okla. May 6, 2016) ("The loss of educational and career opportunities he will encounter if he is not reinstated and allowed to graduate is not readily compensable in money damages."); *Univ. of Conn.*, 2020 WL 406356, at *2 ("[I]t is highly likely that a two-year suspension and a sanction for sexual assault would indeed forever change the trajectory of [the student's] education and career," because "he would need to explain a gap on his résumé in future applications to schools or jobs." (cleaned up)).

TCU argues that Doe's alleged injuries are speculative. The Court disagrees. Even a favorable decision on the merits will not restore the gap in Doe's transcript. And as other courts have found, it is "highly likely" that Doe will be asked to explain that gap. *Id.* Doe has already suffered the consequences of the suspension. Because TCU will not issue a letter of good standing to a suspended student, Doe was—and remains—unable to transfer out of TCU.[123] Doe has demonstrated "more than an unfounded fear" that his reputation and life will be irreversibly damaged absent a stay. *Daniels Health Scis.*, 710 F.3d at 585 (citation and internal quotation marks omitted).

TCU also argues that Doe's injuries are compensable with monetary damages. But "the mere fact that economic damages may be available does not always mean that a remedy at law is 'adequate.'" *Janvey*, 647 F.3d at 600. Courts routinely find that reputational harm can constitute

---

[123] Hearing Exs. at 5, 43, 52, ECF No. 37.

irreparable injury. *See Daniels Health Scis.*, 710 F.3d at 585; *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1056 (5th Cir. 1997) (holding that absent an injunction the plaintiff would suffer "such severe injury to her professional reputation that a monetary award would likely be inadequate and almost certainly speculative"). "Injury to reputation or goodwill is not easily measurable in monetary terms, and so often is viewed as irreparable." 11A Charles Alan Wright & Arthur R. Miller, Fed. Prac. and Proc. Civ. § 2948.1 (3d ed. 2022). Doe's injury absent an injunction is nearly impossible to measure, but nearly certain to occur. That makes a paradigmatic case for granting a preliminary injunction. Doe has thus shown that he is likely to suffer irreparable harm.

### C.  Balance of the Equities

The Court must next weigh the equities. TCU asserts an abstract interest in enforcing its policies. It also claims that forcing TCU to lift the suspension will "potentially endanger the safety of other students."[124] The Court disagrees. Allowing Doe to finish this semester "would not visit any substantial harm" on TCU or its students. *Valley*, 118 F.3d at 1056. After the two incidents occurred, Doe and Roe coexisted on campus without incident for over a year before Roe even filed her complaint with TCU. Classes are over, finals are approaching, and then summer begins. Moreover, TCU can mitigate any hardship to itself or Roe by instituting another "no-contact" order on Doe. The Court is also willing to expedite resolution of the merits at the convenience of the parties, potentially before the fall semester begins. Finally, the Court emphasizes that it is *not* ordering TCU to allow Doe back on campus, nor is it reversing other remedies ordered by TCU.[125] The Court tailors its Order to remedy the specific harm caused by not allowing Doe to finish his courses this semester. The balance of the equities weighs in Doe's favor.

---

[124] Defs.' Resp. Br. 24, ECF No. 26.
[125] Hearing Exs. at 248, ECF No. 37 (requiring Doe to attend therapy and complete Title IX training).

### D.  Public Interest

Finally, the Court "must decide whether the issuance of an injunction would undermine the public interest." *Id.* TCU is correct that the public has a strong interest in curbing campus sexual violence, as demonstrated by federal and state policy.[126] But the public also has a strong interest in ensuring due process for those accused of sexual assault, as well as holding institutions accountable for sex discrimination. *See* 34 C.F.R. § 106.45. The public interest thus neither favors nor disfavors a preliminary injunction in this case.

### E.  Status Quo

Before concluding, the Court must address another critical disagreement between the parties. TCU argues that preliminary injunctions are particularly disfavored where the moving party seeks to alter the status quo.[127] TCU cites *Roark v. Individuals of Federal Bureau of Prisons, Former & Current*, 558 F. App'x 471 (5th Cir. 2014), but the unpublished case does not support TCU's proposition. Nevertheless, the issue of defining the status quo is well-taken. "It is often loosely stated that the purpose of a preliminary injunction is to preserve the status quo." *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974). TCU argues that the status quo is Doe's status as a suspended student, and so the Court must favor preserving Doe's suspension.[128] But a more accurate description of the status quo is the "last uncontested status of parties." *Yeargin Const. Co. v. Parsons & Whittemore Ala. Mach. & Servs. Corp.*, 609 F.2d 829, 831 (5th Cir. 1980). At bottom, "[t]he purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the

---

[126] Defs.' Resp. Br. 24–45, ECF No. 26.
[127] *Id.* at 12.
[128] *Id.* at 11–12.

merits." *Canal Auth.*, 489 F.2d at 576. In this case, preserving the status quo requires lifting the suspension so that the Court may consider the merits with minimal harm to both parties.

**IV.        CONCLUSION**

"[C]ourts should refrain from second-guessing the disciplinary decisions made by school administrators." *Davis Next Friend LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648 (1999). That is particularly so when reviewing a school's decision dealing with two emotionally challenged students. But courts must step in when severely flawed proceedings discriminate "on the basis of sex." 20 U.S.C. § 1681. At this preliminary stage, the evidence demonstrates that TCU has discriminated against Doe because of his sex. Because Doe is facing irreparable harm from that discrimination and the equities tip in his favor, the Court issues this preliminary injunction.

Finally, Federal Rule of Civil Procedure 65(c) ordinarily requires the moving party to post a security "to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." But in appropriate cases "the court 'may elect to require no security at all.'" *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) (citation omitted). Doe requests that the Court waive the security requirement because TCU faces no risk of monetary loss from the injunction.[129] TCU does not object. The Court thus waives the security requirement of Rule 65(c).

Therefore, the Court **GRANTS** Plaintiff John Doe's Motion to Amend (ECF No. 22) and Motion for Temporary Restraining Order (ECF No. 6).

Accordingly, the Court **ORDERS** that, for the duration of this Temporary Restraining Order, TCU is **RESTRAINED** and **ENJOINED** from enforcing Plaintiff's suspension.

---

[129] Pl.'s Br. 27–28, ECF No. 7.

The Court further **ORDERS** that Defendants, their officers, agents, employees, attorneys, and any other persons who are in active concert or participation with them, are **ENJOINED** from prohibiting Plaintiff's attendance of classes or taking finals.

The Court further **ORDERS** that Defendants, their officers, agents, employees, attorneys, and any other persons who are in active concert or participation with them, are **ENJOINED** from refusing Plaintiff excused absences since April 8, 2022, resulting from Plaintiff's suspension.

**SO ORDERED** on this **29th day** of **April, 2022.**


Reed O'Connor
**UNITED STATES DISTRICT JUDGE**