# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF TEXAS
# FORT WORTH DIVISION

| | |
|---|---|
| JOHN DOE<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>TEXAS CHRISTIAN UNIVERSITY,<br><br>VICTOR J. BOSCHINI, JR,<br>*in his official capacity.*<br><br>　　　　Defendants. | Civil Action No.: 4:22-cv-00297 |

## FIRST AMENDED COMPLAINT

## I.　　INTRODUCTION

1.　　John Doe ("Doe" or "Plaintiff") sues Defendants Texas Christian University ("TCU") and Victor J. Boschini, Jr. ("Boschini" and collectively with TCU, the "Defendants") for violation of 20 U.S.C. 1681, et seq. ("Title IX") and for breach of contract. Doe seeks relief enjoining Defendants from suspending Doe from TCU.

2.　　Absent relief from this Court, Doe's entire college career will be destroyed as a result of phony sexual assault allegations by his ex-girlfriend and Defendants' biased application of Title IX in violation of Doe's rights. TCU and the persons who conducted the Title IX proceeding that ultimately determined Doe's fate, promote and harbor the mentality of "believe the woman," "believe survivors" and "never blame the victim."

1

3.      Doe completed five (5) semesters at TCU as of May 2022. He is on a Dean's scholarship and intends to enter the Neeley Business School.[1] His GPA is a 3.45. Doe is an Eagle Scout and has never had any disciplinary problems throughout his entire academic career. He has never had problems with the law. Doe has certainly never been accused of "sexual assault"—until his ex-girlfriend, Jane Roe ("Roe"), vindictively and falsely accused Doe of sexually assaulting her on two occasions during the fall semester of 2020 (the "Allegations"). For the first false allegation ("Allegation 1"), Roe claimed that on August 19, 2020, Doe digitally penetrated her vagina without her consent while in her dorm room in Colby Hall on TCU's campus. Roe waited over a year after Allegation 1 to make a complaint to TCU.[2]

4.      For the second false allegation ("Allegation 2"), Roe claimed that on October 3, 2020, Doe inserted his penis in her vagina without her consent while in Austin. Roe claims that Allegation 2 occurred after Roe called Doe (her prior alleged rapist according to Allegation 1) from her hotel because she needed him to comfort her in the midst of a panic attack about being "drugged and raped," and Doe picked up Roe from the hotel and then allegedly raped her at a friend's apartment where they stayed the night together (Doe drove Roe back to the hotel the following morning).

5.      Roe initially claimed Allegation 1 occurred **after** Allegation 2, but reversed her position shortly before the panel hearing after being confronted with text message evidence that proved Allegation 1 could not have occurred after Allegation 2.

---

[1] Doe applied to enter the Neely Business School, but ultimately could not complete the process due to Roe's Title IX complaint.

[2] Section 5.1.1. of the Student Code of Conduct states that reports of misconduct "should be submitted as soon as possible after the incident takes place and under most circumstances, should be submitted within one (1) calendar year." Roe reported Allegation 1 thirteen (13) months later.

6.     TCU conducted a panel hearing on January 28, 2022, via Zoom to determine whether the Allegations violated TCU's Policy 1.008, the Policy on Prohibited Discrimination, Harassment, Sexual Misconduct, and Retaliation (the "Policy"). The hearing panel issued their Deliberative Report on February 2, 2022, and concluded that (1) Doe engaged in conduct that violates the Policy for Allegation 1; and (2) Doe <u>did not</u> violate the Policy for Allegation 2.

7.     As the penalty, the hearing panel suspended Doe "effective immediately" and stated that he is eligible to reenroll in classes for the 2023 Maymester, but such enrollment and acceptance is not guaranteed. The hearing panel also directed Doe to attend therapy and counseling and to complete online Title IX training prior to reenrollment. In addition, Doe is to remain on "conduct probation" for the remainder of his time at TCU.

8.     Doe timely appealed the hearing panel's decision on Allegation 1 to the Vice Chancellor for Student Affairs within three days after the date of the Deliberative Report.  The Vice Chancellor for Student Affairs has final authority to reverse or uphold the hearing officer's decision, and the decision by the appellate officer is binding upon all involved. Michael Russel, the Associate Vice Chancellor for Student Affairs, upheld the hearing panel's decision with respect to Allegation 1, giving Doe no choice but to file this Complaint.

## II.     PARTIES

9.     Plaintiff Doe is an undergraduate student at TCU. He is a resident of Texas and may be served through undersigned counsel. At all relevant times he was an undergraduate student at TCU, except that Doe did not enroll for the Fall 2021 academic semester for the reasons explained herein.

10.     Defendant TCU is an institution of higher education. TCU is located at 2800 South University Drive, Fort Worth, Texas 76109.

11.     Defendant Boschini is an adult individual and resident of Texas, who at all relevant times was the Chancellor of TCU and is named as a defendant in his official capacity. Chancellor Boschini's place of business is 3101 Bellaire Drive North, Fort Worth, Texas 76109.

### III.     JURISDICTION AND VENUE

12.     This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's cause of action arises under Title IX, 20 U.S.C.1681, *et seq*. This Court has supplemental jurisdiction over all state-law claims under 28 U.S.C. § 1367(a).

13.     This Court has personal jurisdiction over all the parties in this lawsuit because each party listed in the lawsuit resides in Texas.

14.     Venue is proper because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred at TCU's campus within the jurisdiction of this Court.

### IV.     FACTUAL BACKGROUND

**A.     TCU's Policies**

15.     TCU has several policies that govern its relationships with students and faculty.

16.     Those policies include, without limitation, the Policy, "Policy 1.009" (herein so called) titled "Responding to Reports of Prohibited Discrimination, Harassment, Sexual Misconduct and Retaliation, the Student Code of Conduct (the "Code"), and the Student Bill of Rights and Responsibilities (the "Bill of Rights").

17.     The Policy governs, in part, allegations of sexual assault under Title IX.

18.     The Code and Policy 1.009 set forth, among other things, the processes by which Title IX proceedings are handled and the rights of the parties involved.

19.     Sections I. 1.-2. of the Bill of Rights address a student's right to access higher education at TCU and his or her right to use all appropriate facilities and services of TCU.

20.     Section II. 1. of the Bill of Rights gives students the right to register for and attend any class for which he or she has met the prerequisites.

**B.     Doe's and Roe's Romantic and Sexual Relationship from 2018-2020**

21.     Doe and Roe are undergraduate students at TCU. Doe began his freshman year at TCU in the fall of 2019, and Roe began her freshman year at TCU a year after him, in the fall of 2020.

22.     Doe and Roe both attended Fort Worth Country Day School ("Country Day") and became acquainted through a mutual friend. Shortly thereafter, in the fall of 2018, Doe and Roe began a romantic dating relationship with each other—Roe was a junior at Country Day and Doe was a senior.

23.     Although Doe and Roe broke up in early 2020, their romantic and sexual relationship continued off and on through most of 2020.

**C.     The Colby Hall Incident (Allegation 1)**

24.     Throughout their entire relationship, including after they were "officially" broken up, Roe and Doe were sexually active and intimate with each other, and Roe frequently initiated the sex.

25.     For example, on August 16, 2020—just three days before the "Colby Hall incident" that putatively forms the basis of Allegation 1—Roe told Doe that her parents were gone and invited Doe over to her parent's house for sex. Roe picked up Doe and they engaged in sex on that date.

26.     On August 17, 2020, Roe complained to Doe in a text message that her throat was sore from the consensual oral sex she gave him the day prior. The text exchange states in part:

        Roe: "U hurt my throat"

5

Doe: "that's really sexy"
Roe: "No I'm not trying to be sexy it hirts"
Doe: "oh well i'm sorry" "i didn't touch you tho you did all that"
Roe: "I didn't say u touched me" "I wasn't talking about ur hands stupid"
Doe: "i know but so like you did that to yourself!" "you were going hard"
Roe: "K well"
…
Doe: "you're not!" "just take the compliment miss" "yesterday it was really good"
Roe: "Well good for u"
…
Roe: "Thank u for saying that it was good it just makes me
feel embarrassed"
…
Roe: "Never mind we shouldn't talk about sex anymore"

27.      On August 19, 2020 (the date of the Colby Hall incident), Roe and Doe communicated off and on most of the day. Doe messaged Roe and asked if she wanted to "go on a friend date" somewhere "quick."

28.      Roe conveyed to Doe that she was not feeling well.

29.      Doe offered to bring her ice cream and asked how he could help her. Roe responded, "U can watch a show with me."

30.      The two discussed via text message whether they would meet at Doe's fraternity house or at Roe's dorm room in Colby Hall on TCU's campus.

31.      Roe also told Doe in a text, "wait u don't think we're hooking up do u?"

32.      Roe expressed concerns about being seen at a fraternity house during sorority "rush" and the two agreed that Doe would travel to Roe's dorm room. Roe told Doe that her roommates were gone and she would be alone until at least 11 p.m. She also told Doe that she would wait to shower until he got to her room.

33.      When Doe arrived to Colby Hall, Roe went down to the lobby to let him in and escorted him to her room.

34.     When they got to Roe's room, Roe told Doe that she and her roommate had been practicing sex moves. Roe then began practicing sexual positions with Doe on the floor, which led Doe to believe that she wanted to have sex. Specifically, while laying on his back on the ground, Roe hovered over Doe in a reversed sitting position (facing away from Doe) and "grinded" on Doe's crotch.

35.     Doe occasionally attempted to put his hands on her hips or back, over her clothes, but Roe would playfully say "no touching." That dynamic, however, was not entirely new to them as Roe liked Doe to beg for sex occasionally.

36.     At one point while in Roe's room, they got up and Roe bent over a desk or another piece of furniture and again grinded on Doe's crotch.

37.     Roe eventually straightened up and Doe began to slowly slide his hand down the front of her pants.

38.     Given the grinding she had been doing on Doe's crotch, he continued to believe they were going to have sex.

39.     However, when Doe's hand moved right above Roe's vagina, Roe told Doe something to the effect of "we're not going to hook up today." In response, Doe removed his hand and he never touched her vagina.

40.     Doe left the dorm room shortly after their encounter.

41.     Roe falsely alleged that while in her room, Doe inserted his fingers into her vagina without her consent (Allegation 1).

42.     Roe, however, cannot describe how Doe was putatively able to insert his fingers into her vagina, how she was sitting or laying, the position of her legs, what she was wearing or any other details of her allegation. That is because her allegation is false.

43.     Roe admits she never yelled for help, attempted to run out of the room, called or texted anyone, or pushed Doe's hand off of her. That is because her allegation is false.

44.     Roe's alleged "proof" for Allegation 1 is contained in a text exchange with Doe shortly thereafter where Doe apologized for his "behavior" in trying to initiate sex, stated that he had no self-control and stated, "I'm one of those aren't I" in response to a text from Roe that said, "I mean self control? Like rapists say the same thing."

45.     **Later in the text string, however, Roe said "I mean I've [sic] very used to u doing that[,] you do that almost everytime [sic]," "I don't think it's rape [Doe]," "I just think it's disrespectful and u don't listen"** (collectively, the "Exculpatory Texts").

46.     Hon. Ignazio J. Ruvolo ("Judge Ruvolo"), the Panel Chair and a retired California state court judge, excluded the Exculpatory Texts and photographs of Roe and Doe from consideration at the Title IX hearing "because they were not shown to be unavailable at the time of the investigation … and because any relevance of the proffered evidence was more prejudicial than probative of a material fact …."

47.     To understand why Doe made the putative "admissions" requires one to understand the pattern in which Doe handled Roe throughout their almost two-year relationship.

48.     Throughout their entire relationship, Roe was fragile, insecure, unpredictable and immature. Even the smallest of slights or disagreements would destabilize Roe and could lead to Roe burning herself or forcing herself to purge.

49.     Although Doe too was immature—and admittedly did not know how to handle her complex emotions—he loved Roe. Roe's parents even called Doe her "security blanket."

50.     Doe quickly learned he could successfully diffuse or avoid one of Roe's dramatic episodes and make her happy by validating her feelings, apologizing, accepting fault for literally anything and admitting to being the "bad guy."

51.     For example, that approach worked on the date of the Colby Hall incident, as evidenced in part by their friendly small talk and her appreciation for the groceries Doe brought her the following day, August 20, 2020.

52.     Doe has never believed that (1) he is a rapist; (2) lacks self-control; or (3) that he touched Roe without her consent. Despite irrationally saying untrue things about himself, Doe never imagined that Roe would use his words against him to cry rape.

53.     Roe also relied on texts Doe sent Roe's best friend in December 2020 or January 2021—months after the dates of the alleged incidents—where he admitted to being a "bad person."

**D.     The Austin Incident (Allegation 2)**

54.     After the Colby Hall incident, Roe and Doe continued to talk off and on.

55.     On or about October 3, 2020, approximately six (6) weeks after the Colby Hall incident, Roe and Doe drove to Austin, Texas—separately—because of the University of Texas vs. TCU football game.

56.     Neither Doe nor Roe were in Austin as part of any TCU educational program or activity and neither actually attended the football game.

57.     That night, after the football game, Doe was at his friend's apartment when Roe called him hysterically crying from her hotel room. Roe was staying in a hotel room with several of her sorority sisters and best friends. Roe told Doe "I need you, I really need you" and begged Doe to pick her up from the hotel.

9

58.     Roe now claims she called Doe to pick her up because she was having a panic attack about being drugged and raped, and she turned to Doe (her prior alleged rapist) to comfort her.

59.     Roe initially claimed that Allegation 1 occurred **after** Allegation 2.[3] In his January 24, 2022 response to TCU's Final Investigative Report, Doe submitted text message evidence that Allegation 1 occurred before Allegation 2.[4] But it was too late for Roe to fix her significant mistake about the timing of the Allegations, because her response to TCU's Final Investigative Report was due on January 24, 2022, just like Doe's. Roe's mistake was significant because in her January 24, 2022 response she states:

> **I was sharing a hotel with those friends and I remember starting to have panic attacks about being drugged and raped. I called [Doe] to talk to him and see if he could help calm me down.**

60.     It is nonsensical and not credible for Roe to claim to have been raped by Doe on August 19, 2020, then to call Doe for comfort six (6) weeks later while she was having "panic attacks about being drugged and raped."

61.     Doe picked up Roe in an Uber and took her back to Doe's friend's apartment. Roe was fine, coherent and no longer crying.

62.     Neither Doe nor Roe allege they were intoxicated.

63.     When they arrived at the apartment, Doe and Roe immediately went into one of the bedrooms. While in the bedroom, they had consensual sex and fell asleep until the next morning when Doe dropped Roe off back at her hotel.

---

[3] In her November 30, 2021 written response to TCU's Preliminary Investigative Report, Roe stated that Allegation 2 occurred earlier than Allegation 1. She also admitted her mistake during the panel hearing.
[4] It was not until Doe independently reviewed over 1,200 pages of text messages in January of 2022 that Doe learned the dates of the alleged incidents. At no time prior to the panel hearing did Roe provide the dates on which she claimed the Allegations occurred.

64.     Both Roe and Doe admit to having intercourse, but Roe claims she did not consent to the intercourse (Allegation 2).

65.     The evidence introduced at the panel hearing further revealed that Roe believed Doe raped her hundreds, or maybe as many as 1,000 times, and that Roe only wanted to participate in sex with Doe about ten percent of the time they had sex.

**E.      Communications, Interactions and Consensual Sex after the Austin Incident**

66.     After the Austin incident, Doe and Roe continued to communicate off and through December 8, 2020. They also saw each other at times and continued to engage in sex on at least a few occasions. Examples of those communications and interactions are as follows:

**Oct. 16, 2020** – Roe texts Doe and says, "I really didn't try to be annoying with that photo I just have been thinking about us lately just like remembering and I saw that and wanted to show u I'm really sorry if I hurt u I did not mean to."

**Oct. 24, 2020** – Roe calls Doe to pick her up and he complies. Afterwards, Roe texts Doe and says, "Hi!! I just wanna say I'm so sorry I made u come get us earlier, that was actually so nice of u to get us" "I really really appreciate it that was very nice" "And I'm also sorry we were so drunk that's embarrassing but just wanted to say thank u."

**Oct. 25, 2020** – Roe texts Doe and, in summary, says she is sad about Doe, misses Doe and is jealous that she saw Doe with another female. Roe states in part, "Like yesterday … I was sitting behind u the whole tailgate and I saw [another girl] the whole time all over u and I just like it really felt like to me y'all knew I was there I was like literally a few feet away and like that's great I'm happy for u I just like I would've hoped u wouldn't be shoving that in my face"; "My feelings were hurt I don't think u were trying to make me jealous"; and "I'm saying it hurt me that I saw that."

**Oct. 30-31, 2020 –** Roe peppers Doe with text messages and phone calls and says things like "Fuck face," "Answer my phone" and "R u mad at me."

**Nov. 1, 2020 –** Roe peppers Doe with text messages and Snapchat messages. Roe offers to pick up Doe and does pick him up in her car. This occurs the day after Roe saw Doe go home with the girl from the tailgate mentioned above.

**Nov. 2, 2020 –** Roe peppers Doe with text messages. She says things like: "if I call u will u answer" and "Can u please come get me and [a friend] from pool House we can like hug it out and end it on good terms"

**Nov. 3, 2020 –** Roe wants to get back together with Doe and says things like "can I please come back to you and can I try and make it happy like it was"; "I want that so bad but you left me after 3 days how do I know you wouldn't do that again"; "Well do u want me to come shark tank duce" ("shark tank duce" was their code for watching a movie and having sex); and "I know I just I really like hanging out with u too"

**Nov. 4, 2020 –** Roe asks Doe to spend her birthday with her, which they did. Pictures show how happy she appeared to be with Doe. Roe stays with Doe at his fraternity house that night and they have consensual sex.

**Nov. 5, 2020** – Roe says to Doe, "THANK U SOOOO MUCH FOR MY SWEATER!! That was so nice and thoughtful and U hung out with me and talked to me and made me feel so special! Thank u!"

**Nov. 6, 2020** – Roe sends Doe a video of her and a friend.

**Nov. 14, 2020** – Roe texts Doe because she is stuck in a car with "so many people" and a guy is "smushing" her.

**Nov. 27, 2020** – Roe texts Doe on his birthday and she is very kind to him.

67.     Then, on December 8, 2020, Roe sent Doe a message via Snapchat and said "I want to fuck you."

68.     Doe rejected Roe's request for sex by sending her a text message (as opposed to Snapchat) and called her out for being hypocritical because her Snapchat messages frequently contradicted her text messages. Those text messages from December 8, 2020 are referred to herein as the "December 8th Texts."

69.     Throughout their entire relationship, Roe frequently used Snapchat to communicate things to Doe that she did not want others to see. Roe and Doe communicated through Snapchat almost as often, if not more often, as they did via text messaging.[5]

---

[5] Doe engaged a professional to attempt to retrieve all of the Snapchats between Doe and Roe, but the professional was unable to successfully retrieve the Snapchats without Roe's cooperation.

**F.      Roe's Jealousy and Motive to Lie**

70.      Doe began seeing other women and Roe became very jealous as evidenced in part by the text messages above between Roe and Doe on October 25, 2020.

71.      After Doe rejected Roe's "I want to fuck you" message on December 8, 2020, Roe and Doe did not have sex again.

72.      Not long thereafter, Doe began dating a new girlfriend (the "Girlfriend"), who is also a TCU student.

73.      On January 15, 2021, Doe missed a phone call from Roe. Doe returned her call and left Roe a message telling her not to call him again.

74.      One night at a bar on West 7th in Fort Worth, in February or March of 2021, Roe saw Doe and his Girlfriend sitting on a bench. When they stood up to leave together in an Uber, Roe, who had been watching them, rapidly approached the Girlfriend telling her not to go home with Doe. Doe and the Girlfriend went home together.

75.      The next day Roe's dad called Doe's dad and said Doe needed to stay away from Roe. Doe was very confused because he had no contact with Roe since the phone message he left her in January.

76.      A few days later, Doe's dad received another call from Roe's dad who accused Doe of "stalking" Roe. That phone call occurred one day after Doe dropped off a friend, who was a girl and who helped Doe with his Spanish, in the parking lot in front of Roe's dorm.

77.      Doe and his dad perceived the two phone calls from Roe's dad as veiled threats. Accordingly, Doe moved back home and took the Fall 2021 semester off from school in an effort to avoid any other confrontations with Roe, and in the hopes the entire situation would settle with time.

13

78.     Roe and her best friend (the "Best Friend") have also targeted the Girlfriend, despite the Girlfriend having never met Roe. For example, the Best Friend admitted at the panel hearing that she (the Best Friend) yelled "rapist" multiple times to the Girlfriend while at a bar on West 7th Street in Fort Worth in the fall of 2021. Moreover, during a spring break trip in Cabo San Lucas in March of 2022 (after the panel hearing), Roe kicked the Girlfriend's bathroom stall door and threw her drink at the stall door while the Girlfriend was in the stall, all while giggling.

79.     Instability, jealousy and vengeance are the underpinnings of Roe's motive to falsely accuse Doe of sexually assaulting her.

**G.     Roe Files a Title IX  Complaint**

80.     Section 5.1.1. of the Code states that reports of misconduct in violation of the Code "should be submitted as soon as possible after the incident takes place and under most circumstances, should be submitted within one (1) calendar year."

81.     On September 15, 2021—over a year after the date of Allegation 1—Roe submitted a report to TCU's Office of Institutional Equity ("OIE") and accused Doe of sexually assaulting her. TCU investigator Leigh Holland met with Roe for an "initial inquiry."

82.     On October 4, 2021, Roe subsequently filed a "Formal Complaint" with the OIE naming Doe as a respondent and alleging sexual misconduct. Roe did not provide additional details but referred to her initial report filed on September 15, 2021.

83.     Roe requested a formal resolution according to TCU's policies on sexual assault.

84.     Ms. Holland performed the initial investigation and submitted a preliminary report on November 12, 2021. In the preliminary investigative report, Ms. Holland noted that (1) "[Roe] declined the initial investigative interview with the investigator. She also declined to give detailed

14

information as it relates to both alleged incidents during her follow-up interview"; and (2) "The complainant also refused to provide detailed answers to questions posed in her interview."

85.     Doe and Roe were given an opportunity to submit responses and addenda to the preliminary report.

86.     Doe submitted his response on November 30, 2021, through his Title IX advisor. He requested that the complaint be dismissed as "there [was] no basis for substantiating [Doe's] allegations without any first party evidence."

87.     Doe also submitted polygraph examinations for consideration because those polygraph examinations further evidenced proof of Doe's innocence.

88.     Roe submitted what she considered her "official response" to the Preliminary Investigative Report on November 30, 2021 (the "November 30th Letter").

89.     The November 30th Letter included new alleged "details" of the Allegations that Roe previously failed to disclose. Those new "details," however, severely misstated the facts and were false:

   a.  Roe stated that "after starting college at TCU, [Roe and Doe] still had some social interactions," but in reality Roe and Doe also had consensual sexual intercourse off and on during the fall semester of 2020, which she initiated as detailed above.

   b.  Roe stated that after starting college Doe "acted much angrier and meaner toward [her]" but failed to mention the underlying reason, which was that he found out she had sex with two other guys and it upset him.

   c.  Roe stated that "it [was] easier for [her] to tell him to leave [her] alone and that [she] didn't feel comfortable with how he treated [her]," but in reality she initiated contact and wanted to be with Doe on several occasions throughout the fall semester.

   d.  Roe stated "[the Austin] incident really scared [her] and [she] realized he was capable of actually hurting [her]. Later into the Fall 2020 Semester [Doe] came to [her] dorm room (Colby Hall, room 231) one night [and]…sexually assaulted [her]." **The Austin incident, however, occurred *six weeks* after the Colby Hall incident and as shown above, Roe was not afraid of Doe and she frequently initiated (or attempted to initiate) their in-person interactions**.

15

e. Roe stated that "[the] day leading up to the assault [Allegation 1], [she] was in bed because [she] felt really sick' [her] throat and head were hurting." Roe failed to mention, however, that her throat was sore from the oral sex she gave him just a few days prior.

f. Roe stated that "[Doe] asked to come over. Because of [her] past experiences with [Doe], [she] was scared of being alone in a room with him, so [she] told him no."[6] In reality, text messages on the day of the Colby Hall incident show that Doe never asked to come over, he told her to "think hard" about how he could help her feel better to which her responses were "U can watch a show with me," "U can come" and asking him to bring her a humidifier. She also never told him "no." For the same reasons explained above, she was also not afraid of being alone with Doe, like when she invited him over for sex to her parent's house (and picked him up) three days earlier on August 16, 2020.

g. Roe stated that "He then told [her] he would get [her] groceries or food and that he really wanted to come over," but in reality the text messages show that Doe brought her groceries the next day, on August 20, 2020, and that she was thankful. The texts also show that he never told her he "really wanted to come over."

h. Roe stated that "He continued to persist [on coming over]…," but in reality, Roe invited him over and, again, Doe did not insist on coming over.

i. Roe stated that "[she] told him that [she] did not want to have any sexual contact. [She] thought because it was in writing, and [She] told him before he got there, that he would listen to [her]," but the reality is that the only thing she put in writing was "Wait u don't think we're hooking up do u" and then proceeded to practice sex moves and grind on him when he got to her dorm room.

j. Roe stated that "[she] was traumatized by the assault…." "After this incident, [she] obviously did not feel safe being around [Doe], and [she] continued to see him on and around TCU's campus." In reality, however, Roe and Doe continued to see each other and have consensual, and intimate, sexual intercourse, examples for which are set forth above.

90.    Ms. Holland completed and submitted a final investigative report on December 7, 2021. Ms. Holland indicated in the final investigative report that Roe was not cooperative during the investigative process.

91.    On December 9, 2021, TCU sent out a "Title IX Conduct Hearing Process Delay Notice" because of the end of the Fall 2021 semester and winter break.

---

[6] Roe made this statement because she incorrectly claimed the Austin incident occurred **before** the Colby Dorm incident.

92.     On January 7, 2022, the Dean of Students Office notified Doe that they scheduled a panel hearing for January 28, 2022, via Zoom to hear and determine the outcome of the Allegations.

93.     Doe and Roe were once again given an opportunity to respond to the final investigative report in writing by January 24, 2022.

94.     Doe timely submitted his response to the final investigative report on January 24, 2022, and included dozens of exhibits which he intended to use as rebuttal evidence.[7] Some of the exhibits included exculpatory text messages between Roe and Doe as well as photographs of Roe and Doe taken after the Austin incident.

95.     TCU's rules do not definitively state any other deadline for providing evidence or exhibits to be used at the hearing. Additionally, they do not state any deadline after which evidence may not be admitted at the hearing, other than the deadline to respond to the final investigative report. Nevertheless, Doe timely submitted all of his evidence prior to the hearing under TCU's policies.

96.     Doe met with the Jessica Ledbetter, the Assistant Dean of Students and Co-Procedural Chair, and Judge Ruvolo (the Panel Chair and retired California state court judge) on January 25, 2022, for a prehearing meeting where Doe explained the significance of the evidence he submitted along with his response to the final report. Judge Ruvolo advised Doe that he would make a determination on the admissibility of the exhibits at the beginning of the hearing scheduled on January 28, 2022.

---

[7] Doe spent several weeks prior to this time gathering over 1,200 pages of text messages between Roe and Doe. He engaged a professional to extract Snapchat messages between Roe and Doe, but without success.

H.      **The Hearing**

97.      Prior to the hearing, Doe raised questions regarding TCU's jurisdiction to investigate matters that occurred off campus (i.e., Austin) under the auspices of Title IX.  Doe did not contest that TCU could investigate the off-campus allegation, just that it may not do so through their Title IX department and further that it may not consolidate the Title IX case with a non-Title IX case, or consolidate two cases that do not arise out of the same set of facts and circumstances.

98.      Doe and his adviser notified TCU that federal regulations prohibit consolidating two incidents that do not arise out of the same set of facts and circumstances. *See* 34 C.F.R. 106.45 (b) (4).[8] As evidenced in part by an email dated January 21, 2022, from Karen Bell Morgan (a Dean in the Dean of Students of Students Office), TCU disagreed. Ms. Morgan stated in part, " we believe the alleged incidents do arise from the same 'facts and circumstances'…the alleged incidents are all part of the same relationship between the two parties involved. Separating these incidents into two separate, unrelated hearings would not be possible, as they are interconnected to one another."

99.      Consequently, TCU moved forward with the hearing on both Allegations as scheduled on January 28, 2022.

100.      Section 1.19 of the Code states that Title IX panel members "may include an appointed panel chair and/or panelists who are not members of the TCU community to ensure fairness for the Complainant and Responding Student and compliance with applicable law."

101.      Nevertheless, TCU's Dean of Students Office appointed three panelists all of whom were members of the TCU community. The hearing panelists included (1) Reece Harty, Clark Hall

---

[8] "Consolidation of formal complaints. A recipient may consolidate formal complaints as to allegations of sexual harassment against more than one respondent, or by more than one complainant against one or more respondents, or by one party against the other party, where the allegations of sexual harassment arise out of the same facts or circumstances…."

Dormitory Director; (2) Dr. Clark Jones, College of Science and Engineering Faculty; and (3) Laura Shaw, Director of Student Affairs Business and Operations.

102.    The hearing panelists were essentially the "jury" as they were tasked with determining the truthfulness of the Allegations and Doe's fate.

103.    Unlike voir dire of a jury panel in a court of law, however, TCU does not have a procedure in place that allows the parties involved, like Doe, to determine whether any of the panel members hold biases and could be fair and impartial panelists.

104.    As explained further below, Doe believes that *at least* one panel member, Reece Harty, harbors and has expressed bias in favor of women and women accusers.

105.    At the beginning of the hearing, Judge Ruvolo excluded relevant information, including the Exculpatory Texts ("I don't think it's rape [Doe]," and others), from the hearing panel's consideration because he determined that the exhibits "were not shown to be unavailable at the time of the investigation . . . and because any relevance of the proffered evidence was more prejudicial than probative of a material fact."

106.    The exhibits excluded by Judge Ruvolo were crucial to Doe's defense. The excluded exhibits primarily consisted of text messages, including the Exculpatory Texts and the December 8th Texts. However, Judge Ruvolo also excluded significant pictures, including pictures of Doe and Roe happily together on her birthday (November 4, 2020), months after Allegation 1 and weeks after Allegation 2.

107.    At TCU, a hearing under Section 5.7 of the Code operates something like an informal trial. The parties, Roe and Doe, could make opening statements, cross-examine witnesses, give testimony, call witnesses, offer evidence, and make closing arguments.

108.    The panel decided whether a preponderance of the evidence supported a finding of responsibility for sexual assault.

109.    The Dean of Students provided Doe with a list of witnesses (Roe and the Best Friend) who were interviewed as part of the investigation. The Dean of Students also provided Doe with documentary evidence gathered over the course of the investigation and the preliminary and final investigative reports.

110.    The hearing panel was required to apply TCU's definitions of sexual assault and non-consensual sexual intercourse to determine whether Doe was responsible for sexual assault.

111.    The Policy is TCU's policy on sexual misconduct, and it defines "sexual assault" as:

> "Any sexual act directed against another person without their consent, including instances where the person is incapable of giving consent."

112.    The Policy defines "non-consensual sexual intercourse" as:

> "For purposes of this policy, [non-consensual sexual intercourse] is the penetration, no matter how slight, of the vagina or anus, with any body part or object, or the oral penetration by a sex organ of another, without consent. This includes: vaginal or anal penetration by a penis, tongue, finger or object, or oral copulation (mouth to genital contact)."

113.    On February 2, 2022, Judge Ruvolo, sent out the panel's Deliberative Report. Judge Ruvolo drafted the Deliberative Report, and according to Reece Harty, at no time did the panel members review the Deliberative Report despite the fact that it was intended to reflect their findings and conclusions.

114.    The panel concluded that Doe violated TCU's policies for Allegation 1 but concluded that Doe did not violate TCU's policies for Allegation 2.

115.    Specifically, the panel found in favor of Doe for Allegation 2 because (1) in the car ride on the way back to Fort Worth from Austin the following day, Roe did not say anything to

her Best Friend about her interaction with Doe nor did she ask for any assistance; and (2) "after this visit to Austin, the two continued to reach out to one another and had consensual sex for some time thereafter" including "having intimate sexual contact with [Roe] in early November on or near [Roe's] birthday."

116.    The panel found in favor of Roe for Allegation 1 because of the putative "admissions" Doe sent Roe after the Colby Hall incident and messages Doe sent to the Best Friend in December 2020 or January 2021. Although Roe testified at the hearing that Doe raped her that day (August 19, 2020, Allegation 1), the panel was not allowed to rely on the contemporaneous texts from Roe in which she admits that Doe did <u>not</u> rape her that day.  That is because those texts were improperly excluded as evidence in the hearing.

117.    The logic of the panel, however, makes no sense because the very same reasons the panel found in favor of Doe with respect to Allegation 2 should have also been applied in reaching their conclusion for Allegation 1. Specifically, Roe failed to mention Allegation 1 to any of her friends after the Colby Hall incident even though she saw them that night after Doe left, and the two continued to reach out to one another and had consensual sex for some time thereafter, including on her birthday and of course, what the panel found to be consensual sex in Allegation 2.  Roe further admitted at the hearing that she and Doe engaged in sex several times after Allegation 2.

I.       **Disciplinary Process and Outcomes**

118.    As the penalty, the hearing panel suspended Doe "effective immediately" and stated he is eligible to reenroll in classes for the 2023 Maymester, although such enrollment and acceptance is not guaranteed. The hearing panel also directed Doe to attend therapy/counseling

and complete online Title IX training prior to reenrollment, and further ordered Doe to remain on "conduct probation" for the remainder of his time at TCU.

119.    It is substantially likely that Doe was found in violation of the Policy with respect to Allegation 1 because TCU inappropriately excluded evidence which exonerated him from the allegation of rape.

120.    It is substantially likely that Doe was found in violation of the Policy with respect to Allegation 1 because TCU inappropriately consolidated the two unrelated Allegations in the same Title IX hearing in contravention of federal regulations.

121.    Although (1) the panel found Roe lied about Allegation 2 by concluding that Doe did <u>not</u> rape her; and (2) Roe lied and severely misled the hearing panel in the November 30th Letter as set forth above, neither TCU nor the panel disciplined Roe despite Roe's violation of Section IV. H. of the Policy, which states as follows:

**False Information and Complaints.**

> 1. **False Information** - Providing false information or hindering a University investigation are prohibited and can result in disciplinary action up to and including termination or expulsion.
> 2. **False Complaints** - Any person who knowingly and intentionally files a false complaint or files a claim in bad faith under this policy is subject to disciplinary action up to and including dismissal from the University.

122.    TCU's "Immunity for Sexual Assault Reporting," Section 5.8.14 of the Code, only applies to students who, "***in good faith***, report to or assist the University in investigating a report about, or who testify or otherwise participate in a conduct proceeding regarding, an incident of sexual harassment…." (Emphasis added). There is no plausible explanation as to how Roe could have lied in good faith.

123.    Doe timely appealed the hearing panel's decision on Allegation 1 to the Vice Chancellor for Student Affairs within three days after the date of the Deliberative Report.[9]

124.    The Vice Chancellor for Student Affairs has final authority to reverse or uphold the hearing officer's decision, and the decision by the appellate officer is binding upon all involved.

125.    On April 8, 2022, Ms. Ledbetter emailed Doe the Appeal Determination issued by TCU's Associate Vice Chancellor of Student Affairs,  Michael Russel. The Appeal Determination upheld the hearing panel's decision in all respects.

126.    Ms. Ledbetter commanded in her email that "**<u>Suspension from TCU is immediately in effect upon receipt of this notice</u>**…. **<u>Because Suspension is effective immediately, you are no longer permitted to attend classes, barred from enrollment at TCU until the 2023 Maymester, and banned from all TCU property for the duration of your Suspension</u>**. TCU Police will be contacting you very soon regarding the issuance of a criminal trespass order against you as a result of the determination in this case." (Emphasis original).

127.    Alas, Doe's only recourse is relief from this Court.

**J.    Gender Bias in Favor of Women and Accusers of Sexual Assault**

128.    The Assistant Dean of Students and Co-Panel Chair, Jessica Ledbetter, played an active role throughout the entire Title IX process. Ms. Ledbetter, however, harbors extreme bias against male students as evidenced by her recent (May 2021) doctoral dissertation entitled "*Moral Identity, Implicit Theory, and Moral Behavior: Untangling the Web of Connected Characteristics in Student Conduct*" (the "Dissertation").

---

[9] After receiving the Deliberative Report, Doe asked Ms. Ledbetter in an email dated February 10, 2022, whether the sanctions would be stayed during the appeal process. Ms. Ledbetter failed to directly answer Doe's question and instead cryptically responded, in part, by quoting the Code.

129.     According to her Dissertation, Ms. Ledbetter conducted a study of TCU students "to understand the link between a student's moral mindset, moral identity, and subsequent moral decisions, particularly as they pertain to student perspectives about the code of conduct." That study purportedly revealed that "[m]ale students tend to have lower moral identity internalization and symbolization," and "being a male student significantly predicted lower moral behavior intentionality and consciousness, as well as more negative code of conduct policy evaluations."

130.     In response to the results of the study of male students, Ms. Ledbetter opined in her Dissertation as follows:

- "Unfortunately, this was an unsurprising result given some of the available academic literature."

- "[C]ould it be that institutional messaging, both implicit and explicit, resonate [sic] more closely with female gender norms?"

- "It is possible that male students simply desire to fit in and be perceived as strong in stark contrast with the female norm of care and empathy, which could be viewed as weak."

- "These male students need context to understand why their behavior is harmful to their peers and to their community, in addition to understanding how it personally affects them. In other words, to materially change male moral behavior, administrators must target moral identity internalization and symbolization. Likewise, this programming must be informed by gender norms which dictate perceptions about what classifies as appropriate male behavior, as previously discussed."

- "With these findings in mind, the development of targeted programming to build male moral identity, behavior awareness, and the comprehension of behavioral consequences in male students is more crucial than ever for the explicit benefit of those male students individually and to continue prioritizing institutional mission fulfillment. This programming is needed regardless of the male student's moral learning disposition, as moral identity internalization mediates the relationship between moral mindset and moral behavior intentionality and consciousness."

131.     In her Dissertation, Ms. Ledbetter also thanked and revealed her close relationship with Michael Russel—*who decided Doe's Appeal*—as follows:

Dr. Mike Russel: Thank you for always showing such immense confidence in my abilities and allowing me to try new things, taking on bigger and bigger projects. I have learned so much by observing your work firsthand over the past few years and grown from our many academic and practice-focused conversations. Your passion to support and grow our college students is both inspirational and aspirational. I am blessed that you have not only been my supervisor, but also my good friend.

132.    Doe wanted to enroll at Southern Methodist University for the Spring 2022 semester, and was accepted subject to SMU's receipt of a "letter of good standing" (or similar statement that Doe was in good standing) from TCU. Had Doe requested that TCU confirm his good standing, TCU would have disclosed the pending Title IX investigation. Further, TCU does not consider students in good standing upon receiving suspension.

133.    In early January of 2022, Doe met with Jeremey Steidl, one of TCU's Assistant Dean of Students, and discussed enrollment at TCU for the Spring 2022 semester. Mr. Steidl incorrectly and falsely told Doe that he (Doe) was prohibited from enrolling for the Spring 2022. Specifically, Mr. Steidl told Doe that it was against TCU's policy that he be permitted to enroll for the Spring semester because of the pending Title IX investigation. After receiving a letter from Doe's attorney, on the date of the deadline to enroll, Doe learned he could in fact enroll at TCU contrary to Mr. Steidl's misrepresentations, and he did.

134.    In January of  2022, Roe complained to Mr. Steidl that one of Roe's and Doe's male friends (the "Male Friend") texted Roe and told her it would not be a good idea for her to come to a get together he and his roommates were having at their rent house. Mr. Steidl's secretary contacted the Male Friend and arranged a Zoom meeting between Mr. Steidl and the Male Friend. During the Zoom meeting, Mr. Steidl asked the Male Friend why he told Roe it would be a good idea if she did not attend his get together. The Male Friend explained that he and his roommates had decided they would not drink at their house around underage kids. Without explaining why, Mr. Steidl asked the Male Friend to sign a no-contact order in favor of Roe, but the Male Friend

elected not to do so. Despite believing the Male Friend's explanation for why he texted Roe, Mr. Steidl unilaterally entered a no-contact order against the Male Friend.

135.    At the "Pre-Hearing Meeting" (herein so called) on January 25, 2022, Ms. Ledbetter told Doe and his adviser that re-direct and re-cross examination of witnesses was prohibited at the hearing because "frankly we worry about **re-traumatization** of the individuals who are involved." The only individual who would be "retraumatized" is a true victim of a sexual assault.

136.    Ms. Ledbetter also stated during the Pre-Hearing Meeting that she and one of the panel members, (Reece Harty who is one of Ms. Ledbetter's friends), went to lunch together earlier that day. Ms. Ledbetter stated that Mr. Harty told her he already began a review of the documents submitted in the case. In other words, Ms. Ledbetter and Reece Harty discussed the case, yet Doe lacked the ability to inquire about the extent of those conversations.

137.    Ms. Ledbetter and Mr. Steidl are both on the Dean of Students staff. As mentioned above, the Dean of Students Office selected the hearing panelists from the TCU community. Ms. Ledbetter and Mr. Steidl likewise facilitated the Title IX hearing on behalf of TCU and played an active role throughout the entire process—they even attended and participated in both days of the panel hearing and remained present during the panel's deliberations (along with Judge Ruvolo).

138.    After the panel hearing, Doe discovered that at least one panel member, Reece Harty, may have bias in favor of women and women accusers in light of tweets he posted on Twitter between September and November of 2018, which is around the same time as Justice Kavanaugh's highly contentious confirmation hearing. For example, on September 29, 2018, Mr. Harty retweeted a tweet by Millennial Politics that says, "Sexual assault is not a Republican issue nor a Democratic issue. It's a human issue we all need to take seriously and address"; on September 30, 2018, Mr. Harty retweeted a tweet by USA Today announcing "landmark legislation that will

require all publicly traded companies with headquarters in California to have a least one woman on their board of directors by the end of 2019"; on October 5, 2018, Mr. Harty retweeted Time Magazine's tweet, which states "**The best way to help women survivors be heard? Elect more women**" (emphasis added); and on November 27, 2018, Mr. Harty retweeted Time Magazine's tweet and article, which states "How 343 women made French history by talking about their abortions."

139.    On February 15, 2022, TCU's Campus Advocacy, Resource and Education ("CARE") department posted a picture of what appears to be Mr. Harty on its Facebook and Instagram pages showing his participation in a "Pancake Palooza" in support of CARE. CARE's "mission is to advocate and support survivors of sexual violence," and as explained and evidenced below, CARE is severely biased in favor of accusers of sexual assault. CARE also provided training to each of the three panel members prior to Doe's Title IX hearing.

140.    Again, TCU does not have a voir dire-type procedure in place that would have allowed Doe to flush out any gender or accuser bias and whether that bias would impact Mr. Harty's ability to be a fair and impartial panelist.

141.    TCU's website also evidences bias in favor of a complainant. The OIE's Title IX webpage includes a "Complainant Information" tab and a "Respondent Information" tab. The Complainant Information page focuses on "survivors" of sexual assault, how they can navigate the process, and "Do's and Don'ts" when helping and listening to a "survivor." The "Dos and Don'ts" state as follows:

> k.   "The first thing you can do to help is to listen and be supportive. Listen without judgment. Talking about what happened can help a survivor regain a sense of control. Let them guide the conversation and when they choose to talk about it."
>
> l.   "It is often very difficult for survivors to talk about their experiences and disbelief can cause additional pain. The fear of not being believed is a real concern for people who have experienced an assault or interpersonal violence."

m. "Support the survivor and encourage them to get support. Share the numerous options and resources available. If the survivor seeks medical attention or plans to file a report, offer to be there. Their decisions to report or seek support is the survivor's alone, but your involvement can be encouraging and positive."

n. "Be respectful of the survivor and their privacy and confidentiality. If you are not a mandatory reporter, it is not your place to share their story without their permission, either in conversation or on social media."

o. "Do not blame a survivor for what happened or make them feel guilty for what happened. It is important to understand that no matter what happened, it is not the survivor's fault."

p. "Do not criticize or judge how a survivor reacted during or after the assault or related incident — why they stayed in an abusive relationship, whether they said no or not, why they do/do not wish to report the matter. Understand people react differently to situations and they need your support even more following a traumatic incident."

q. "Do not force a survivor to do anything they do not want to do. After an assault or harassment, survivors often feel powerless. It is important to empower a survivor to make their own decisions about what do following an incident, including decisions surrounding reporting and seeking help."

142.    The    Complainant    Information    page    is    found    here: https://www.tcu.edu/institutional-equity/title-ix/complainant-information.php.

143.    The Respondent Information page focuses on persons accused of sexual misconduct. It mirrors the Complainant Information page and contains information on how a person accused of sexual misconduct can "navigate the process." It also has a "Do's and Don'ts" section for helping and handling a respondent who has been accused of sexual assault, but that section is *verbatim* of the Complainant Information "Do's and Don'ts" section listed above—i.e., helping "survivors" of sexual assault.

144.    The    Respondent    Information    page    can    be    found    here: https://www.tcu.edu/institutional-equity/title-ix/respondent-information.php.

145.    TCU's CARE department, news, website and social media and its website and social media pages further show the female and accuser-biased backdrop against which Title IX

28

proceedings are conducted and the attitude of the TCU community towards alleged sexual assaults, which is believe the accuser no matter what!

146.    Undoubtedly, universities like TCU should have departments like CARE to support victims of sexual assault, but it is the practice of CARE, and therefore, TCU to <u>always</u> believe the accuser regardless of the truth. Here are some examples:

r.   TCU's CARE "Welcome" page states in part, "It does not matter when or where your trauma occurred….**We believe**, we care!

s.   CARE's social media is rife with posts and comments like, "Believe Survivors," "Listen Believe Support" and "We believe you. We C.A.R.E."

t.   CARE's social media also portrays men as the aggressors.

u.   CARE's assistant director who is a "Title IX" advocate, Leah Carnahan, says that when students go to her about sexual assault, she listens without passing judgment, but "[m]ost importantly, **she believes them.**" (https://www.tcu360.com/2019/04/title-ix-advocate-works-to-support-tcu-survivors-of-sexual-assault/)

v.   TCU's Chief Inclusion Officer who was previously the Title IX coordinator, Darron Turner, and Ms. Carnahan opposed the new changes to Title IX that ensure due process for accused students and which took effect in 2020 under the former Secretary of Education, Betsy Devos. (See https://www.tcu360.com/2019/07/department-of-educations-title-ix-changes-could-impact-tcu-students/). Mr. Turner made the comment in the immediately foregoing article that "the single investigator model, which involves one-on-one conversations with the survivor, respondent and witnesses, is more accurate because of its intimate interpersonal dynamic." In that same article, Ms. Carnahan opposed implementing the new Title IX procedural protections because "the outcome of an academic disciplinary system, which deals with access to education, is different from the purpose of the criminal justice system…. 'It wouldn't stop someone living their life free of jail time.'"

147.    After years of criticism for being too lax on campus sexual assault, the U.S. Education Department's Office for Civil Rights ("OCR") sent a Dear Colleague Letter (the "DCL") on April 11, 2011,[10] to colleges and universities (including TCU) encouraging schools to

---

[10] Dear Colleague Letter: Sexual Violence, Russlynn Ali, Office for Civil Rights, U.S. Dep't of Educ. (Apr. 4, 2011).

become more aggressive in the investigation and adjudication of sexual violence complaints. The DCL is addressed in the immediately preceding TCU 360 article.

148.    Courts have indicated that the DCL, as well as subsequent guidance and statements provided by the OCR, forced colleges and universities to drastically change their prior sexual harassment policies out of fear that the Department of Education would pursue violations of Title IX that could lead to the revocation of all federal funding. As a result, universities violated accused students' rights under Title IX.[11]

149.    The DCL and its history is the backdrop against which TCU created its Title IX processes and departments and ultimately handled Doe's Title IX proceeding.

## V.    CAUSES OF ACTION

### COUNT I: VIOLATION OF RIGHTS UNDER TITLE IX OF THE EDUCATION AMENDMENTS ACT OF 1972

150.    Plaintiff restates, realleges, and reincorporates by reference all allegations set forth in every preceding paragraph as if set forth in this paragraph in full.

151.    Title IX of the Education Amendments Act of 1972 provides, in relevant part:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

152.    TCU is an institution of higher education that receives federal funding.

153.    TCU has promulgated its Title IX policy, among others, to comply with Title IX and its implementing regulations, 34 C.F.R. 106.1 *et seq.*, and the Clery Act and its implementing regulations, 34 C.F.R. 668.1 *et seq.*

---

[11] *See Doe v. Purdue*, 928 F.3d 652, 668-69 (7th Cir. 2019) (addressing the history and implications of the DCL and finding "[that] letter and accompanying pressure gives John a story about why Purdue might have been motivated to discriminate against males accused of sexual assault.").

154.     Title IX bars the imposition of university discipline where gender bias is a motivating factor in university's decision to discipline. Plaintiffs attacking a university's disciplinary proceeding on the grounds of gender bias generally fall within two categories, which include "erroneous outcome" and "selective enforcement." Under the *"Purdue* Standard," a plaintiff can also show a violation of Title IX when the facts raise a plausible inference that the university discriminated against the respondent on the basis of sex. *Doe v. Purdue*, 928 F.3d 652, 667 (7th Cir. 2019).

## A.     Erroneous Outcome

155.     The following facts establish articulable doubt on the accuracy of the outcome of the disciplinary proceeding with respect to Allegation 1:

      a.  TCU consolidated the two Allegations so that both would be heard and considered by the panel at the same time. The two Allegations resulted from completely unrelated events and the hearing panel should not have considered Allegation 2 (the Austin incident) under the auspices of Title IX. The consolidated hearing resulted in the panel "splitting the baby" as it found in favor of Roe for Allegation 1, but not for Allegation 2.

      b.  Judge Ruvolo precluded Doe from submitting rebuttal evidence prior to and during the hearing, including without limitation, (1) the Exculpatory Texts whereby Roe stated "I don't think it's rape [Doe]"; (2) the December 8th Texts where Doe pointed out the hypocrisy in Roe's Snapchat earlier that day that said "I want to fuck you"; and (3) photos of Roe and Doe taken after the Colby Hall incident showing how unafraid and happy Roe was to be around Doe.

      c.  TCU misinterpreted and misapplied its own policies regarding the introduction of evidence to the detriment of Doe.

      d.  The panelists' decision was irrational and they arbitrarily applied evidence to one allegation that was equally applicable to the other allegation.

      e.  Six weeks after Allegation 1, Roe called her purported rapist (Doe) to pick her up from the hotel in Austin where she was safe with her best friends because she was having a panic attack about being drugged and raped, and she felt that Doe could calm her.

      f.  Doe failed to receive sufficient notice of all the allegations against him until the hearing began despite Section 5.3.13 of the Code.

31

g. Roe's jealousy of and vengeance against Doe because he moved on and began dating someone else motivated her to falsely accuse Doe of sexually assaulting her.

h. Roe and her Best Friend retaliated against and harassed Doe's Girlfriend, including when (1) the Best Friend (admittedly) yelled "rapist" to the Girlfriend at a bar in the fall of 2021 and (2) Roe kicked the Girlfriend's bathroom stall door and threw her drink at the Girlfriend during spring break of 2022, despite having never met each other.

i. It is non-sensical to believe that Doe would lie about digitally penetrating Roe's vagina while at Colby Hall, yet admit to inserting his penis into Roe's vagina while in Austin.

j. Roe's November 30th Letter contained major falsities and misrepresentations— notably her claim that Allegation 1 occurred after Allegation 2—which should have established Roe's lack of credibility.

k. Roe waited over a year after Allegation 1 to file the Title IX complaint.

l. Roe could not explain the details surrounding how Doe putatively inserted his fingers into her vagina.

m. Roe claimed that she only wanted to participate in sex with Doe about ten percent of the time and Doe raped her hundreds, or maybe as many as 1,000 times.

n. TCU's Dean of Students Office (which includes Mr. Steidl and Ms. Ledbetter) selected other staff members at TCU to be the panelists, when they could have chosen persons outside of the TCU community as suggested by Section 1.19 of the Code in order to ensure "fairness."

o. CARE, whose mission it is to support victims of sexual assault and to believe all complainants, is closely tied to the OIE and Dean of Students and trained the three panel members who decided Doe's case. TCU is conditioned to believe complainants and disbelieve respondents like Doe.

p. TCU lacks a voir-dire type process that would have allowed Doe to determine whether the hearing panelists had biases or beliefs that could impede their ability to be fair and impartial decision makers.

q. Overall, TCU failed to allow a fair and equitable investigation, hearing and decision. TCU failed to allow Doe to fully and completely defend himself.

156. Gender bias was a motivating factor behind the erroneous finding as demonstrated by, among other things, the following:

a. The procedural irregularities, including the exclusion of evidence that Doe submitted along with his response to the final investigative report, including the Exculpatory Texts, other text messages and pictures.

b. The irrationality of the hearing panel's decision and the inconsistencies in its decision.

c. The Dissertation, including Ms. Ledbetter's role throughout Doe's Title IX process and her significant and close relationship with TCU and others involved in the Title IX process.

d. Jeremy Steidl's false statement to Doe that he (Doe) could not enroll at TCU because of the pending Title IX investigation because TCU's policy prohibited such enrollment. That statement evidences Mr. Steidl's "guilty until proven innocent" mentality, and his favoring Roe.

e. Mr. Steidl's request to the Male Friend that he (the Male Friend) sign a no-contact order, and Mr. Steidl's subsequent and unilateral entry of a no-contact order against the Male Friend.

f. Assistant Dean of Students and Co-Procedural Chair Jessica Ledbetter's statement at the Pre-Hearing Meeting that TCU prohibits re-direct and re-cross examination of witnesses because "frankly we worry about re-traumatization of the individuals who are involved." Only a true victim of a sexual assault would be "re-traumatized," and Ms. Ledbetter's statement assumes all accusers are honest and true victims.

g. Ms. Ledbetter's discussion of Doe's Title IX case with Reece Harty prior to the hearing.

h. TCU's "Respondent Information" page and "Complainant Information" page focus on helping "survivors" of sexual assault. TCU therefore fails to provide equivalent resources and information for respondents, including those who have been falsely accused of sexual assault.

i. TCU, its CARE department and those involved in Doe's Title IX investigation and hearing harbor and promote the mentality of "believe the woman," "believe survivors" and "never blame the victim."

j. Panelist Reece Harty's retweets express bias in favor of women and "survivors" of sexual assault, all of which took place during the timeframe of Justice Kavanaugh's divisive and contentious confirmation hearing.

k. Panelist Reece Harty's apparent involvement with the CARE program.

l. Pursuant to Section 1.19 of the Code, the Dean of Students Office could have selected "panelists who are not members of the TCU Community to ensure fairness for the Complainant and Responding Student and compliance with applicable law,"

33

but TCU failed to do so. Instead, the Dean of Students office selected three (3) of its own "TCU community" members.

m.  TCU lacks a voir-dire type process that would have allowed Doe to determine whether the hearing panelists had biases or beliefs that could impede their ability to be fair and impartial decision makers, and TCU's CARE department trains the panelists prior to a Title IX hearing.

n.  TCU disciplined Doe for putatively violating the Policy, but failed to discipline Roe for providing false information and filing a false complaint in violation of Section IV.H. of the Policy (see further explanation in the following "Selective Enforcement" section).

o.  TCU's use of the "preponderance of the evidence" standard in a quasi-criminal sexual assault case, as opposed to a higher standard (clear and convincing or beyond a reasonable doubt), favors an accuser.

p.  The DCL and its history is the backdrop against which TCU handled Doe's Title IX proceeding.

**B.  <u>Selective Enforcement</u>**

157.  TCU does not publish or make available statistics or information regarding the outcome of Title IX violations involving alleged sexual misconduct by a male student against a female student or vice versa.

158.  Nevertheless, TCU's "selective enforcement" is evidenced by the fact that TCU disciplined Doe for putatively violating the Policy, but failed to discipline Roe for providing false information and filing a false complaint in violation of Section IV.H. of the Policy. In other words, TCU selectively enforced the Policy by disciplining Doe but refusing to discipline Roe for her violation of the Policy.

159.  Section IV.H.1. of the Policy prohibits a person from providing false information, and Section IV.H.2. of the Policy prohibits a complainant from filing a false complaint.

160.  While under the Policy, providing false information "can result in disciplinary action," a person who knowingly files a false complaint "is subject to disciplinary action up to and including dismissal from the University."

34

161.    The hearing panel clearly found that Roe lied about being raped by Doe in Austin— the hearing panel found that contrary to Roe's allegation of rape, Roe and Doe engaged in consensual sexual intercourse while in Austin. That false claim violates Section IV.H.2. of the Policy.

162.    The evidence also proved that Doe's November 30th Letter contained numerous blatantly false and misleading statements. That false information violates Section IV.H.1. of the Policy.

163.    Roe's lies and providing of misleading and false information could not have been done in "good faith," and thus she was not entitled to immunity from discipline.

164.    Ultimately, TCU treated Roe more favorably than Doe despite her blatant violations of the Policy. TCU, at a minimum, could have mandated that she attend counseling and therapy.

165.    Defendants' violation of Doe's rights has resulted in harm and injury to Doe for which Defendants are liable.

## C.    **The Purdue Standard**

166.    The *Purdue* Standard has been adopted by several circuit courts of appeals, and the Fifth Circuit likewise appears to be considering its adoption currently in *Van Overdam v. Tex. A&M Univ.*, Docket No. 21-20185. Accordingly, all of the facts set forth above raise a plausible inference that TCU discriminated against Doe on the basis of sex under the *Purdue* Standard.

## COUNT II: BREACH OF CONTRACT

167.    Plaintiff restates, realleges, and reincorporates by reference all allegations set forth in every preceding paragraph as if set forth in this paragraph in full.

168.     Upon enrolling at TCU, Doe entered into a contract with TCU comprised of the policies and procedures promulgated by TCU as applicable to all students in exchange for tuition. These policies included, without limitation, the Policy, the Code and the Bill of Rights.

169.     TCU's policies promised Doe specific, enforceable rights, including but not limited to the following:

    a.   Sections I.1.-2. of the Bill of Rights, which include Doe's right to access higher education at TCU and his right to use all appropriate facilities and services of TCU

    b.   Section II.1. of the Bill of Rights, which includes Doe's right to register for and attend any class for which he has met the prerequisites.

    c.   Section 1.19 of the Code seeks to ensure fairness of the panelists in Title IX violations.

    d.   The Code and Policy 1.009 entitle Doe to introduce rebuttal evidence prior to the Title IX hearing.

    e.   Section 5.3.13 of the Code entitles Doe to fair notice of the complaint and allegations against him.

    f.   Generally, the Code and the Policy entitle Doe to a fair, impartial and equitable process for alleged Title IX violations.

170.     TCU breached each of the express promises that are embodied in its policies and contracts with Doe.

171.     Doe has been irreparably harmed by Roe's allegations against him and the subsequent investigation, hearing, and suspension from TCU. He has suffered reputational harm and emotional distress, his freedom has been restricted and he will suffer diminished income and career opportunities as a result of his suspension for which Defendants are liable.

## VI.     <u>PRAYER FOR RELIEF</u>

172.     A suspension will cause irreparable harm to Doe's career, educational opportunities and goals. A suspension will harm his reputation and cause emotional harm. No legal remedy exists for those injuries.

173.   Doe suffers ongoing actual damages as a result of TCU's unlawful disciplinary action in violation of Title IX. THEREFORE, Doe prays that the Court grant the following relief:

a.   Declare Defendants liable for breach of contract;

b.   Declare Defendants in violation of Title IX;

c.   Declare that TCU's Title IX process resulted in an erroneous outcome and gender bias was a motivating factor behind the erroneous outcome;

d.   Enter an order enjoining Defendants from suspending Doe from TCU;

e.   Order TCU to expunge Doe's transcript and college record of any reference to his wrongful sanctions and finding of his violation of sexual misconduct;

f.   Order TCU to issue a letter acknowledging the erroneous outcome of Doe's Title IX process at TCU;

g.   Order TCU to institute policies guaranteeing fair and equitable processes for accused students;

h.   Order TCU to pay all direct and indirect damages suffered by Doe;

i.   Order Defendants to pay Doe's reasonable attorney's fees and costs;  and

j.   Order such additional legal or equitable relief as the Court finds just and improper.

Dated: May 10, 2022

Respectfully Submitted,

/s/ Brian Roark
Brian Roark (admitted *pro hac vice*)
State Bar No. 00794536
brian@brianroark.com
BOTSFORD & ROARK
1307 West Avenue
Austin, Texas 78701
Telephone: (512) 476 – 1900
Fax: (512) 479 – 8040

/s/ Bryan D. Bruner
Bryan D. Bruner
State Bar No. 03252475
bbruner@brunerpc.com
Lynne B. Frank
State Bar No. 24087215
Lfrank@brunerpc.com
BRUNER & BRUNER, P.C.
3700 W. 7th Street
Fort Worth, Texas 76107
Telephone: (817) 332-6633
Facsimile: (817) 332-6619

/s/ H. Dustin Fillmore, III
H. Dustin Fillmore, III
State Bar No. 06996010
dusty@fillmorefirm.com
THE FILLMORE LAW FIRM, L.L.P.
201 Main Street, Suite 801
Fort Worth, Texas 76102
Telephone: (817) 332-2351
Facsimile: (817) 870-1859

**ATTORNEYS FOR JOHN DOE**

## **Certificate of Service**

The undersigned certifies that the foregoing document was served on the following counsel of record via the Court's CM/ECF electronic filing system in accordance with the Federal Rules of Civil Procedure on May 10, 2022.

Alex E. Brakefield (alex.brakefield@huschblackwell.com)
Samuel P. Rajaratnam (sammy.rajaratnam@huschblackwell.com)
Caidi Davis (caidi.davis@huschblackwell.com)
Scott D. Schneider (scott.schneider@huschblackwell.com)
HUSCH BLACKWELL LLP
1900 N. Pearl Street, Suite 1800
Dallas, Texas 75201

**ATTORNEYS FOR DEFENDANTS**

*/s/ Brian Roark*