## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | | |
|---|---|---|
| **JOHN DOE,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **Civil Action No. 4:22-CV-00297-O** |
| | § | |
| **TEXAS CHRISTIAN UNIVERSITY** | § | |
| **& VICTOR J. BOSCHINI, JR.,** | § | |
| | § | |
| *Defendants.* | § | |

---

### NON-PARTY JANE ROE'S RESPONSE TO
### MOTION TO HOLD IN CONTEMPT AND MOTION TO COMPEL DEPOSITION AND
### JANE ROE'S MOTION FOR PROTECTIVE ORDER AND
### MOTION TO QUASH AND BRIEF IN SUPPORT

---

**WICK PHILLIPS GOULD & MARTIN LLP**

David J. Drez III
Texas Bar No. 24007127
*david.drez@wickphillips.com*
Colin P. Benton
Texas Bar No. 24095523
*colin.benton@wickphillips.com*
100 Throckmorton Street, Suite 1500
Fort Worth, Texas 76102
Telephone: 817.332.7788
Facsimile: 817.332.7789

**ATTORNEYS FOR NON-PARTY JANE ROE**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

I.   INTRODUCTION ................................................................................. 1

II.  RELEVANT BACKGROUND ................................................................ 2

    A.   Doe's alleged need to depose Roe. .......................................... 2

    B.   Doe does not pursue topics he claimed he needed to ask Roe. ............... 3

    C.   Doe's counsel focused on retrying the TCU disciplinary
        proceeding and asked questions to harass or embarrass Roe. ............... 4

    D.   Roe's Victim's Advocate at the deposition observed Roe during
        the deposition and on breaks and believes Roe is likely to harm
        herself because of the deposition. ........................................ 11

    E.   The licensed clinical social worker that treats Roe testifies that
        Roe's mental health has been harmed by testifying to the point Roe
        considers death a viable alternative to testifying. ....................... 13

    F.   Doe seeks to hold Roe in contempt and overreaches yet again. .......... 14

    G.   Armed with Roe's negative response to questions about her
        testifying at trial, Doe's counsel served a trial subpoena directly on
        Roe the day after filing the Motion for Contempt. ....................... 14

III. ARGUMENT AND AUTHORITIES ....................................................... 15

    A.   Doe's Motion for Contempt should be denied. ........................... 15

        1.   Doe's Motion fails to identify a single question the Court
            ordered Roe to answer. ............................................. 15

        2.   Doe has not sought and obtained necessary predicate relief
            under Rule 37 to be entitled to a contempt order. ................... 16

    B.   Roe is entitled to a Protective Order. ..................................... 17

        1.   Rule 26 protects Roe from any further annoyance,
            embarrassment, and undue burden and violations of her
            privacy interests. ................................................... 17

        2.   Federal Rule of Evidence 412 protects Roe from any further
            invasion of her privacy, embarrassment, and stereotyping
            engaged in by Doe's counsel. ....................................... 18

3.    The information *actually* sought from Roe is not relevant to a Title IX claim against TCU. ...................................................... 19

4.    Roe is entitled to a protective order. ........................................... 20

    a.    The evidence before the Court shows the severe burden to Roe. .................................................................. 21

    b.    Roe's continued participation will not lead to relevant information. ............................................................ 21

    c.    Sexual assault victims should not be forced to testify when they are not a party to the case. ........................... 22

C.    Motion to Quash. ...................................................................................... 23

IV.    CONCLUSION ....................................................................................................... 23

V.    PRAYER ................................................................................................................. 24

CERTIFICATE OF CONFERENCE ............................................................................... 24

CERTIFICATE OF SERVICE ........................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**

*Altaf v. Allstate Tex. Lloyds*,
 No. 1:20-CV-00105, 2021 WL 2098971 (E.D. Tex. Apr. 22, 2021)........................................ 18

*Doe v. Maryland*,
 No. ELH-20-1227, 2021 WL 1174707 (D. Md. Mar. 23, 2021) ................................................ 3

*Doe v. Princeton Univ.*,
 No. CV 20-4352 (BRM), 2020 WL 3962268 (D.N.J. July 13, 2020) ..................................... 20

*Doe v. Univ. of St. Thomas*,
 240 F. Supp. 3d 984 (D. Minn. 2017)........................................................................................ 3

*Doe v. Univ. of the South*,
 687 F. Supp. 2d 744 (E.D. Tenn. 2009)................................................................................. 3, 20

*Evans v. Griffin*,
 932 F.3d 1043 (7th Cir. 2019) ............................................................................................. 16, 17

*Fremont Energy Corp. v. The Seattle Post-Intelligencer*,
 688 F.2d 1285 (9th Cir. 1982) ................................................................................................. 16

*Gomes v. Univ. of Maine Sys.*,
 365 F. Supp. 2d, 6 (D. Me. 2005) ........................................................................................ 3, 20

*Gulf Oil Co. v. Bernard*,
 452 U.S. 89 (1981)................................................................................................................... 18

*Harris v. Amoco Prod. Co.*,
 768 F.2d 669 (5th Cir. 1985) ................................................................................................... 18

*HDSherer LLC v. Nat. Molecular Testing Corp.*,
 292 F.R.D. 305 (D.S.C. 2013) ................................................................................................. 23

*Keys v. W. Montana Mental Health Ctr.*,
 No. CV 15-32-M-DLC, 2015 WL 12748266 (D. Mont. Oct. 13, 2015) ........................... 19, 22

*Leamon v. KBR, Inc.*,
 No. H-10-253, 2011 WL 13340578 (S.D. Tex. 2011)............................................................. 19

*Leatherman v. Tarrant Cnty. Narcotics Intelligence & Coordination Unit*,
 28 F.3d 1388 (5th Cir. 1994) ................................................................................................... 18

*Petroleos Mexicanos v. Crawford Enterprises, Inc.*,
 826 F.2d 392 (5th Cir. 1987) ................................................................................................... 15

*Seattle Times Co. v. Rhinehart*,
　467 U.S. 20, 104 S. Ct. 2199, 81 L. Ed. 2d 17 (1984) ............................................................ 18

*SEC v. Res. Dev. Int'l, LLC*,
　217 F. App'x 296 (5th Cir. 2007) ............................................................ 15

*Simpson v. Univ. of Colo.*,
　220 F.R.D. 354 (D. Colo. 2004) ............................................................ 19

*Stevens v. Greyhound Lines, Inc.*,
　710 F.2d 1224 (7th Cir. 1983) ............................................................ 16, 17

*Stewart v. Kroeker*,
　No. C04-2130L, 2005 WL 8172489 (W.D. Wash. Sept. 13, 2005) ........................................ 16

**Rules**

Fed. R. Civ. P. 26 ............................................................ 17, 18, 19, 24

Fed. R. Civ. P. 37 ............................................................ 16, 17

Fed. R. Evid. 412 ............................................................ 18, 19, 22, 24

Non-Party Jane Roe ("Roe") files this (1) Response to Plaintiff John Doe's ("Doe") Motion to Hold Roe in Contempt and Motion to Compel Deposition, and (2) her own Motion for Protective Order and Motion to Quash and Brief in Support, and states as follows:

## I. INTRODUCTION

The issue before the Court is whether to compel additional testimony from Roe. Doe seeks contempt and further deposition testimony. Roe asks the Court to protect her from any further testimony in this case, either through a deposition or at trial.  In Roe's Motion to Quash (ECF No. 66) and Motion to Reconsider (ECF No. 96), the Court was presented with serious concerns regarding Doe's deposition of Roe, including the risk of further jeopardizing Roe's already fragile mental health and those implicating Roe's counsel's ethical obligations.  Although the Court did not find undue burden necessary to quash the deposition in its entirety, "the Court recognize[d] that permitting Roe's deposition to proceed will impose some degree of hardship on her given the sensitive nature of the underlying dispute."  ECF No. 118 at 4.  The Court placed substantial guardrails on the process by, among other things, ordering Doe's counsel to refrain from seeking information for the purpose of embarrassment, harassment, or other improper means. Yet Roe's counsel's fears came to fruition primarily as a result of the subject matter on which Roe was interrogated, which was only aggravated by the means in which her testimony was elicited.

The risk to Roe is no longer theoretical.  The risk is now actual and dreadfully serious. Roe's treating clinical social worker and therapist opines that based on her direct observation and conversations with Roe four days after the deposition, Roe's mental health has been harmed to the point that Roe considers death a viable alternative to testifying. The Victim's Advocate who witnessed Roe during and after the deposition echoes these concerns based on her observation of Roe during and after the deposition.  As a result, Roe not only responds to Doe's Motion, but Roe further seeks a protective order from the Court protecting her from any further testimony, including

at trial.[1]  Part one outlines the background leading up to Doe's Motion, including what occurred at Roe's deposition and specific evidence of Roe's licensed professional's observations after Roe's deposition. Part two provides the legal basis for the Court to deny Doe's Motion, grant Roe protection, and quash the trial subpoena.

## II. RELEVANT BACKGROUND

### A.    Doe's alleged need to depose Roe.

In the face of the evidence of severe harm—*i.e.*, undue burden—a deposition would cause a victim of sexual violence such as Roe, Doe protested that he needed Roe's testimony because she was "at the center of Doe's Title IX allegations." ECF No. 79 at 3. Doe contended that Roe "witnessed and participated in interviews, meetings with TCU officials, the investigation, the conduct panel hearing and appeal." *Id.* Doe further pointed to Roe's alleged knowledge of "the pressures her parents and advisors put on TCU to ensure TCU found Doe responsible for the alleged assaults." *Id.* Doe urged he had to obtain Roe's testimony to address these topics and that need outweighed the undue burden the deposition would cause Roe. *Id.*

When denying Roe's Motion to Quash, the Court reasoned Doe's Title IX case permitted him to discover from Roe "information about interviews, meetings with TCU officials, the investigation, the panel hearing, and the appeal *in which she participated* directly or as a witness" because this information "may shed light on both the accuracy of the outcome of the disciplinary proceeding (erroneous outcome) and TCU's potentially disparate treatment of Roe (a female) and Doe (a male) throughout the investigation and proceedings (gender bias; selective enforcement)."[2]

---

[1]   The issue of trial testimony is also live as Doe's counsel served Roe with a trial subpoena the day after filing his motion, and without so much as conferring with Roe's counsel about accepting service.

[2]   ECF No. 96 at 6.

But the Court ordered Doe's counsel to "refrain from seeking information for the purpose of embarrassment, harassment, or other improper means." ECF Nos. 96, 118.

**B.    Doe does not pursue topics he claimed he needed to ask Roe.**

Aside from a line of questions about Roe's communications with TCU's investigator Leigh Holland, Doe's counsel—over the course of more than two hours—asked almost no questions concerning the topics Doe told the Court he purportedly needed to pursue:

- There were **<u>no questions</u>** about why Roe decided to pursue TCU's Title IX process, who (if anyone) encouraged her to pursue it, and why she (allegedly) delayed in pursuing it. ECF No. 79 at 3.

- There were **<u>no questions</u>** about alleged external pressure put on TCU by Roe's parents and advisors. *Id.* at 4.

- There were **<u>no questions</u>** about alleged miscommunication and misunderstanding between Roe and her father regarding Roe's meeting with TCU. *Id.* at 4.

- There were **<u>no questions</u>** about whether Roe was being "fed" answers at the Title IX hearing. *Id.*

- There were **<u>no questions</u>** about allegedly excluded text messages and photos from the Title IX hearing. *Id.* at 5.

- There were **<u>no questions</u>** about the environment on campus with respect to sexual assaults. *Id.*

While the law provides that "[i]t is not the province of [the] Court 'to retry' [Doe's] disciplinary proceeding[,]" Doe's counsel treated Roe's deposition as precisely that opportunity. *Doe v. Maryland*, No. ELH-20-1227, 2021 WL 1174707, *23 (D. Md. Mar. 23, 2021).[3]

---

[3]    Numerous cases support the principle that a Title IX case is not a retrial of the underlying proceedings. *See*, *e.g.*, *Doe v. Univ. of the South*, 687 F. Supp. 2d 744, 755 (E.D. Tenn. 2009) ("This is not a lawsuit between [Roe] and the Plaintiff[]…The Court therefore expresses no opinion as to whether a sexual assault occurred, whether any such acts were consensual, or who, as between John Doe and [Roe] is credible."); *Doe v. Univ. of St. Thomas*, 240 F. Supp. 3d 984, 989-90 (D. Minn. 2017) ("As a general rule, Title IX is not an invitation for courts to second-guess disciplinary decisions of colleges or universities."); *Gomes v. Univ. of Maine Sys.*, 365 F. Supp. 2d, 6, 13 (D. Me. 2005) ("This Court's review is substantially circumscribed; the law does not allow this Court to retry the University's disciplinary proceeding.").

**C.    Doe's counsel focused on retrying the TCU disciplinary proceeding and asked questions to harass or embarrass Roe.**

Over the course of two hours, Doe's counsel essentially endeavored to pick apart every detail of the two sexual assaults she reported to TCU and flat out called her a liar, on multiple occasions.  Roe testified—several times—that everything she previously said during the TCU Title IX hearing was true.  Ultimately, Roe refused to answer certain questions about the Colby Hall incident when Doe's counsel attempted to twist her words. (App. 080–81, Roe Depo., 66:24–67:10).[4] When Doe's counsel continued to ask Roe the same questions, Roe's counsel informed him that Roe was not going to answer. Counsel then offered Doe's counsel the chance to make a record of any questions he wanted to ask, but advised Doe's counsel not to repeatedly ask the same questions because if he did, Roe was going to become very upset. Doe's counsel refused and instead doubled down on his efforts to traumatize Roe.  Doe's counsel ignored the Court's order and continued to ask the same questions to Roe to harass and embarrass her. Despite this intentional harassment, Roe remained at the deposition and answered many of the questions. For the Court's reference, the below exchange occurred after two earlier breaks in the deposition, by which time Doe's counsel was well aware of how traumatizing the deposition was on Roe:

> Q. Okay. So let's talk about Colby Hall, then. Let's go back and talk about Colby Hall.
>
> A. Okay.
>
> Q. All right.
>
> MR. DREZ: Can I just say something to her?
>
> MR. FILLMORE: Uh-huh.

---

[4]   "App." refers to Non-Party Jane Roe's Appendix in Support of Non-Party Jane Roe's Response to Motion to Hold in Contempt and Motion to Compel Deposition and Jane Roe's Motion for Protective Order and Motion to Quash and Brief in Support, which is filed concurrently herewith.

MR. DREZ: If you get to a point where you aren't comfortable answering questions --

THE WITNESS: On -- my answer is going to be the same to every question, but you can ask them.

Q. (BY MR. FILLMORE) Okay. Are you refusing to answer questions?

A. Yes.

Q. You're not going to answer any questions about Colby Hall?

A. No. Everything I said during the trial is the truth. Or not a trial. Sorry. A –

Q. You were at a Title IX hearing.

A. Yes, hearing.

Q. You were not under oath.

A. Yes, but --

Q. You are today.

A. -- you can take my responses to that as what I would be saying now because it is the truth.

Q. Okay. All right. I need to ask you some questions.

A. You can ask them, but I will not answer them.

Q. Okay. And that's kind of what you did to Investigator Holland, too. You refused to answer her questions about Colby Hall, correct?

A. After she had asked them already --

Q. Okay.

A. -- and didn't remember the answer.

Q. All right. So I want to know -- you were wearing clothes, you were wearing panties when he comes over to your dorm room, correct?

A. I refuse to answer that question.

Q. And you go and you sit on your bed with [Doe], correct?

A. I refuse to answer that question.

MR. DREZ: Stop for just a second.

MR. FILLMORE: Uh-huh.

MR. DREZ: Okay? I'll let you make your record of the questions you were going to ask her.

MR. FILLMORE: Uh-huh.

MR. DREZ: But I'm going to ask that you don't ask them here because she's asked you not to. If you want to make a record -- if she said she's not going to answer them and she's sticking to her prior testimony, then I'm asking, for the purpose of understanding where the witness is coming from, you can make your record after. You can put all those questions on the record if you want to take something before the Judge. But if you keep asking them now, she's going to get real upset.

MR. FILLMORE: Well, if she's well enough to go to [Doe]'s house, she's well enough to sit here and answer questions, so . . .

MR. DREZ: Well, that may be your opinion, Dustin.

MR. FILLMORE: Uh-huh.

MR. DREZ: But I am telling you the court ordered you not to do something that's embarrassing, harassing, or humiliating to the witness.

MR. FILLMORE: And this is not.

MR. DREZ: It is because she's --

MR. FILLMORE: No.

MR. DREZ: -- told you she's not answering the questions and I've asked you to move on. I've given you an opportunity to make a record. If you ask them now, all you're going to do is cause her to be very upset. Okay?

MR. FILLMORE: Uh-huh.

MR. DREZ: So if you want to make your record after, do it. But if you keep doing – going through the thing she's told you she's not going to talk about, it serves no purpose other than to harass her.

MR. FILLMORE: I disagree with that, respectfully.

MR. DREZ: Well, are you going -- is that what you're going to do?

MR. FILLMORE: Yeah, yeah. No, I'm going to keep asking her questions.

(App. 127–130, Roe Depo. 113:17–116:24).

Doe's counsel proceeded to ask Roe seven different times how Doe forcefully put his fingers in Roe's vagina. Despite the badgering, Roe testified that Doe had in fact stuck his fingers in her vagina.[5] However, that explanation was somehow not good enough, so Doe's counsel continued to badger her, apparently in order for her to provide a graphic description of how the assault occurred. Roe refused to supply that information. This exchange is excerpted below:

Q. Okay. So let's go to the night that you allege something happened. **You claim that he forcefully penetrated your vagina with his -- one or more fingers** --

A. I'm not answering those questions.

Q. -- while you were sitting on the bed?

A. I'm not answering those questions.

Q. **You claim that he forcefully penetrated your vagina with his -- one or more fingers** while he – you were bent over the desk in your room?

A. I'm not answering those questions.

Q. Are you telling the truth? Are these claims real?

A. I think everyone in the room knows it's the truth.

Q. And -- so why won't you answer the questions? If everybody knows it's true, why won't you answer the questions?

A. I already have and I think you're trying to make me upset. I'm not going to let you bully me into feeling like I'm the person that did something wrong.

Q. **I want to know how did he get his fingers inside your vagina when you were wearing pants and panties**?

---

[5]   "The story you told at the hearing is y'all were sitting beside each other and he reached over and stuck his fingers in your vagina, right? That's what you told -- A. That is what happened, yes." (App. 135, Roe Depo., 121:4–7).

A. I'm not answering that question.

Q. You cannot explain that, can you?

A. I can't remember exactly -- exactly how every single thing went. Because when someone is on top of you and their eyes are not responding and you're saying "stop" and they don't respond, you're not really paying attention to exactly the little details going on.

(App. 133–134, Roe Depo., 119:3–120:8).

Doe's counsel then began referring to Roe's factual assertions as a "story" in a demeaning and derogatory way, insinuating that Roe made up the events that Doe admitted to. He also continued to press Roe for a graphic description of the sexual assault:

Q. Okay. **So now you're telling a story** that he was on top of you, which you've not told before, right? **You haven't told that story before, have you**?

A. I think "on top" and "next to" is not that – I don't mean it differently. I mean, we were on my bed and he was above me. Not – it could have been sitting,

Q. Okay. Well, that – **this is the first time you've talked – told this story**. **The story you told at the hearing is y'all were sitting beside each other and he reached over and stuck his fingers in your vagina, right**? That's what you told –

A. That is what happened, yes.

Q. Okay. **And how did he get past your pants and your panties**?

A. I'm not answering that question.

Q. And you claim then that you got up and went over to the desk to escape him, right?

A. That's true.

Q. All right. **So – and he went – he followed you over there and stuck his fingers in you again**?

A. Yes.

Q. All right. From behind or the front? How?

A. I'm not answering that question.

Q. You can't recall or are you just refusing to answer?

A. I'm just refusing to answer.

Q. So you do know, you're just refusing to give that information?

A. Because I think you're trying to make me upset.

Q. Ma'am, I have to ask you these questions because –

A. You can ask them.

Q. Okay. So I'm not trying to make you upset. I'm trying to get what the truth is. **So if you can explain to the jury how he managed to bypass your pants and panties to get his fingers in your vagina, can you do that**?

A. You've asked me that question four times and I've had the same response.

Q. And your response is what?

A. I'm not answering that.

(App. 134–136, Roe Depo., 120:20–122:11).

Doe's counsel then dropped any pretense of compliance with the Court's order and began haranguing Roe to confess that nothing ever happened, and telling Roe that it was time for her to tell the truth. When Roe testified that she had told the truth and would not let Doe's counsel bully her, Doe's counsel shifted gears and asked if she would testify or respond to a subpoena for trial. Such questioning served no purpose other than to harass and intimidate Roe:

Q. **Isn't it time you told the truth**?

MR. RAJARATNAM: Objection, form.

THE WITNESS: I have.

MR. DREZ: Yeah.

Q. (BY MR. FILLMORE) **Isn't it time -- it didn't happen, did it, [Roe]**?

MR. RAJARATNAM: Objection, form.

THE WITNESS: I've --

Q. (BY MR. FILLMORE) **It did not happen, did it, [Roe]**?

A. I'm not going to let you bully me. You know he did it. I know he did it.

Q. "I know he did it." **It didn't happen** --

A. How do you -- he admitted it.

Q. **Now, in any of the text messages where – did he say that he stuck his fingers in your vagina**?

A. He said he's a rapist.

Q. No. And he also said he hit you and you've – you've said he said he hit you and he didn't. So does -- is there -- **do you have a single text message where he said, "I stuck my fingers in your vagina"**?

A. I don't think he said it specifically.

Q. Right. All right. Let me talk to my -- oh, let me ask you this real quick.
Are you willing to come testify live in front of a jury at the trial of this matter?

A. No.

Q. So we're going to need to subpoena you and -- to get that done. So --

MR. DREZ: Well, then you can talk to me about it.

MR. FILLMORE: Okay. Will you --

MR. DREZ: She doesn't need to answer these questions right now.

Q. (BY MR. FILLMORE) Will you authorize Mr. Drez to accept the subpoena?

MR. DREZ: She – that's not fair. You don't have to answer that question.

Q. (BY MR. FILLMORE) Okay. Do you live on [name of street]?

A. Yes.

Q. [specific address]?

A. I don't feel comfortable answering that.

Q. Okay.

MR. FILLMORE: All right. Let's take a break.

Q. (BY MR. FILLMORE) Wait, real quick. Are you going to be out of the country in the spring?

A. Why is that relevant?

Q. Are you leaving the country to go to class overseas in the spring?

A. No.

Q. You're going to be here in the spring?

A. Yes.

(App. 136–138, Roe's Depo., 122:17–124:20).

Following the above, Roe left the deposition with her father in a state of severe emotional distress.  She told her father and her Victim's Advocate that she would rather kill herself than testify.  (App. 008, at ¶ 7). Doe's counsel indicated that Roe was no longer going to continue to answer questions and reserved the right to seek redress from the Court due to Doe's counsel asking questions designed to upset, harass, and embarrass Roe:

> MR. DREZ: And we will likewise reserve our rights to seek redress because counsel continued to ask the witness questions in a means designed to upset her and harass her and embarrass her, and nonetheless continued pressing that means, and we consider it improper and we'll raise that issue with the court and – if and when relief is sought.

(App. 140, Roe Depo., 126:12–18).

**D.     Roe's Victim's Advocate at the deposition observed Roe during the deposition and on breaks and believes Roe is likely to harm herself because of the deposition.**

As permitted by the Court, Roe had a non-attorney party present at the deposition, referred to here as "Victim's Advocate."  The Victim's Advocate, who is a certified volunteer victim's

advocate,[6] attended the deposition. She witnessed the entire deposition and interacted with Roe during breaks and after the deposition ended. (App. 008, at ¶ 3).

The Victim's Advocate's testimony makes clear that the fears Roe previously presented in her Motion to Reconsider were realized. She testifies that she observed questions at the deposition that were harassing and intended to embarrass Roe. (App. 008, at ¶ 4). She witnessed "badgering, hostile accusations, and questioning designed to intimidate, embarrass, and emotionally upset [Roe]." *Id.* She testifies that "Mr. Fillmore at one point repeated thrice an accusation at [Roe] that she was lying and making the story up as she repeatedly denied his accusations." *Id.* The Victim's Advocate observed Roe calmly respond to the harsh questions and accusations, but as the questioning escalated and Roe was pressed to relive the horrific details of each assault, Roe became emotionally upset and overwhelmed. (App. 008, at ¶ 5).

The Victim's Advocate also witnessed that Roe had to leave the room three separate times to take breaks and regain her composure. *Id.* Each time, she observed Roe have short, rapid breathing and nausea. *Id.* She also observed Roe vomit multiple times and exhibit uncontrollable outbursts and crying. *Id.* The Victim's Advocate was able to help calm Roe down on two of those occasions. (App. 008, at ¶ 6). As the deposition continued, the Victim's Advocate witnessed Roe flee the room and building and threaten to harm herself if she was forced to return to the deposition. (App. 008, at ¶ 7). After witnessing the deposition and meeting with Roe during and after the deposition and based on the Victim's Advocate's experience working with trauma victims, the Victim's Advocate testifies that she is very concerned Roe will harm herself as a result of the deposition. (App. 008, at ¶8). The Victim's Advocate further testifies there is a high degree of risk

---

[6]   The Victim's Advocate is certified by the Office of the Attorney General as volunteer victim's advocate. (App. 007, at ¶ 2). She serves on the Governor's Sexual Assault Survivor's Task Force. *Id.* She visits with victims who present at hospitals for forensic exam. She also provides support, crisis management, and serves as a liaison between the victim and law enforcement. *Id.* She also provides support via a 24-hour crisis hotline. *Id.*

that Roe will harm herself if she is forced to continue with the deposition, provide further testimony, or otherwise participate in this case. *Id.*

**E.    The licensed clinical social worker that treats Roe testifies that Roe's mental health has been harmed by testifying to the point Roe considers death a viable alternative to testifying.**

Roe has also returned to her licensed professional—a licensed clinical social worker and clinical therapist for a rape, crisis and victim services department at Roe's treatment facility—since her deposition.[7] In support of Roe's Motion to Reconsider, her treating professional previously testified on what *could* happen if Roe were subjected to a four-hour deposition where she was cross-examined about her past sexual history with Doe and the Title IX proceeding. (App. 003–004, at ¶ 6. Having seen Roe on November 7, 2022—four days after Roe's deposition—Roe described experiencing severe distress, panic, and fear during the deposition. *Id.* Roe informed the treating professional of clinically significant distress and impairment in social, occupational, and personal areas of functioning. *Id.*

In the most recent session, Roe presented as distressed, evidenced by frequent crying and inability to finish sentences. (App. 004, at ¶ 7). Roe exhibited fidgeting, hunched posture, fluctuating speech patterns, and frequent intense emotional changes. *Id.* The professional testifies "[a]ll of these are common occurrences when a client recounts a traumatic experience in session. [Roe] made the statement that she would 'rather be dead' than be required to testify another time." *Id.* The treating professional immediately assessed for suicide risk. She testifies she is concerned "additional testifying will further traumatize her and put her at risk for suicide." *Id.* The treating professional further opined that her original fears were realized that the deposition has had negative

---

[7]   The CV of Roe's treating professional was previously submitted to the Court as Exhibit A-1 in support of her Motion to Reconsider and was filed under seal at ECF No. 110.

effects on Roe's mental health and her new counseling goals are to return to a baseline, as well as continue other trauma work for which Roe originally sought counseling. (App. 004, at ¶ 8).

Roe's treating professional opined it is her "clinical opinion . . . that what [Roe] endured during the deposition has re-traumatized her based on her reports and my clinical observations during the session on 11/07/2022. It is also my clinical opinion, based on observation and direct conversation with [Roe], that this event has harmed her mental health to the point she considers death to be a viable alternative to testifying. I have serious concerns about Roe's short- and long-term mental health if she is forced to continue the deposition or to testify in court." (App. 004–005, at ¶ 9).

**F.      Doe seeks to hold Roe in contempt and overreaches yet again.**

In his motion, Doe asks that Roe be "ordered to complete her deposition, and the Court should add an extra hour to the Court's four-hour time limitation to make up for the time Roe wasted by her lack of cooperation."  ECF No. 125 at 8.  Yet after Roe left the deposition, Doe's counsel said, "I estimate I have maybe 30 more minutes to go" and further stated "we have more exhibits to go over."  (App. 139, Roe Depo. 125:6 – 24). Doe's counsel decided to approach the deposition in the manner in which he did, spending almost no time on the topics that Doe told the Court justified Roe's deposition.

**G.      Armed with Roe's negative response to questions about her testifying at trial, Doe's counsel served a trial subpoena directly on Roe the day after filing the Motion for Contempt.**

Lest there be any doubt about Doe's intentions, Doe's counsel was well-aware of Roe's reaction to questions about her testifying at trial.[8]  Doe's counsel was likewise aware that he could communicate with Roe's counsel about any subpoena, and indeed Roe's counsel had accepted

---

[8]   (App. 137–138, Roe Depo., 123:16 – 124:20).

service of the original subpoena for Roe's deposition. Instead of asking Roe's counsel to accept service, or otherwise extending some modicum of professional courtesy, and in spite of the fact that the trial of this case is sixty days away, Doe's counsel had Roe personally served at her apartment on November 10, 2022. (App. 011). Equally notable is that Doe's counsel had the opportunity to mention this when the parties conferred on this motion *the day before* Roe was served. Personal service of the trial subpoena on Roe was blatantly done at a time and in a manner designed solely to harass her. Roe also moves to quash the trial subpoena on the same basis that justifies protecting Roe from further deposition testimony.

### III. ARGUMENT AND AUTHORITIES

**A.    Doe's Motion for Contempt should be denied.**

> **1.    Doe's Motion fails to identify a single question the Court ordered Roe to answer.**

"A party commits contempt when [s]he violates a definite and specific order of the court requiring him to perform . . . a particular act or acts with knowledge of the court's order." *SEC v. Res. Dev. Int'l, LLC,* 217 F. App'x 296, 298 (5th Cir. 2007). "[T]he movant bears the burden of establishing the elements of contempt by clear and convincing evidence." *Id.* (citing *Petroleos Mexicanos v. Crawford Enterprises, Inc.,* 826 F.2d 392, 401 (5th Cir. 1987)).

Doe's motion for contempt, apparently made pursuant to FED. R. CIV. P. 37(b)(1) and 45(g), is based entirely on this Court's order denying Roe's Motion to Quash. (ECF No. 125 at 2, 8). In that Order, Roe was ordered to appear for an in-person deposition, which Roe did. She answered questions under oath for more than two hours. Nowhere in the Court's order was Roe ordered to answer any particular question. Thus, as an initial, fundamental matter, Roe cannot be held in contempt because Doe has wholly failed to point to any specific question the Court ordered Roe to answer and that Roe still refused to answer. *See Ibarra v. Baker*, F. App'x 457, 471 (5th

Cir. 2009) (vacating in part Rule 45 sanction for failure to comply with subpoena because "[t]he subpoena does not command any other person to do anything" so the sanctioned party "could not have disobeyed the subpoena if it did not require him to act").

### 2. Doe has not sought and obtained necessary predicate relief under Rule 37 to be entitled to a contempt order.

Doe's motion is similar to one rejected in *Stewart v. Kroeker*, No. C04-2130L, 2005 WL 8172489 (W.D. Wash. Sept. 13, 2005). In that case, a non-party appeared and testified in compliance with a Rule 45 subpoena. *Id.* at *1. After the non-party refused to answer a number of questions and asserted her Fifth Amendment privilege, the defendant filed a motion for contempt under Rule 45. *Id.* The court denied the motion outright because "[t]he subpoena did not direct [the non-party] to answer any of the specific questions propounded by [defendants, however]. If [the non-party] is to be held in contempt for failure to answer questions, then it must be pursuant to Rule 37(b)(1) . . . ." *Id.* (quoting *Fremont Energy Corp. v. The Seattle Post-Intelligencer*, 688 F.2d 1285, 1287 (9th Cir. 1982)). The court concluded, "Defendants eschewed a motion to compel under Rule 37 and are therefore unable to show that [non-party] failed to 'answer a question after being directed by the court . . . ." *Id.* (quoting FED. R. CIV. P. 37(b)(1)).

Similarly, in *Evans v. Griffin*, 932 F.3d 1043 (7th Cir. 2019), the court reversed and remanded an order dismissing a case as a sanction for a party who allegedly failed to appear for a deposition. The Seventh Circuit first explained that Rule 37(d) did not supply a basis for sanctions because the rule applies only when a witness "literally fails to show up for a deposition session." *Id.* at 1045 (quoting *Stevens v. Greyhound Lines, Inc.*, 710 F.2d 1224, 1228 (7th Cir. 1983)). However, "[t[he problem [here] was a refusal to participate, not a failure to show up." *Id.* "[I]f a party 'does in fact appear physically for the taking of his deposition but refuses to cooperate . . .

the proper procedure is first to obtain an order from the court, as authorized by Rule 37(a), directing

him to be sworn and testify.'" *Id.* (quoting *Stevens*, 710 F.2d at 1228).

The court then analyzed Rule 37(b) and explained the rule applies only if the movant has

first filed a Rule 37(a) motion and obtained an order from the court:

> Rule 37 [applies] only when a litigant fails 'to comply with a court order'
> (capitalization omitted). Use of Rule 37(b) is therefore impossible if there is no
> court order in place. A party lays the predicate for Rule 37(b) sanctions by filing a
> motion under Rule 37(a) seeking 'an order compelling disclosure or discovery.'
> FED. R. CIV. P. 37(a)(1). Only if (and to the extent) the court grants that order, and
> then the person subject to the order fails to comply with it, may the party seeking
> discovery move on to Rule 37(b) and ask for sanctions. *See Stevens*, 710 F.2d at
> 1228. Kayira skipped the essential first step of this process, instead immediately
> seeking sanctions.

*Id.* at 1046.

It is unclear from Doe's Motion what question Doe wanted answered that Roe refused to

answer. Roe *did* answer certain questions by referring to her prior testimony before the TCU panel,

even swearing multiple times that her prior testimony was true.  That Doe's counsel did not like

the answer does not equate to a refusal to answer, and in any event, Roe was not ordered to answer

those or any questions, and she certainly was not required to answer them more than one time.

Doe skipped an "essential first step of this process" and cannot establish his burden by clear and

convincing evidence. *See id.* The Motion for Contempt should be denied.

**B.      Roe is entitled to a Protective Order.**

**1.      Rule 26 protects Roe from any further annoyance, embarrassment, and undue
burden and violations of her privacy interests.**

The Court has broad discretion to place reasonable limits on discovery so as to protect a

non-party from, among other things, annoyance, oppression, or undue burden. *See* FED. R. CIV. P.

26. In pertinent part, Rule 26(c)(1) provides:

> [A]ny person from whom discovery is sought may move for a
> protective order in the court where the action is pending . . . The

> motion must include a certification that the movant has in good faith
> conferred or attempted to confer with other affected parties in an
> effort to resolve the dispute without court action. The court may, for
> good cause, issue an order to protect . . . person from annoyance,
> embarrassment, oppression, or undue burden or expense. . . .

*See* FED. R. CIV. P. 26(c)(1)(G). To establish good cause, that party must submit "a particular and

specific demonstration of fact . . . ." *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 102 n. 16 (1981).

A district court can exercise its discretion in determining to restrict discovery and in

determining whether to grant a motion for a protective order. *Leatherman v. Tarrant Cnty.*

*Narcotics Intelligence & Coordination Unit,* 28 F.3d 1388, 1394 (5th Cir. 1994); *Altaf v. Allstate*

*Tex. Lloyds*, No. 1:20-CV-00105, 2021 WL 2098971, at *3 (E.D. Tex. Apr. 22, 2021) (citing

*Harris v. Amoco Prod. Co.,* 768 F.2d 669, 684 (5th Cir. 1985)).

Courts may restrict discovery that "may seriously implicate privacy interests of . . . third

parties." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 35, 104 S. Ct. 2199, 81 L. Ed. 2d 17 (1984).

Although Federal Rule of Procedure 26(c) "contains no specific reference to privacy or to other

rights or interests that may be implicated, such matters are implicit in the broad purpose and

language of the Rule." *See id.* at 35 n. 21.

### 2. Federal Rule of Evidence 412 protects Roe from any further invasion of her privacy, embarrassment, and stereotyping engaged in by Doe's counsel.

Rule 412 of the Federal Rules of Civil Procedure provides:

The following evidence is not admissible in a civil or criminal proceeding involving
alleged sexual misconduct:

(1) evidence offered to prove that a victim engaged in other sexual behavior; or

(2) evidence offered to prove a victim's sexual predisposition.

FED. R. EVID. 412(a). "Rule 412 aims to safeguard the alleged victim against the invasion of

privacy, potential embarrassment and sexual stereotyping that is associated with public disclosure

of intimate sexual details and the infusion of sexual innuendo into the factfinding process."

*Simpson v. Univ. of Colo.*, 220 F.R.D. 354, 357 (D. Colo. 2004) (citing Advisory Committee Notes to 1994 Amendments to FED. R. EVID. 412). To that end, the Advisory Committee recognized that although Rule 412 is an evidentiary rule that does not expressly apply to discovery, it should be utilized in support of protective orders:

> [i]n order not to undermine the rationale of Rule 412, however, courts should enter appropriate orders pursuant to Fed. R. Civ. P. 26(c) to protect the victim against unwarranted inquiries and to ensure confidentiality. **Courts should presumptively issue protective orders barring discovery** unless the party seeking discovery makes a showing that the evidence sought to be discovered would be relevant under the facts and theories of the particular case, and cannot be obtained except through discovery.

*Advisory Committee Notes to 1994 Amendments* to FED. R. EVID. 412 (emphasis added). As one district judge explained, "[t]he Court must then respect the public policy concerns of Rule 412 in shaping the proper scope of discovery in this case." *Keys v. W. Montana Mental Health Ctr.*, No. CV 15-32-M-DLC, 2015 WL 12748266, at *2 (D. Mont. Oct. 13, 2015).

The Court should apply Federal Rule of Evidence 412 in support of a protective order, protecting Roe from having to further participation in a deposition and/or trial of this case. *Leamon v. KBR, Inc.*, No. H-10-253, 2011 WL 13340578, at *2 (S.D. Tex. 2011) (Hittner, J.) (applying Rule 412 to bar the deposition of a former sexual partner of the plaintiff, an adult female who alleged that she was raped while working as a paramedic at Camp Harper in Iraq).

### 3. The information *actually* sought from Roe is not relevant to a Title IX claim against TCU.

Courts could not be clearer that a Title IX case is not a vehicle for what Doe is attempting to do in this case—litigate whether a sexual assault occurred:

> **This case comes before this Court in limited posture**. The Plaintiffs' claims against the Defendants are grounded primarily upon the way the University officials conducted the process leading to its conclusion that the Plaintiffs had violated the Code and to its imposition of sanctions. In essence, the Plaintiffs claim that the Defendants failed to accord them a fair and impartial hearing and fair and impartial appeals before imposing and affirming significant sanctions. The Defendants

> respond that the University disciplinary proceedings were fundamentally fair. This Court's review is substantially circumscribed; **the law does not allow this Court to retry the University's disciplinary proceeding**.
>
> **This is not a lawsuit between the Complainant and the Plaintiffs. This Court is not asked to make an independent determination about what happened between the Plaintiffs and the Complainant on June 10, 2002**. Neither the Plaintiffs nor the Complainant have testified before this Court. **This Court draws no opinion, therefore, about whether a sexual assault occurred, whether the acts were consensual, who among the Plaintiffs and the Complainant is credible, and who is not**. This decision, which grants summary judgment in favor of the Defendants, is not a judicial finding either in favor or against the Plaintiffs or in favor or against the Complainant on the merits of her claims and their defenses.

*Gomes v. Univ. of Maine Sys.*, 365 F. Supp. 2d 6, 13–14 (D. Me. 2005) (emphasis added). The question before the Court is not what occurred in Austin and at Colby Hall but whether Doe can set forth sufficient evidence that TCU discriminated against him on the basis of his sex in the Title IX proceeding.[9] On this point, it is telling that Doe apparently does not need additional testimony from Roe in order to respond to TCU's pending motion for summary judgment. This is because nothing Roe was questioned on or that Doe wants to further question Roe about is germane to TCU's motion or Doe's Title IX claim. The matters represented to the Court as potentially relevant were almost completely ignored by Doe's counsel.

### 4.     Roe is entitled to a protective order.

It is abundantly clear that Doe is attempting to improperly use this Title IX case to exonerate himself from his admissions and TCU's finding that he engaged in non-consensual sexual contact with Roe. He has vindictively[10] brought Roe into this misguided effort, and it is

---

[9]   *Doe v. Princeton Univ.*, No. CV 20-4352 (BRM), 2020 WL 3962268, at *3 (D.N.J. July 13, 2020) (noting, "the issue here is not whether Plaintiff committed a sexual act, but whether or not Princeton subjected Plaintiff to an unfair disciplinary proceeding"); *Doe v. Univ. of the South*, 687 F. Supp. 2d 744, 755 (E.D. Tenn. 2009) ("This is not a lawsuit between [Roe] and the Plaintiff[] . . . The Court therefore expresses no opinion as to whether a sexual assault occurred, whether any such acts were consensual, or who, as between John Doe and [Roe] is credible.").

[10]   The vindictive nature of Doe's lawsuit is front and center in his live complaint, in which he describes Roe as "fragile, insecure, unpredictable and immature. Even the smallest of slights or disagreements would destabilize Roe and could lead Roe to burning herself or forcing herself to purge." ECF No. 43, ¶48.

**NON-PARTY JANE ROE'S RESPONSE TO**                                                        **PAGE 20**
**MOTION TO HOLD IN CONTEMPT AND MOTION TO COMPEL DEPOSITION AND**
**JANE ROE'S MOTION FOR PROTECTIVE ORDER AND**
**MOTION TO QUASH AND BRIEF IN SUPPORT**

clear from Doe's counsel's questions that the entire purpose of subjecting Roe to discovery is to harass her. Doe's counsel's entire purpose in deposing Roe was not to discover information to prove his Title IX case, but to interrogate Roe in hopes of extracting a confession that she had falsely accused Doe of non-consensual sexual contact. That issue is not before the Court, but to be sure, Roe unequivocally testified that she stood by everything she reported: "MR DREZ: Are you swearing your testimony before was true?  THE WITNESS: Yes." (App. 074, Roe Depo., 60:8–10). Doe must not be permitted to use the judicial process to harass and embarrass Roe.

> ### a.    The evidence before the Court shows the severe burden to Roe.

Roe has set forth sufficient and compelling evidence that the burden already caused by her participation in this case is significant. The licensed professional who is treating Roe testified that it is "my clinical opinion . . . that what [Roe] endured during the deposition has re-traumatized her based on her reports and my clinical observations during the session on 11/07/2022. It is also my clinical opinion, based on observation and direct conversation with [Roe], that this event has harmed her mental health to the point she considers death to be a viable alternative to testifying. I have serious concerns about Roe's short- and long-term mental health if she is forced to continue the deposition or to testify in court." (App. 004–005, at ¶ 9). The Victim Advocate's testimony likewise establishes the extreme harm Roe has experienced as a result of the deposition.  (App. 008–009, at ¶ 8). Roe has set forth sufficient, compelling evidence of the severe burden and harm that being subjected to a deposition has caused her and the harm that further testimony would cause.

> ### b.    Roe's continued participation will not lead to relevant information.

Outside of Doe's failed efforts to extract a confession from Roe, everything Doe sought and may seek from Roe is available from other sources. Balancing the extreme harm to Roe against the need for Doe to have Roe's testimony favors preventing Roe from further testifying or

participating in this case. At Doe's counsel's election, almost no topics the Court previously deemed relevant were pursued at Roe's deposition.  The burden on Roe clearly outweighs any value this evidence would have for Doe's Title IX case and a protective order should be issued in favor of Roe.

> c.    **Sexual assault victims should not be forced to testify when they are not a party to the case.**

Cases where a victim of sexual assault has been forced to testify are instructive and distinguishable because those cases involve a victim-plaintiff suing a responsible party—*i.e.*, an employer. In *Keys v. Western Montana Mental Health Center*, the plaintiff sued a counseling facility and its employees alleging one of its employees violently raped and beat her. When the defendants wanted to inquire into the plaintiff's sexual history with her alleged attacker, the plaintiff moved for protective order. The court granted it as to plaintiff's lifelong sexual history and past sexual partners based on Federal Rule of Evidence 412 but permitted questions into a prior relationship and consensual sexual encounters between plaintiff and her attacker. The court reasoned, "No judge wants to allow a possible rape victim to be subjected to a line of embarrassing and intrusive questions, effectively reliving the incident again. However, because Plaintiff seeks to use evidence of the alleged assault in their claim, Defendants must be allowed to conduct discovery to defend against those claims." *Keys v. W. Montana Mental Health Ctr.*, No. CV 15-32-M-DLC, 2015 WL 12748266, at *3 (D. Mont. Oct. 13, 2015).

*This is not a case where Roe sued TCU or Doe and then seeks to avoid discovery*. In that case it might be arguable that Roe be forced to testify. But this case involves Doe and TCU—Roe is not a party. Cases permitting limited discovery are inapposite. The Court should protect Roe from any further participation in this lawsuit rather than compel continued participation against her will.

C.    **Motion to Quash.**

The evidence before the Court establishes the need for a protective order in favor of Roe. But Doe now seeks to further harass Roe by serving her with a trial subpoena. (App. 011).  Again, this was done sixty days before the trial date and intentionally without contacting Roe's counsel to accept service—despite the professional courtesy that existed as a matter of course before the deposition. The evidence set forth by Roe establishes that the subpoena should be quashed. *HDSherer LLC v. Nat. Molecular Testing Corp.*, 292 F.R.D. 305, 307 (D.S.C. 2013) (reciting Federal Rules of Civil Procedure protect non-party from compliance with subpoena that would cause embarrassment and annoyance).

## IV. CONCLUSION

Two things are abundantly clear.  First, Roe endured extreme trauma during and as a result of her deposition, to the point that she threatened suicide.  Second, compelling further testimony from Roe, by way of a deposition or at trial, will have the same if not an unspeakable impact on her.  Under these circumstances, the judicial process should protect Roe.

Roe has participated in this lawsuit far more than necessary. Doe is abusing the discovery process to extract revenge on Roe. If that was not clear before, it became perfectly clear at Roe's deposition when she—*under oath*—(1) stood by everything she has previously asserted, and (2) reaffirmed that Doe did what he admitted to doing in his text messages. Doe's counsel's attempt to extract a confession that Roe's "story" was made up was in direct violation of the Court's Order. Doe's Motion should be denied.

Further, Federal Rule of Civil Procedure 26, Federal Rule of Evidence 412, and Doe's counsel's conduct at the deposition, as well as the evidence before the Court provide sufficient grounds for the Court to grant Roe a protective order from any further participation in this lawsuit. This same evidence supports granting Roe's Motion to Quash.

## V. PRAYER

Wherefore, Roe respectfully prays that the Court deny Doe's Motion for Contempt and Motion to Compel Deposition, grant Roe's Motion for Protective Order and preclude her from further deposition or live testimony or participation is this lawsuit, and for any and all further relief to which Roe is justly entitled.

Respectfully submitted,

**WICK PHILLIPS GOULD & MARTIN LLP**

*/s/ David J. Drez III*
David J. Drez III
Texas Bar No. 24007127
*david.drez@wickphillips.com*
Colin P. Benton
Texas Bar No. 24095523
*colin.benton@wickphillips.com*
100 Throckmorton Street, Suite 1500
Fort Worth, Texas 76102
Telephone: 817.332.7788
Facsimile: 817.332.7789

**ATTORNEYS FOR NON-PARTY JANE ROE**

## CERTIFICATE OF CONFERENCE

Counsel for Roe has conferred with counsel for Doe and TCU regarding the merits of this motion for protective order and motion to quash.  Doe is opposed to the relief sough.  TCU is unopposed to the relief sought.

*/s/ David J. Drez III*
David J. Drez III

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the November 14, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will electronically mail notification of such filing to all counsel of record who have appeared in this case.

*/s/ David J. Drez III*_____

David J. Drez III
