IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

JOHN DOE,

*Plaintiff*,

v.

TEXAS CHRISTIAN UNIVERSITY,

*Defendant.*

Civil Action No. 4:22-CV-00297-O

## PLAINTIFF JOHN DOE'S BRIEF IN OPPOSITION TO
## DEFENDANT TCU'S MOTION FOR SUMMARY JUDGMENT

Brian Roark
Botsford & Roark
1307 West Avenue
Austin, Texas 78701
Telephone: (512) 476-1900
Fax: (512) 476-8040
brian@brianroark.com
*Admitted pro hac vice*

Bryan D. Bruner
Lynne B. Frank
Bruner & Bruner, P.C.
3700 West 7th Street
Fort Worth, Texas 76107
Telephone: (817) 332-6633
Fax: (817) 332-6619
bbruner@brunerpc.com
lfrank@brunerpc.com

H. Dustin Fillmore III
The Fillmore Law Firm, L.L.P.
201 Main Street, Suite 700
Fort Worth, Texas 76102
Telephone: (817) 332-2351
Fax: (817) 870-1859
dusty@fillmorefirm.com

**Attorneys for Plaintiff John Doe**

## TABLE OF CONTENTS

I.    Summary Judgment Standards ........................................................................1

II.   Statement of Facts ........................................................................................ 2

    A.    Doe and Roe commence their formal dating relationship and begin having sex. ...........................................................................................................2

    B.    Roe follows Doe to TCU, they continue to have sex even though their formal dating relationship has ended, and Doe begins seeing another girl. .............3

    C.    Doe begins dating a new girl. ...................................................................5

    D.    Roe retroactively and falsely labels two encounters with Doe as sexual assaults. ..................................................................................................6

        1.    What really occurred at Colby Hall on August 19, 2020.............................7

        2.    What really happened in Austin on October 3/4, 2020. ............................. 8

    E.    Roe refuses to cooperate with TCU's investigation. .................................8

    F.    Roe falsely claims she cooperated with TCU's investigation and dramatically changes her sexual-assault stories. .................................................. 11

    G.    Doe moves TCU to dismiss Roe's complaint, but TCU refuses.......................... 13

    H.    Meanwhile, after consistent pressure from Roe's parents, TCU creates new and admittedly unfair "trauma informed training" to ensure Doe's Title IX conviction.................................................................................................14

    I.    TCU handpicks and "trains" employees to serve as jurors on Doe's Title IX panel. .............................................................................................. 20

    J.    TCU continues its jury tampering to convict Doe for the alleged Colby Hall incident. ................................................................................................ 20

    K.    TCU's rigged hearing goes forward and obtains a Title IX conviction—but only after more jury tampering. .................................................................23

    L.    TCU's rigs the appeal as well. ................................................................. 28

    M.    Roe is deposed and demonstrates she has no credibility...................................... 28

III.  Argument ................................................................................................... 29

    A.    Doe is entitled to proceed to trial on his Title IX claim. ...............................29

        1.    TCU's case against Doe suffered from significant evidentiary weaknesses and the panel's decision was illogical. ....................................31

        2.    Procedural flaws infected Doe's Title IX proceeding................................32

        3.    Biased TCU officials infected Doe's Title IX proceeding.........................36

          4.     TCU was pressured to convict Doe...................................................37

          5.     Roe was motivated to lie. ...............................................................38

          6.     TCU harbors systemic bias against males...................................38

    B.    Doe is entitled to Proceed to Trial on his Breach of Contract Claim. ..................39

          1.     TCU's policies constitute an express contract or, at a minimum, form the foundation of an implied contract. ...............................41

          2.     TCU Breached its Contract with Doe. ....................................... 44

          3.     Doe has Established Damages. ...................................................47

IV.    Conclusion ........................................................................................... 50

## TABLE OF AUTHORITIES

### Cases

*Abraxas Petroleum Corp. v. Hornburg*, 20 S.W.3d 741 (Tex. App.—El Paso 2000, no pet.).......47

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................................1, 2

*Anyadike v. College*, No. 7:15-CV-00157-O, 2016 WL 7839183 (N.D. Tex. Mar. 14, 2016)........ 42

*Boyles v. Kerr*, 855 S.W.2d 593 (Tex. 1993) ................................................................. 49

*City of Wichita Falls v. Bruner*, 191 S.W.2d 912 (Tex. Civ. App.—Fort Worth 1945, writ ref'd w.o.m.) ................................................................................................................... 48

*Cole v. Hunter*, 497 F. Supp. 3d 172 (N.D. Tex. 2020).............................................................1, 2

*Colli v. S. Methodist Univ.*, No. 3:08-CV-1627-P, 2011 WL 3524403 (N.D. Tex. Feb. 14, 2011) (slip op.) ...............................................................................................40, 46, 47

*Colli v. Southern Methodist University*, No. 3:08-CV-1627-P, 2011 WL 3524403 (N.D. Tex. Feb. 14, 2011) ................................................................................................................. 46

*Dean v. Dean*, 821 F.2d 279 (5th Cir. 1987)................................................................. 49

*Delgado v. Methodist Hosp.*, 936 S.W.2d 479 (Tex. App.—Houston [14th Dist.] 1996, no writ)49

*Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018)...................................................................38

*Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561 (D. Mass. 2016) .................................................39, 49

*Doe v. Columbia Univ.*, 831 F.3d 46 (2d Cir. 2016).................................................37, 38

*Doe v. Miami Univ.*, 882 F.3d 579 (6th Cir. 2018) .........................................................38

*Doe v. Oberlin Coll.*, 963 F.3d 580 (6th Cir. 2020) .......................................................32

*Doe v. Purdue*, 928 F.3d 652 (7th Cir. 2019) .................................................... 29, 37, 38

*Doe v. Tex. Christian Univ.*, No. 4:22-CV-00297-O, 2022 WL 1573074 (N.D. Tex. Apr. 29, 2022) ............................................................................................................. passim

*Doe v. Univ. of Arkansas*, 974 F.3d 858 (8th Cir. 2020) ......................................... 32, 37

*Doe v. Univ. of Denver*, 1 F.4th 822 (10th Cir. 2021) ................................ 29, 30, 31, 32

*Doe v. Washington & Lee Univ.*, No. 6:14–CV–00052, 2015 WL 4647996 (W.D. Va. Aug. 5, 2015)............................................................................................................. 38

*Doe v. William Marsh Rice Univ.*, No. 4:20-CV-2985, 2021 WL 4215501  (S.D. Tex. Sept. 16, 2021) ........................................................................................................... 39, 40

*Five Oaks Achievement Ctr., LLC v. Camp Worth, LLC*, No. 4:20-CV-00234-O, 2021 WL 3751164 (N.D. Tex. Mar. 3, 2021) ............................................................................. 1

*Goodman v. President & Trustees of Bowdoin Coll.*, 135 F. Supp. 2d 40 (D. Me. 2001) ............ 46

*Green v. Windsor Park Asset Holding Tr.*, No. 4:19-CV-00875-O, 2020 WL 7394462 (N.D. Tex. Nov. 13, 2020), aff'd, No. 20-11226, 2021 WL 2521340 (5th Cir. June 18, 2021).................... 1

*Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320 (5th Cir. 1996) ....................................... 2

*Gulf C. & S.F.Ry. Co. v. Coopwood*, 96 S.W. 102 (Tex. Civ. App. 1906, writ denied) .............. 49

*King v. Baylor Univ.*, 46 F.4th 344 (5th Cir. 2022) ................................................ 40

*Klocke v. Univ. of Tex. at Arlington*, 938 F.3d 204 (5th Cir. 2019) ................................ 30

*Marin Real Estate Ptnrs., L.P. v. Vogt*, 373 S.W.3d 57 (Tex. App.—San Antonio 2011, no pet.) 48

*Menaker v. Hofstra Univ.*, 935 F.3d 20 (2d Cir. 2019) ........................................... 32, 37

*Norris v. Univ. of Colorado, Boulder*, 362 F. Supp. 3d 1001 (D. Colo. 2019) .......................... 34

*Orr v. Copeland*, 844 F.3d 484 (5th Cir. 2016) ...................................................... 1

*Overdam v. Tex. A&M Univ.*, 43 F.4th 522 (5th Cir. 2022) ........................................ 29

*Pacheco v. St. Mary's Univ.*, No. 15-CV-1131 (RCL), 2017 WL 2670758 (W.D. Tex. June 20, 2017).......................................................................................... 40, 41, 44

*Pasco v. Knoblauch*, 223 Fed. Appx. 319 (5th Cir. 2007) ............................................ 2

*Pat H. Foley & Co. v. Wyatt*, 442 S.W.2d 904 (Tex. Civ. App.—Houston [14th Dist.] 1969, writ ref'd n.r.e.) ...................................................................................... 49

*Plummer v. Univ. of Houston*, 860 F.3d 767 (5th Cir. 2017)........................................ 29

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2000).................................... 1

*Rolex Watch U.S.A., Inc. v. Beckertime, LLC, et al.*, No. 4:20-CV-01060, 2021 WL 4311450 (N.D. Tex. Sept. 21, 2021).......................................................................... 2

*Southwell v. Univ. of Incarnate Word*, 974 S.W.2d 351 (Tex. App.–San Antonio 1998, pet. denied) .................................................................................... 40, 41, 42, 44

*Stewart v. Basey*, 245 S.W.2d 484 (Tex. 1952) ..................................................... 47

*TiVo Inc. v. DISH Network Corp.*, No. 2:04-CV-01 (DF), 2009 WL 10677749 (E.D. Tex. June 2, 2009) ................................................................................................................ 48

*Trimble v. Millwood Hosp.*, 420 F. Supp. 3d 550 (N.D. Tex. 2016)...............................................1

*Univ. of Tex. Health Sci. Ctr. at Houston v. Babb*, 646 S.W.2d 502 (Tex. App.—Houston [1st Dist.] 1982, no writ) ................................................................................... 40, 42

*Villareal v. Chamberlain Coll. of Nursing & Health Scis., Inc.*, No. CV H-19-0300, 2019 WL 4736488 (S.D. Tex. Sept. 27, 2019) .............................................................40, 41, 44

*Villarreal v. Art Inst. of Houston, Inc.*, 20 S.W.3d 792 (Tex. App.—Corpus Christi–Edinburg 2000, no pet.)........................................................................................41, 44

## Statutes

20 U.S.C. § 1681 ........................................................................................................ 29

## Other Authorities

*Academic Bills of Rights: Conflict in the Classroom*, 31 J.C. & U.L. 243 (2005) .........................43

Nondiscrimination on the Basis of Sex, 85 Fed. Reg. at 30,248 ...................................................34

## Rules

Fed. R. Civ. P. 56(a) .....................................................................................................1

## Regulations

34 C.F.R. § 106.45......................................................................................................32

34 C.F.R. § 106.45 (b)(1)(ii)................................................................................... 33, 34

34 C.F.R. § 106.45 (b)(1)(iii)................................................................................... 33, 36

34 C.F.R. § 106.45 (b)(4) .........................................................................................36

34 C.F.R. § 106.45 (b)(5)(i) ................................................................................35, 46

34 C.F.R. § 106.45 (b)(5)(ii)....................................................................................34

34 C.F.R. § 106.45 (b)(5)(iii) ...................................................................................34

## I.  SUMMARY JUDGMENT STANDARDS

As movant, TCU bears the burden to prove "that there is no genuine dispute as to any material fact and [TCU] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

"When reviewing the evidence on a motion for summary judgment, courts must resolve all reasonable doubts and draw all reasonable inferences in the light most favorable to the non-movant." *Cole v. Hunter*, 497 F. Supp. 3d 172, 180 (N.D. Tex. 2020); *see also Trimble v. Millwood Hosp.*, 420 F. Supp. 3d 550, 555, 560–61 (N.D. Tex. 2016). And in performing its assessment of the evidence, the Court may not make "credibility determinations or weigh the evidence" and is required to "disregard all evidence favorable to [TCU] that the jury is not required to believe." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150–51 (2000); *see also Orr v. Copeland*, 844 F.3d 484, 490 (5th Cir. 2016). Thus, the Court must determine whether the evidence and reasonable inferences favoring Doe are so deficient that no reasonable jury could find for Doe. *See, e.g.*, *Green v. Windsor Park Asset Holding Tr.*, No. 4:19-CV-00875-O, 2020 WL 7394462, at *6 (N.D. Tex. Nov. 13, 2020), aff'd, No. 20-11226, 2021 WL 2521340 (5th Cir. June 18, 2021). "As long as there appears to be some support for the disputed allegations such that reasonable minds could differ as to the import of the evidence, the motion for summary judgment must be denied." *Five Oaks Achievement Ctr., LLC v. Camp Worth, LLC*, No. 4:20-CV-00234-O, 2021 WL 3751164, at *1–2 (N.D. Tex. Mar. 3, 2021) (internal quotation marks omitted).

In this case, TCU's motives/intentions that underlay its actions against Doe are the primary issues to be determined—and a summary judgment is "rarely proper when an issue of intent

is involved."[1] *Pasco v. Knoblauch*, 223 Fed. Appx. 319, 322 (5th Cir. 2007); *see also Rolex Watch U.S.A., Inc. v. Beckertime, LLC, et al.*, No. 4:20-CV-01060, 2021 WL 4311450, at *6 (N.D. Tex. Sept. 21, 2021) (O'Connor, J.). This is so because issues of TCU's motive and intent are inextricably bound to questions of credibility that only a jury can resolve. *See Anderson*, 477 U.S. at 255 ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict."); *Cole*, 497 F. Supp. 3d at 180.

## II.   STATEMENT OF FACTS

What follows is a summary of the facts—and the reasonable inferences that should be drawn in Doe's favor—that demonstrate TCU's motion to be without merit.[2] It is important to note that TCU has adopted the deposition testimony of its employees as its own testimony. *See* Stipulation Regarding Deposition Testimony and Conduct Panel Hearing Transcript (ECF No. 137).[3] Accordingly, the deposition testimony of TCU employees is the testimony of TCU.

## A.   Doe and Roe commence their formal dating relationship and begin having sex.

John Doe and Jane Roe began their formal dating relationship when they were in high school in the fall of 2018. App. 1, 001 (Doe Dec. ¶ 4). Their dating relationship continued after Doe graduated from high school and enrolled as a student at TCU. *Id.* During their formal dating relationship, Doe and Roe had many consensual sexual encounters. *Id.*

---

[1] To be clear, Doe is not claiming that the mere presence of an intent issue *automatically* precludes summary judgment. *See, e.g., Guillory v. Domtar Indus. Inc.*, 95 F.3d 1320, 1326 (5th Cir. 1996).

[2] Unless context demonstrates otherwise, the reasonable inferences to be drawn from the facts are those statements that are unsupported by a cite to evidence in the summary judgment record.

[3] TCU and Doe also stipulated to the accuracy of the Conduct Panel Hearing Transcript.

**B.    Roe follows Doe to TCU, they continue to have sex even though their formal dating relationship has ended, and Doe begins seeing another girl.**

Doe and Roe's formal dating relationship ended while Doe was at TCU and before Roe graduated from high school. *Id.* Roe decided to enroll at TCU even though she was accepted to other colleges. App. 48, 764-785 (Roe Dep. 38:4–40:2). Roe made that decision while knowing Doe would also be a student at TCU. *Id.*

The day before Roe moved into her dorm room at TCU's Colby Hall (August 16, 2020), Roe performed oral sex on Doe at Roe's parents' home. App. 1, 002 (Doe Dec. ¶ 5); App. 3, 017-19; App. 48, 764-785 (Roe Dep. 104:2-15). Thereafter, during the early morning hours of October 4, 2020, Doe and Roe had sex in Austin, Texas while the two of them were there for a football game between TCU and the University of Texas. App. 1, 003 (Doe Dec. ¶¶ 14–15).

In October, Doe began a relationship with another girl who will be referred to herein as "Girl 1." App. 1, 004 (Doe Dec. ¶ 18). Roe was unhappy and hurt by this turn of events. App. 48, 764-785 (Roe Dep. 82:25 –83:19). Indeed, on one occasion that month, Roe was especially hurt when she witnessed Girl 1 being physically affectionate to Doe at a tailgate party. App. 4, 024-25; App. 48, 764-785 (Roe Dep. 82:25 –83:19). This resulted in a text exchange with Doe during which they both expressed how much they missed each other and wanted to get back together as a couple. *Id.* Roe also told Doe that Girl 1's affection for Doe made her "jealous." App. 1, 004 (Doe Dec. ¶ 18). To win Doe back, Roe initiated sex with and performed sexual acts on him that he had never experienced before in any of his many sexual encounters with Roe. *Id.*

During the time Doe was seeing Girl 1, Roe sent numerous photos of herself to Doe to rekindle a formal dating relationship. App. 5, 049-80. On October 26, 2020, Roe sent Doe a

Snapchat photo of herself with the message "love me pls." *Id.*, 050. Roe also told Doe she wanted him to stay away from Girl 1. App. 1, 004 (Doe Dec. ¶ 18).

On October 31, 2020, Doe's fraternity held a Halloween party at The Fort Worth Club in downtown Fort Worth. *Id.* (Doe Dec. ¶ 20) Doe, Roe, and Girl 1 were present at this party and Roe was upset with Doe because she saw him with Girl 1. *Id.* Roe confronted Doe and Girl 1 and told Girl 1 she was not allowed to see Doe. *Id.* Doe left the Halloween party with Girl 1. *Id.* In November 2020, Roe told Doe that she wanted to get back together with him. *Id.* (Doe Dec. ¶ 21).

Doe decided to buy Roe a present for her upcoming birthday and went shopping with Roe's best friend, who helped him. *Id.* Doe bought Roe a sweater, and Roe was very happy with the gift. *Id.*; App. 48, 764-785 (Roe Dep. 95:2–18); App. 6, 082. Roe even sent Doe pictures of herself in her birthday sweater. App. 5, 060-062.

A surprise party was planned for Roe's birthday, November 5, 2020. App. 48, 764-785 (Roe Dep. 95:2–13). Doe attended Roe's party, and photos were taken of the happy couple at the party. App. 5, 066-68; App. 48, 764-785 (Roe Dep. 95:2–96:5); App. 6, 081-83. The two spent that night together in Doe's room at his fraternity house, and as part of Roe's birthday celebration, she and Doe had sex. App. 1, 004 (Doe Dec. 21); App. 48, 764-785 (Roe Dep. 11:15–18).

On or about November 7, 2020, Roe and Doe had sex in Doe's room at his fraternity house and again in the fraternity house's communal shower. App. 1, 004 (Doe Dec. ¶ 21); App. 5, 073. Shortly thereafter, Doe confessed to Roe that he spent the night with Girl 1. *Id.* Roe became very upset with Doe. *Id.*

By December 2020, Doe decided he did not want to get back together with Roe. *Id.* But Roe wanted to, and again turned to sex in order to win Doe back. Specifically, on December 8,

2020, Roe admits she sent Doe a message through Snapchat stating, "I want to f—— you." App. 48, 764-785 (Roe Dep. 12:5–9; 82:17–20); App. 1, 005 (Doe Dec. ¶ 22). Doe declined her request for sex and never had sex with Roe again. App. 1, 005 (Doe Dec. ¶ 22).

## C.   Doe begins dating a new girl.

In mid-January 2021, Doe ceased communicating with Roe. *Id.* Doe then began dating a new girl ("Girl 2"). *Id.* In February 2021, Roe saw Doe and Girl 2 sitting on a bench together. *Id.* (Doe Dec. ¶ 23). When Doe and Girl 2 stood up to leave together in an Uber, Roe, who had been watching them, rapidly approached Girl 2 and angrily told her not to go home with Doe. *Id.* Roe watched as Doe and Girl 2 left together against Roe's command. *Id.*[4]

Around this same time, Roe began making false and derogatory claims about Doe to her parents. Whatever Roe's stories were at that time, they were sufficient to prompt Roe's father to ask Doe's father to ask Doe to stay away from Roe—even though Doe had had no contact with Roe. App. 2, 007-16 (Doe's Dad's Dep. 13:13-15:21, 24:2-25:23, 28:17-31:19, 33:20-35:6, 36:15-37:22). Further telephone contact between the two fathers convinced Doe's parents that Roe's parents were likely pressuring Roe to file a lawsuit or complaint against their son. *Id.* Doe's parents believed Roe's father to be litigious and the most likely instigator of a lawsuit or complaint. *Id.* So, in an attempt to placate Roe's dad, Doe and his parents agreed that Doe should not enroll at TCU for the fall semester. *Id.*

---

[4] Roe further revealed her jealousy as recently as March 2022—after the Title IX panel hearing— when she bullied and harassed Girl 2 in the restroom in Cabo, Mexico. Specifically, she kicked and threw a drink at Girl 2's restroom stall. App. 48, 764-785 (Roe Dep. 107:4-12).

**D.**   **Roe retroactively and falsely labels two encounters with Doe as sexual assaults.**

During Doe and Roe's sexual relationship, it is estimated they had hundreds of sexual encounters. App. 1, 001 (Doe Dec. ¶ 4); App. 7, 088, 102.[5] The number of their sexual encounters was so great Roe has no way of even estimating it. App. 48, 764-785 (Roe Dep. 12:10–13:2). This provides context going forward.

On September 15, 2021, Roe submitted an initial online "report" to TCU's Office of Institutional Equity ("O.I.E."). App. 8, 105. Her report consisted of her name, e-mail address, and the statement: "I would like to report being sexually assaulted on multiple occasions by [Doe]." *Id.*; App. 48, 764-785 (Roe Dep. 14:5–7). A reasonable inference is that Roe had not yet decided which sexual encounters with Doe—*out of the hundreds to choose from*—she would *retroactively* claim were "sexual assaults."

TCU's O.I.E. commenced an investigation of Roe's allegations and assigned the matter to investigator Leigh Holland. App. 50, 803-809 (Holland Dep. 29:2–17). Investigator Holland met with Roe on September 22, 2021, for an "initial inquiry." App. 9, 107; App. 50, 803-809 (Holland Dep. 42:22–43:15). By that date, Roe had sorted through her sexual history with Doe and labeled two of those encounters as sexual assaults. Roe reported to Investigator Holland that the first alleged sexual assault occurred at Roe's dorm room in TCU's Colby Hall where, according to Roe, "[Doe] put his fingers inside [ Roe's] vagina without her consent." App. 10, 132. Roe also labeled her sexual encounter with Doe in Austin (following the October 3, 2020, TCU/UT football game)

---

[5] Roe retroactively claimed at the TCU Title IX conduct panel hearing that of all the times she and Doe had sex, she only wanted to participate 10% of the time. App. 7, 89, 101-102.  In October 2020, Roe also told Doe that he had raped her hundreds, and perhaps as many as a thousand times. *Id.*; App. 1, 004 (Doe Dec. ¶ 19).

as a sexual assault, claiming "[Doe] picked [Roe] up in an uber and they went to [Doe's] friend's home [where Doe] put his penis inside [Roe's] vagina while she was saying no." *Id.*

### 1. What really occurred at Colby Hall on August 19, 2020.

On the day of the alleged incident (August 19, 2020) Roe was wearing skin-tight pants (leggings) and underwear. App. 48, 764-785 (Roe Dep. 68:19–25; 69:24–70:5; 72:8–73:15; 75:13–25; 79:20–22); App. 12, 138; App. 13, 150. Doe arrived at Roe's dorm room at approximately 10:20 p.m.—about 20 minutes after Roe returned to her dorm room after driving her friends to a party. App. 48, 764-785 (Roe Dep. 77:10–78:21); App. 13, 155 (text from Doe at 10:11 p.m., "I'm like 6 minutes away"). It is without dispute that Roe was fully clothed, wearing pants and underwear, at all times when Doe was in Roe's dorm room on August 19, 2020. App. 1, 002 (Doe Dec. ¶ 8); App. 48, 764-785 (Roe Dep. 68:19–25; 69:24–70:5; 72:8–73:15; 75:13–25; 79:20–22).

After Doe arrived, a *fully clothed* Roe wanted to demonstrate sexual positions and movements she had been practicing. App. 1, 002 (Doe Dec. ¶ 8); App. 22, 485. She practiced her sexual maneuvers on Doe while he lay on her dorm-room floor, and she practiced other sexual moves while she was bent over her desk with Doe standing behind her. *Id.* Roe also played a mind-sex game with Doe that included her playfully telling Doe "no touching" as he attempted to caress her—over her clothing—during the mock sex. App. 1, 002 (Doe Dec. ¶ 8). The mock sex ended when Doe began to slip his hand inside the waistline of Roe's pants. *Id.* Roe changed her playful tone and told Doe, in substance, "we're not going to hook up today," and Doe did not proceed any further. *Id.* Doe and Roe got into a disagreement, and he left her dorm room shortly thereafter. *Id.* (Doe Dec. ¶ 9). But, in any event, Doe's fingers never penetrated her vagina because of Roe's clothes, the physical limitations posed by their respective body positions, and Roe's "no touching" command. *Id.*

### 2.  What really happened in Austin on October 3/4, 2020.

Though they traveled separately, Doe and Roe were in Austin for the October 3, 2020, football game between TCU and The University of Texas. App. 48, 764-785 (Roe Dep. 45:1–21; 47:25–48:25; 53:14–16). During the early morning hours of October 4, 2020, Roe claims she called Doe and told him she was having a panic attack about being drugged and raped by a stranger. App. 17, 175; App. 7, 084. Roe called Doe to calm her down, and during the call she asked Doe if she could see him. *Id.*; App. 48,  764-785 (Roe Dep. 54:3–14). Doe and Roe agreed that Doe should come get her and the two should spend the night together. App. 1, 003 (Doe Dec. ¶ 15); App. 48, 764-785 (Roe Dep. 55:7–57:17). So, at about midnight or 1:00 a.m., Roe left the safety of her hotel room, waited outside her hotel for Doe to arrive in an Uber, got into an Uber with Doe, and traveled to the place he was staying. App. 48,  764-785 (Roe Dep. 55:7–57:17; 58:17–59:5). Doe and Roe had consensual sex during the early morning hours of October 4, 2020. App. 1, 003-4 (Doe Dec. ¶ 16); App. 22, 488-89.

### E.    Roe refuses to cooperate with TCU's investigation.

After the initial inquiry, Investigator Holland informed Roe that TCU's O.I.E. did not consider Doe to be a student because he decided to take the Fall 2021 semester off from school. App. 14, 165. It appeared TCU was not going to move forward with Roe's complaint.

Roe then filed a formal "complaint" with TCU's O.I.E. on October 4, 2021, in which she accused Doe of "sexual misconduct." App. 15, 167-169. TCU's complaint form required Roe to provide a detailed factual statement to support her allegation of "sexual misconduct" against Doe, including the details of the incident(s) and the dates and locations of the incidents. *Id.* But Roe

didn't provide any details and instead responded, "see initial report filed and initial inquiry filed on the 15th, I had the meeting on the 22nd of september [sic]." *Id.*[6]

Roe's lack of substantiating detail was particularly problematic for her Colby Hall allegation because she failed to provide any detail to allow any understanding of how it was *possible* for Doe's fingers to gain access to a fully clothed Roe's vagina. App. 8, 105; App. 15, 167-169. For example, was Roe standing or sitting when the alleged assault occurred? How could Doe place a finger inside her vagina while a fully clothed Roe was in a seated position? How could Doe place a finger inside Roe's vagina while she was fully clothed and standing? There were (and are) many missing details between "Doe came into my dorm room" and "Doe stuck his fingers in my vagina." Roe provided none of these important, substantiating details. *Id.*

Instead, Roe submitted carefully curated and out-of-context text messages between herself and Doe to cast Doe in a false light and make it appear that he *perhaps* confessed to sexually assaulting Roe on August 19, 2020. App. 50, 803-809 (Holland Dep., 33:3–9); App. 10, 131-133; App. 11, 134-137; App. 22, 485-488. But, regarding Colby Hall, Roe concealed from TCU the mock-sex session that she initiated and the mind-sex game she played throughout the mock-sex session during which she repeatedly commanded Doe not to touch her. App. 50, 803-809 (Holland Dep. 30:6–17). Roe also concealed the fact that both she and Doe were fully clothed throughout the mock-sex session she initiated. *Id.* Roe also withheld from TCU the other Colby Hall text messages wherein she stated that whatever Doe did to her in her dorm room, it didn't "make [her] feel disrespected," that she was far more worried Doe gave her Covid, and that (after *she* introduced the topic of rape)

---

[6] Roe now claims she did not follow the instructions and provide the necessary details based on the advice of her counsel at the time. App. 48, 764-785 (Roe Dep. 13:12–17:1).

she did not believe she had been raped but thereafter claimed that, whatever Doe did, it was merely "disrespectful." App. 9, 106-103; App. 10, 131-133; App. 11, 134-137; App. 13, 160, 162.

And Roe also withheld from Investigator Holland the context of the relationship dynamic between Roe and Doe wherein Doe would frequently say false and bad things about himself to assuage Roe and maintain some semblance of a relationship with her or to prevent her from self-harm. App. 1, 003 (Doe Dec. ¶ 12); App. 50, 803-809 (Holland Dep. 30:6–17). And perhaps most importantly, in none of the text messages did Doe admit to engaging in the acts Roe claimed occurred in Colby Hall. App. 13, 139-163; App. 48, 764-785 (Roe Dep. 123:6–18).

Investigator Holland e-mailed Roe on October 5, 2021, to set up an investigation interview. App. 16, 171. Roe replied and asked Investigator Holland to "explain how this meeting is different than the previous meeting?" *Id.* Investigator Holland replied: "I will be asking a lot more detailed questions pertaining to your incident." *Id.*

Investigator Holland scheduled a second interview of Roe but, shortly after the interview commenced, Roe made it clear that she would not answer any of the Investigator's questions. App. 50, 803-809 (Holland Dep. 34:22–39:2). Indeed, Roe stated "I'm only here because I'm trying to see what you're trying to ask me." *Id.* (Holland Dep. 37:12–13). Roe refused to provide any details whatsoever to support her allegations against Doe. *Id.* (Holland Dep. 34:22–39:2). The interview ended because of Roe's lack of cooperation. *Id.*

Unable to obtain any substantiating details from Roe, Investigator Holland issued a preliminary investigative report on November 12, 2021. App. 10, 131-133. The report documented that Roe "declined the initial investigative interview with the investigator" and "refused to provide detailed answers to questions posed in her interview." *Id.* (n.3). Her report also acknowledged that

Doe e-mailed a written statement on October 29, 2021, and, during a subsequent interview, Doe denied all of Roe's allegations but provided no further information on the advice of his attorney. App. 10, 131 n. 1.

### F.   Roe falsely claims she cooperated with TCU's investigation and dramatically changes her sexual-assault stories.

Roe responded to the preliminary investigative report in a letter dated November 30, 2021, which was false and inaccurate in numerous respects. App. 9, 106-130. First, Roe changed her original stories by switching the timeline and claiming the alleged sexual assault in Austin occurred *before* the alleged assault in Colby Hall. *Id.*, 106; App. 50, 803-809 (Holland Dep. 44:5–18). Why would Roe flip the order of alleged incidents? The contents of her letter show that Roe had to flip the alleged incidents because her story would fall apart if the Colby Hall allegations preceded the Austin allegations.

Concerning Colby Hall, Roe claimed that she was so "traumatized" by the assault that she could no longer "feel safe being around [Doe]." App. 9, 107. Concerning the alleged Austin incident, Roe claimed she was experiencing a panic attack during her visit to Austin about being drugged and raped, and she called Doe in the hope that he could calm and comfort her. App. 17, 175; App. 1, 003 (Doe Dec. ¶ 15); App. 48, 764-785 (Roe Dep. 49:11–52:8; 54:3–5); App. 7, 084.

Roe's stories put her in quite a difficult situation. If Roe was experiencing panic attacks in Austin about being drugged and raped, as she claimed, then the last person she would call for calming and comfort is the man who (allegedly) raped her weeks earlier and left her "traumatized" and unable to "feel safe" around him. App. 9, 107. And it is patently unbelievable that she would willingly leave the safety of her hotel room, wait outside her hotel for Doe to arrive in an Uber, get into the Uber with Doe, and travel with Doe to the place he was staying. App. 48, 764-785 (Roe Dep.

55:7–57:13; 58:17–59:5). And, if she was perceived as lying about the Austin incident, that would cast considerable doubt on her Colby Hall story. The only way Roe's tales of sexual assault *might* work was to invert the timeline and falsely claim the alleged Austin incident occurred *before* the alleged Colby Hall incident.

But the inverted timeline is only the first of many falsehoods that appear in Roe's letter of November 30, 2021. The main point of Roe's letter was to attack TCU's O.I.E. App. 9, 106-130. Specifically, Roe attacked Investigator Holland by making numerous false statements about the first and second meetings Roe had with her. App. 50, 803-809 (Holland Dep. 42:19–52:24).

Regarding the first meeting (September 22, 2021), Roe claimed she shared "the *full details* of [her] experience with Investigator Holland, including describing how the sexual encounter with [Doe] that day in my dorm room was non-consensual," and she supposedly shared "details of horrific experiences" and her sharing "was very detailed and both emotionally and physically exhausting to talk through" and the details she supposedly shared were so detailed she "couldn't understand what additional details [Investigator Holland] could possibly need" to obtain in a second meeting. App. 9, 108. But Investigator Holland described the true "full details" Roe provided at the initial meeting consisted solely of: "[s]he (Roe) shared that she was assaulted by [Doe] . . . without her consent and she shared that it happened twice, in her dorm room and in Austin." App. 50, 803-809 (Holland Dep. 43:16–44:4).

Regarding her second meeting (November 1, 2021) with Investigator Holland, Roe falsely claimed she "had to recount to [Investigator Holland] all the details of my assault" which details were "the very things we had already discussed in our first meeting." App. 9, 108. All of this was

balderdash. App. 50, 803-809 (Holland Dep. 42:19–52:24). The substantiating details were what

Investigator Holland wanted and what Roe consistently refused to disclose. *Id.*

In her letter, Roe also misrepresented the events leading up to the alleged Colby Hall inci-

dent. Roe writes—

> The day leading up to the assault, I was in bed because I felt really sick; my throat
> and head were hurting. [Doe] and I were texting that day, and I told him I wasn't
> feeling well, but he asked to come over. Because of my past experiences with [Doe],
> I was scared of being alone in a room with him, *so I told him no.* He then told me he
> would get me groceries or food and that he really wanted to come over. He contin-
> ued to persist, and in my previous experiences with [Doe], there were always con-
> sequences when I said "no" to him. So, although I was still hesitant, I eventually
> agreed to let him come over . . . .

App. 9, 106 (emphasis added). But the text messages between Roe and Doe on the date of the Colby

Hall incident (August 19, 2022) show that Roe never once said "no" in response to any request by

Doe to meet. App. 13, 139-163. Indeed, she invited Doe to come over to "watch a show with

[her]." *Id.*, 151. Roe's claim that she was "scared of being alone in a room" with Doe is also false.

Roe invited Doe to her parents' house only two days earlier for a round of oral sex. App. 48, 764-

785 (Roe Dep. 103:12–104:15); App. 1, 002 (Doe Dec. ¶ 5); App. 3, 017-19; App. 18, 238-239.

## G.    Doe moves TCU to dismiss Roe's complaint, but TCU refuses.

Doe also responded to the preliminary investigative report with a letter from his Title IX

advisor, Tom Hill. Mr. Hill asked TCU to dismiss the complaint because Roe "refused to partici-

pate in the interview process" and "there is no basis for substantiating the Complainant's allega-

tions without first party evidence." App. 19, 240. Mr. Hill also submitted the results of a polygraph

examination showing the truthfulness of Doe's denials. *Id.*, 241-243.

TCU refused to dismiss Roe's complaint and Investigator Holland produced a "final in-

vestigative report" on December 7, 2021. App. 11, 134-137. The final investigative report repeats

the contents of the preliminary investigative report almost verbatim. *Compare* App. 10, 131-133 *with* App. 11, 134-137. Her report describes Roe's "allegations" in accordance with Roe's original story that the Colby Hall incident preceded the alleged sexual assault in Austin, despite Roe's attempt to flip the order of these alleged incidents and despite Investigator Holland being aware of the false statements Roe made about their previous interactions. App. 11, 135; App. 50, 803-809 (Holland Dep. 42:19–52:24). And Investigator Holland refused to consider the results of Doe's exculpatory polygraph test. App. 11, 137. Roe's complaints were then turned over to TCU's Dean of Students Office for prosecution. App. 20, 244.

## H. Meanwhile, after consistent pressure from Roe's parents, TCU creates new and admittedly unfair "trauma informed training" to ensure Doe's Title IX conviction.

If Roe was worried about whether her lack of cooperation with TCU's O.I.E., her inability to provide any details concerning the alleged Colby Hall incident, or her serial fabrications would interfere with TCU's willingness and ability to obtain a Title IX conviction against Doe, she needn't have been.

Through several communications with various TCU officials, Roe's parents pressured TCU to convict Doe and criticized TCU's alleged insensitive handling of Roe's claims. For example, on September 30, 2021, Roe's father emailed Investigator Holland and stated, "My daughter has a right to be heard and have an admi[tt]ed rapist held accountable." App. 14, 165. Sometime prior to October 12, 2021, each of Roe's parents also met in person with Kathy Cavins-Tull, who reports directly to the Chancellor,[7] to discuss Roe's allegations and the Title IX process. App. 46, 752-754. Roe's parents wanted TCU to summarily adjudicate Doe guilty so Roe would not have to go through the Title IX process. App. 58, 873-876 (Tull Dep, 17:8-18:13).

---

[7] Ms. Cavins-Tull is the Vice Chancellor of Student Affairs. App. 45, 751-752.

On October 13, 2021, Roe's father also had a lengthy conversation with Sharon Gooding, the Director of TCU's O.I.E, and Cheryl Taylor, an O.I.E. Title IX case manager. App. 42, 742-748 (Ms. Taylor's meeting notes); App. 47, 755-763 (Ms. Gooding's meeting notes); App. 55, 863-865 (Gooding Dep. 36:11-40:19); App. 56, 866-869 (Taylor Dep. 28:19-29:11); App. 45, 751-752. Notes from that meeting reveal that Roe's father was critical of TCU's lack of concern for alleged trauma victims, and that someone needed to hold "creepy little boys" accountable. App. 42, 747. Roe's father emphasized, "[t]here's a written admission of guilt[,] well SHIT what more do you need." *Id.* It was also during this conference that Ms. Gooding assured Roe's father that TCU "understand[s] issues and dynamics of trauma" and that TCU's Title IX panel would be "*well trained.*" *Id.*, 744, 746 (emphasis added).[8]

TCU's prosecution of Doe was overseen by two Assistant Deans of Students, Jessica Ledbetter and Jeremy Steidl. App. 22, 482. Dean Ledbetter's bias against males had recently been documented in her doctoral dissertation in which she claimed male students are morally inferior to female students.  App. 21, 245-481; *See also Doe v. Tex. Christian Univ.*, No. 4:22-CV-00297-O, 2022 WL 1573074, at *9 (N.D. Tex. Apr. 29, 2022) ("Ledbetter's dissertation is evidence of gender bias.").

Dean Ledbetter admits it would be wrong for Dean Steidl or her to influence Title IX panel members with respect to their decision-making and that any training of Title IX panelists should teach the panelists to not be biased in favor of either the accuser or the accused or is in any way

---

[8] Pressure from Roe's parents did not stop in October. Prior to the hearing, on January 19, 2022, Roe's father falsely told a member of TCU's Board of Trustees, "TCU allowed [Doe] to re-enroll after he admitted in writing to being a rapist and after my daughter has an Emergency Protective Order in place against him with the FWPD," and Roe's mother repeated that falsity to TCU's Chief Rangel. App. 43, 749; App. 44, 750. Roe has no knowledge of such an emergency protective order ever being entered against Doe as Roe's parents alleged. App. 48, 764-785 (Roe Dep. 105:15-20).

gender-biased. App. 52, 828-844 (Ledbetter Dep. 29:5–8, 31:7–21). Yet, five days after the October 13, 2021, conference with Roe's father, Deans Steidl and Ledbetter took steps to ensure TCU Title IX panelists would be "well trained" and biased in favor of Roe and against Doe. App. 23, 492-499.

On or before October 18, 2021, Deans Ledbetter and Steidl initiated the creation of new "trauma informed training" that TCU would use to indoctrinate Doe's Title IX Hearing panelists/jurors. *Id.* TCU's Leah Carnahan (Assistant Director for TCU's Campus Advocacy, Resources & Education) created the new "trauma informed training" materials—a video and PowerPoint presentation entitled "The Dynamics of Trauma & Respondent Stress." App. 24, 500-520; App. 25 (video). The results were thrilling. In a November 11, 2021 email to Leah Carnahan, Dean Ledbetter exclaimed—

> So I finally got a chance to watch the video and review the materials you sent. It's great and exactly what we needed. THANK YOU!!

App. 23, 497. TCU's *need* was to indoctrinate Doe's Title IX jurors (and future Title IX juries) so they would be "trauma informed" and, thereby, overwhelmingly biased against Doe.[9]

TCU needed its Title IX jurors to be pre-programmed to believe Roe. This was of particular importance to Dean Steidl. App. 23, 492 ("Also, another point…false reporting numbers (and how small that number is) as a sense of perspective."). So, one of the key points of the new trauma informed training video and PowerPoint slides is accusers make truthful reports of sexual assaults 90% to 98% of the time:

---

[9]This training would create bias against future Title IX defendants, 100% of whom are male. App. 26, 521-522.



App. 24, 503 (emphasis added); App. 25 (video); App. 52,828-844 (Ledbetter Dep. 44:19–45:5, 52:1–9); App. 51, 810-827 (Steidl Dep. Vol. 1, 103:1–24). TCU's Bottom Line Takeaway: You must believe Roe is telling the truth.

As a corollary to TCU Title IX jurors being pre-programmed to believe Roe, TCU needed its jurors to be pre-programmed to believe that Doe is guilty. So, another key point of the video and PowerPoint slides is this: there are only two kinds of defendants (or "Respondents") in TCU's Title IX proceedings and both are guilty:



App. 24, 515; App. 25 (video); App. 51, 810-827 (Steidl Dep. Vol. 1, 105:18–106:4). TCU's Bottom Line Takeaways: First, you must believe that Doe did "NOT" experience "Trauma," and, most importantly, you must believe Doe is either a "Predator" or "Opportunistic"—but, either way, he is guilty. There is no such thing as an innocent Title IX respondent. Significantly, even TCU now admits the training is flawed and not fair to respondents. App. 57, 870-872 (Carnahan Dep. 133:8-15, 134:5-135:3).

But what if Roe was uncooperative or her story is nonsensical and bereft of substantiating details? What if Roe appears to be making the whole thing up? And what if Doe seems calm and his story is logical and rational, and his memories are orderly, and his narrative is chronological? TCU's new "training" took care of these potential problems as well. TCU needed to pre-program its jurors to convert signs and symptoms of fabrication into confirmation that Roe is a "Victim" of sexual assault and, likewise, to convert signs and symptoms of truthfulness and innocence as nothing but the traits of a guilty Doe:



App. 24, 519; App. 25 (video). TCU's Bottom Line Takeaway: No matter what, you must believe Roe is a "Victim," and Doe is guilty.[10] TCU's new "training" was approved by TCU's Dean of Students, Dr. Karen Bell Morgan. App. 52, 828-844 (Ledbetter Dep. 33:8–14).

Dean Ledbetter planned on implementing the new "trauma informed training" just in time for Doe's Title IX hearing as she also confirmed in her November 11, 2021, email:

> I got everything uploaded to our TCU online training tonight. I am going to have Karen help me test the sequencing of it tomorrow, and then ask our panelists for our upcoming hearing to make sure they've completed all new parts, including watching the video you provided.
>
> I am planning to roll out the new Formal Panel training module in December and will ask all of our panelists to go through and make sure they've done all pieces of the Title IX training, including your new video, when they begin working on this new module. I think we will then have the training fully up and running.

App. 23, 497.

TCU created and implemented this new mandatory "training" to tamper with Doe's jury. Indeed, TCU admits the obvious—its new "The Dynamics of Trauma & Respondent Stress" video and PowerPoint slides placed the burden of proof on Doe to prove that he did not violate Title IX:

> Q. And I guess my question is, isn't there a third kind of respondent, innocent, or must all respondents be either a predator or opportunistic?
>
> A. No. I - - I would - - I agree with what you're stating here in terms of *if there is a show of evidence that shows that there **wasn't** a violation*, then that would be a non-violation of the act.

---

[10] TCU also repeatedly refers to complainants as survivors on *both* the respondent and complainant webpage (App. 40, 717-729;  App. 41, 730-742), and Ms. Carnahan refers to complainants as "survivors" and "victims" in her trauma informed training received by Doe's panelists. Apps. 24 and 25.

App. 51, 810-827 (Steidl Dep. Vol. 1, 106:5–11) (emphasis added). TCU's training required Doe to prove a negative—"that there wasn't a violation" of Title IX. Then, and only then, could a TCU Title IX hearing panel conclude there was, in Dean Steidl's words, "a non-violation of the act."

I.    **TCU handpicks and "trains" employees to serve as jurors on Doe's Title IX panel.**

To serve as a TCU Title IX panelist, one must be employed by TCU and one must undergo TCU's "formal training," including the indoctrination discussed above, that was designed by Deans Steidl and Ledbetter. App. 51, 810-827 (Steidl Dep. Vol. 1, 47:6–9, 48:25–50:3, 55:8–11, 57:16–20, 64:2–16, ); App. 52, 828-844 (Ledbetter Dep. 20:17–21:13, 22:18–23:8); App. 54, 850-862 (Juror Jones Dep., 14:25–17:7). Deans Steidl and Ledbetter handpicked Reece Harty (Hall Director for one of TCU's dormitories), Laura Shaw (TCU Administration), and Dr. Clark Jones (TCU professor) to serve as Doe's jurors. App. 51, 810-827 (Steidl Dep. Vol. 1, 77:22–78:3). At least one juror, Reece Harty, was previously influenced by Dean Ledbetter's gender-biased dissertation. App. 35, 702 (Juror Harty texting Dean Ledbetter *during* day 2 testimony at Doe's Title IX hearing, commenting: "[t]his is making me think of your dissertation and moral codes. . . .").

Harty, Shaw, and Jones completed their employer's formal training and, like any loyal TCU employee, none of them objected to it or thought anything was wrong with it. App. 51, 810-827 (Steidl Dep. Vol. 1, 56:4–10, 80:5–21); App. 53, 845-849 (Juror Harty Dep., 45:4–48:10); App. 54, 850-862 (Juror Jones Dep., 18:2–9); App. 49, 786-802 (Juror Shaw Dep. 12:6–15:23). Doe's jurors were "trauma informed" and, therefore, decidedly biased against Doe and in favor of Roe.

J.    **TCU continues its jury tampering to convict Doe for the alleged Colby Hall incident.**

In addition to TCU's formal training, Dean Steidl provided oral training to each of Doe's jurors. App. 51, 810-827 (Steidl Dep. Vol. 1, 83:22–84:7, 91:14–102:25); App. 53, 845-849 (Juror Harty Dep., 65:7–16). There is no recording of Dean Steidl's oral training, but his sworn

description of the oral training confirms he reenforced TCU's gender-biased indoctrination of Doe's jurors. Dean Steidl instructed Doe's jurors to "focus on being trauma informed" and not to ask questions that "*re*traumatize." App. 51, 810-827 (Steidl Dep. Vol. 1, 99:2–100:12) (emphasis added). So, in the days leading up to Doe's Title IX hearing, TCU instructed Doe's jurors to focus on obeying the gender-biased lessons they learned in "The Dynamic of Trauma & Respondent Stress" and, consistent with such "trauma informed" training, assume that Roe had been traumatized by Doe. The jurors were instructed to be careful asking Roe any questions that would "*re*traumatize" her. *Id.* (emphasis added).[11]

And there was more pre-hearing tampering with Doe's jury. When Dean Steidl was deposed, he was asked about a text message that he sent to Dean Ledbetter as the two presided over Doe's Title IX hearing. *Id.* (Steidl Dep. Vol. 2, 93:15–95:14). In the text exchange between them, Dean Steidl disclosed that he had coached Juror Shaw *the day before* the hearing and stated how proud he was that Juror Shaw obeyed his training:

| | |
|---|---|
| **Steidl:** | Good question! We talked a lot about consent *yesterday*, so Laura is really digging in on that. I'm so proud |
| **Ledbetter:** | They are all doing great. |

App. 27, 544 (emphasis added).

But Dean Steidl testified that he had *not* communicated with Juror Shaw the day before the hearing started and explained the text was sent during the second day of the hearing and was merely commenting on general events that occurred during the hearing's first day. App. 51, 810-827 (Steidl Dep. Vol. 2, 93:15–95:14). This testimony was false. *Id.* (Vol. 2, 96:7–99:6). Upon further

---

[11] Because TCU's formal training indoctrinates their Title IX jurors to believe that "respondents" do not suffer trauma (App. 24, 500-520; App. 25 (training video)), Dean Steidl's instructions against "retraumatizing" would only apply to Roe.

questioning, Dean Steidl was forced to admit that he sent the text to Dean Ledbetter on the *first* day of the hearing and the "yesterday" in his text meant he had communicated with Juror Shaw the day *before* the hearing started. *Id.* Of course, Dean Steidl—who had just testified falsely—gave his assurances that his communications with Juror Shaw (and the other jurors) were "not to tell [the jurors] what to ask or point [the jurors] in a direction that we *influence* them." *Id.* (Vol. 2, 98:13–24) (emphasis added).

Dean Steidl's sworn assurances were false as well. Juror Shaw created notes that reveal at least one topic of her pre-hearing session with Dean Steidl was Juror Shaw's questions she planned to ask during the hearing. App. 28, 610. Her notes are very telling for at least two reasons. First, Juror Shaw's pre-planned questions focused exclusively on the alleged Colby Hall incident and showed no interest in the alleged Austin incident. *Id.* Colby Hall was TCU's only opportunity to obtain a Title IX conviction because the alleged Austin incident occurred on private property and not during a TCU sponsored event. App. 22, 482-491. It is apparent that at some point (probably during Dean Steidl's oral training with the other jurors) Juror Shaw received the message that TCU wanted a Title IX conviction and that meant focusing on the Colby Hall incident.[12] Juror Shaw's pre-planned questions dealt exclusively with Colby Hall. App. 28, 610.

Second, her notes reveal Dean Steidl influenced her to revise her pre-planned questions. Prior to meeting with Dean Steidl, Ms. Shaw's hand-written questions repeatedly referred to the Colby Hall incident as "alleged." *Id.* Under TCU's new "trauma informed training" and Dean Steidl's influence, Juror Shaw was to assume Roe *had been sexually assaulted and traumatized* by

---

[12] Dean Steidl also coached Juror Jones on the questions he planned to ask during the panel hearing. App. 52, 828-844 (Ledbetter Dep. 255:6-15).

Doe. So, Juror Shaw obediently scratched through the word "alleged" in each question. *Id.* For example,



*Id.*[13] Juror Shaw's questions were now "trauma informed," and her notes contradict Dean Ledbetter's testimony that she and Dean Steidl "don't have any feedback that we provide to [the panelists]. They just tell us the questions that they're interested in asking." App. 52, 828-844 (Ledbetter Dep. 255:16-24).

An obvious inference arises from the totality of evidence concerning TCU's tampering with Doe's jury to make them "trauma informed": Prior to the commencement of Doe's Title IX hearing TCU had already instructed Doe's jurors that he was guilty of putting one or more fingers in Roe's vagina at Colby Hall. The issues of "whether" or "how" Doe digitally penetrated Roe were decided against Doe by TCU *before the Title IX hearing ever began*.

## K.    TCU's rigged hearing goes forward and obtains a Title IX conviction—but only after more jury tampering.

Doe's Title IX hearing was conducted via Zoom over the course of two days, Friday, January 28, 2022, and Saturday, January 29, 2022. App. 22, 482. TCU hired Ignazio J. Ruvolo, a retired California state judge, to sit as the panel chair. *Id.* But the hearing was rigged.

---

[13]TCU ordered the jurors to destroy their notes concerning their informal training and any notes taken during the hearing or the deliberations. App. 53, 845-849. (Juror Harty Dep., 54:1–24).

TCU's Judge Ruvolo prohibited Doe from introducing exculpatory evidence, including Doe's polygraph results, text messages, and photos that he provided in his response to the final investigative report because "they were not shown to be unavailable at the time of the investigation" *and* because "any relevance of the proffered evidence was more prejudicial than probative of a material fact." App. 22, 489.[14] As documented in the Final Deliberative Report, Judge Ruvolo ensured Doe's exculpatory evidence (including any testimony that referred to the excluded evidence, such as Roe's admission that she did not think anything Doe did at Colby Hall constituted rape) was not considered by the jury during their deliberations. *Id.*

Also, at the beginning of the hearing, Juror Harty confirmed the jury's "trauma informed" bias. Juror Harty, on behalf of himself *and the other jurors*, thanked Roe for "coming forward." App. 7, 085. (". . . we appreciate you coming forward."). The reasonable inference is plain—because Doe's Title IX guilt was predetermined, the jury should thank Roe for "coming forward" as a survivor. Doe was presumed guilty. This is the essence of being "trauma informed" in TCU's dystopian world.

In this case, TCU's trauma informed training was especially important because Roe could not provide any substantiating details about the alleged Colby Hall incident, including how it was possible for Doe to digitally penetrate her while she was fully clothed. App. 52, 828-844 (Ledbetter Dep. 88:2–24). Indeed, Roe admitted she could not explain "how he entered my vagina." App. 7, 086-87. And the jurors did not understand how it was possible for Doe to digitally penetrate Roe's vagina while she was wearing pants and underwear. App. 49, 786-802 (Juror Shaw Dep., 38:16–57:21); App. 54, 850-862 (Juror Jones Dep., 37:5–68:6). But that did not matter. For example, had

---

[14] Judge Ruvolo had the power to admit Doe's exculpatory evidence. App. 31, 665 (¶ 5.7.10f).

Roe been wearing a "suit of armor," Juror Jones would have still found Doe digitally penetrated Roe through her "suit of armor" if—in the words of Juror Jones—"[Roe] claimed that." App. 54, 850-862 (Juror Jones Dep. 60:14–25).

Moreover, in none of Doe's text messages did he admit to digitally penetrating Roe's vagina at Colby Hall, and there is no reasonable explanation for how any of the texts, when considered individually or as a group, constitute evidence that Doe was able to circumvent Roe's pants and underwear to digitally penetrate her vagina. App. 49, 786-802 (Juror Shaw Dep. 57:22–75:6). There was *zero* evidence that Doe *could*—much less, *did*—bypass Roe's pants and underwear to digitally penetrate her vagina.

Deans Steidl and Ledbetter texted each other during the entire two-day hearing. App. 51, 810-827 (Steidl Dep. Vol. 1, 88:11–13); App. 27, 523-609. While the texts clearly show the Deans were biased in favor of Roe, they also show at least two more instances of tampering with Doe's jury. On the second day of the hearing, the Deans became concerned that Roe's attorney (Kelsey McKay) was damaging TCU's case against Doe. App. 27, 590. Dean Steidl exclaimed—



*Id.*; App. 52, 828-844 (Ledbetter Dep. 298:13-24). Then Dean Ledbetter decided "We need a break soon," to which Dean Steidl responded, "Agreed. Hoping she wraps soon so we can break before direct questioning." App. 27, 590-591.

Meanwhile, the Deans were also electronically communicating with their boss, Dr. Karen Bell-Morgan, and describing the crisis that was unfolding during Roe's attorney's cross examination of Doe. App. 29, 612-638. Dean Steidl reported that Roe's attorney was "murdering [my] will to live."[15] *Id.*, 623-624.

Dean Ledbetter devised a plan to deal with the crisis—"We are going to offer to have the panelists meet us at McAlisters and buy them lunch." *Id.*, 624. The "active harm" to TCU's Title IX prosecution—so harmful that it was "murdering [Dean Steidl's] will to live"—motivated the Deans to take a lunch break so they could huddle up with the jury "before direct questioning" of Doe could begin in the afternoon. *Id.*, 623-624; App. 27, 590-591 . Shortly thereafter, the Deans treated the jury to lunch. App. 51, 810-827 (Steidl Dep. Vol. 1, 87:16–88:10); App. 30, 639.

Later that day, the jury began its deliberations. Based on the electronic communications between the Deans and Dr. Morgan, the deliberations began at approximately 4:35 p.m. and the jury was continuing to deliberate at 6:11 p.m. App. 29, 632. More tampering was needed. At 6:21 p.m. Dean Steidl reported to Dr. Morgan—



*Id.*, 633. The tampering was effective. At 6:37 p.m., Dean Ledbetter texted "AL-MOST THERE" and "Finishing outcomes,"[16] which confirmed a wrongful conviction and the ongoing determination of Doe's punishment (or "remedies"). *Id.*; App. 22, 484. So, without any real evidence of

---

[15] Dean Ledbetter also felt compelled to joke about suicide during the panel hearing. App. 27, 569.

[16] App. 31, 641 ("Outcomes are intended to challenge students' moral and ethical decision-making, and to help them bring their behavior in accord with TCU community expectations and repair the harm caused by the misconduct").

guilt, the jury went ahead and found Doe guilty of the alleged Colby Hall incident.[17] App. 22, 482–491; App. 49, 786-802 (Juror Shaw Dep. 18:24–21:1).

The wrongful conviction was hardly surprising as it is undisputed that the jurors obeyed TCU's Title IX new "trauma-informed training." App. 51, 810-827 (Steidl Dep. Vol. 1, 91:4–6); App. 54, 850-862 (Juror Jones Dep., 18:10–15, 20:3–8); App. 49, 786-802 (Juror Shaw Dep. 15:2–23, 17:13–17). Indeed, TCU's new "trauma-informed training" is referenced in the Final Deliberative Report. App. 22, 489 ("While the Hearing Panel recognizes the impact of trauma and the fight, flight, or freeze response and are empathetic to that…."); App. 24, 508; App. 49, 786-802 (Juror Shaw Dep. 33:12–34:24). Doe's jury was pre-programmed, through TCU's formal and informal "training" to find him guilty for Colby Hall.

And TCU celebrated Doe's wrongful conviction. When she learned the jury was "finishing outcomes," Dr. Morgan responded—



App. 29, 633-634.

---

[17]But they did not convict Doe for the alleged, non-Title IX Austin incident. App. 22, 484. Jurors Jones and Shaw later explained the jury could not determine what had happened in Austin and so they did not convict. App. 49, 786-802 (Juror Shaw Dep., 33:7–11); App. 54, 850-862 (Juror Jones Dep. 34:11-15). Of course, the jury did not know what happened at Colby Hall either. The only reasonable explanation is Doe's jurors had been instructed to convict Doe for Colby Hall no matter what.

## L.     TCU's rigs the appeal as well.

After a rigged hearing, it should not be surprising that TCU rigged Doe's appeal as well. Dean Ledbetter communicated with the TCU Dean tasked with the deciding the appeal (Mike Russel) and gave him background information, explained away her having eaten lunch with one of Doe's jurors (Juror Harty) immediately before Doe's Title IX hearing, and even helped him write his decision. App. 52, 828-844 (Ledbetter Dep. 106:24–108:5; 133:13–138:1); App. 37, 709-712; App. 38, 713; App. 39, 714-716. Deans Russel and Ledbetter are friends—Dean Ledbetter even acknowledged Dean Russel in her gender-biased dissertation. App. 52, 828-844 (Ledbetter Dep. 141:8–9); App 21, 249. With Dean Ledbetter's assistance, Dean Russel denied Doe's appeal.  App. 39, 714-716.

## M.     Roe is deposed and demonstrates she has no credibility.

As the Court is aware, Roe was deposed very recently. Through her testimony and behavior, she confirmed that her accusations against Doe are not to be believed:

- she adamantly refused to explain how it was *possible* for Doe to digitally penetrate her vagina while she was wearing pants (leggings) and underwear (App. 48, 764-785, (Roe Dep. 119:3-120:2, 121:2-122:16);

- she invented a new Colby Hall story in which Doe allegedly penetrated her while he was on top of her in her bed, contradicting her previous two versions: (1) Doe digitally penetrated her while the two sat next to each other on her bed; and (2) Doe digitally penetrated her while lying next to her, but not on top of her. (*compare* App. 48, 764-785 (Roe Dep. 119:24–121:10) *with* App. 7, 086-87 (claiming to be in a seated position) *and* App. 7, 90-91 (claiming to be lying side by side, and confirming "[h]e wasn't on top of me"));

- she indicated she no longer believes the alleged Colby Hall incident occurred on August 19, 2020, which, of course, decimates any relevance of the text messages between the two after Doe left Roe's dorm room on August 19, 2020 (App. 48, 764-785 (Roe Dep. 68:19–69:23; 75:8–12); App. 13, 139-163);

- she confirmed she did perform mock sex on Doe in her dorm room (consistent with Doe's version of the August 19, 2020, Colby Hall encounter) but claimed that occurred on a separate date—which would necessarily *post*-date the alleged August 19, 2020 Colby Hall

incident because August 19, 2020, was the first time Doe entered Doe's dorm room (App. 48, 764-785 (Roe Dep. 117:5–119:2); App. 1, 002 (Doe Dec. ¶ 8)); and

- she confirmed just a few weeks ago she went to *Doe's house* to attend a tailgate party while she knew Doe (her alleged rapist) was going to be there (App. 48, 764-785 (Roe Dep. 111:24–113:16).

Roe has zero credibility.

## III.   ARGUMENT

### A.   Doe is entitled to proceed to trial on his Title IX claim.

Title IX (20 U.S.C. § 1681, *et seq.*) bars the imposition of university discipline where gender bias is a motivating factor in the university's decision to discipline. *Plummer v. Univ. of Houston*, 860 F.3d 767, 777 (5th Cir. 2017). Doe's "erroneous outcome" and "selective enforcement" claims are two (2) categories of Title IX claims, but the "*Purdue* Standard"[18] encompasses all fact patterns that "state a claim of sex discrimination under Title IX." *Overdam v. Tex. A&M Univ.*, 43 F.4th 522, 528 (5th Cir. 2022). **TCU failed to move for summary judgment on Doe's Title IX claim under the Purdue Standard, and therefore his Title IX claim should survive under that standard as a matter of right.** Because the Fifth Circuit has recognized the *Purdue* Standard for evaluation of Title IX claims, the "operative question for summary judgment" is:

Could a reasonable jury—presented with the facts alleged—find that sex was a motivating factor in the University's disciplinary proceeding?

*Doe v. Univ. of Denver*, 1 F.4th 822, 830 (10th Cir. 2021). The evidence detailed in the foregoing statement of facts answer that question with a resounding "yes."

Under the **erroneous outcome** standard, a plaintiff must set forth (1) facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding and (2) a

---

[18] *Doe v. Purdue*, 928 F.3d 652, 667 (7th Cir. 2019).

particularized causal connection between the flawed outcome and gender bias. *Klocke v. Univ. of Tex. at Arlington*, 938 F.3d 204, 210 (5th Cir. 2019); *Doe v. Tex. Christian Univ.*, No. 4:22-CV-00297-O, 2022 WL 1573074, at \*4 (N.D. Tex. Apr. 29, 2022).  To show an articulable doubt, a plaintiff may point to particular evidentiary weaknesses behind the finding of an offense such as a motive to lie on the part of a complainant or witnesses, particularized strengths of the defense or particular procedural flaws affecting the proof. *Id.* A plaintiff may further illustrate gender bias by, among other things, identifying statements by members of the disciplinary tribunal, statements by pertinent university officials or patterns of decision-making that also tend to show the influence of gender. *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994); *Tex. Christian Univ.*, 2022 WL 1573074, at \*6. Under the **selective enforcement standard**, the plaintiff must show that "regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Yusuf*, 35 F.3d at 715; *see also Klocke*, 938 F.3d at 210; *Tex. Christian Univ.*, 2022 WL 1573074, at \*3.

TCU's conduct throughout Doe's Title IX proceeding shows that gender bias against Doe is the only plausible explanation for finding Doe responsible for the alleged Colby Hall incident. Because much of the same evidence supports a finding of Title IX liability under the erroneous outcome and selective enforcement tests and the *Purdue* Standard, the following analysis takes a holistic approach in applying the facts to the law. *C.f. Doe v. Univ. of Denver*, 1 F.4th 822, 830 (10th Cir. 2021) ("We think the [Purdue Standard] better accords with the text and analytical framework of Title IX. But we recognize that evidence of an erroneous outcome or selective enforcement are means by which a plaintiff might show that sex was a motivating factor in a university's disciplinary decision."); September 21, 2022 Order, ECF No. 96, Pg. 6 n. 4.

TCU's training—when combined with evidence of (1) TCU's statistics that 100% of respondents are male; (2) pressures by Roe's parents to convict Doe and hold "creepy little boys" responsible; (3) TCU's severe procedural defects and violations of Title IX regulations; (4) weaknesses of Roe's case and her motivations to lie; (5)  irrationality of the panel's decision; (6) Dean Ledbetter's male-biased dissertation; and (7) statements by Deans Steidl and Ledbetter and Reece Harty— is gender biased and reveals that any explanation TCU may posit for its conduct is pretextual. *C.f. Univ. of Denver*, 1 F.4th at 836 (reversing summary judgment in favor of university on male student's Title IX claim and holding that "[w]hile a one-sided investigation, standing alone, might only raise a reasonable inference of anti-complainant bias, [citation omitted] where there is a one-sided investigation plus some evidence that sex may have played a role in a school's disciplinary decision, it should be up to a jury to determine whether the school's bias was based on a protected trait or merely a non-protected trait that breaks down across gender lines").

### 1. TCU's case against Doe suffered from significant evidentiary weaknesses and the panel's decision was illogical.

Not one of Doe's jurors can explain how Doe could have digitally penetrated Roe in Colby Hall, and Roe has *never* been able to explain how it happened or provided any substantiating details. To the contrary, Roe refused to cooperate with the investigation, lied about Investigator Holland and events that took place during the investigation, contradicted herself, and flipped the timeline of when the alleged incidents occurred. Despite TCU's reliance on Doe's text messages, no text message states or proves that Doe digitally penetrated Roe in Colby Hall.

Moreover, and as explained by this Court in its Opinion and Order on Preliminary Injunction, the panelist's decision in finding Doe responsible for the first allegation, but not the second allegation is illogical to the point of absurdity:

In short, the panel concluded that the evidence demonstrated that Doe violated
TCU's sexual assault policy, and that the very same evidence demonstrated he did
not violate TCU's sexual assault policy. Concluding that a thing is both true and not
true is, by definition, erroneous.

*Tex. Christian Univ.*, 2022 WL 1573074, at *4. TCU's "trauma informed" training and other jury

tampering ensured Doe's conviction.[19]

## 2. Procedural flaws infected Doe's Title IX proceeding.

TCU not only violated its own Title IX rules, it repeatedly violated the Title IX regulations

(34 C.F.R. § 106.45) resulting in severe procedural flaws in Doe's case. Such procedural flaws

demonstrate TCU's gender bias. *C.f. Univ. of Denver*, 1 F.4th at 831–36 (citing cases: *Menaker v.*

*Hofstra Univ.*, 935 F.3d 20, 33 (2d Cir. 2019) ("It is precisely because procedural irregularity alone

already suggests bias that even minimal evidence of sex-based pressure on the university is suffi-

cient to establish bias on account of sex."); *Doe v. Oberlin Coll.*, 963 F.3d 580, 586–88 (6th Cir.

2020) ("[Plaintiff had] amply stated a claim for sex discrimination" where there were "clear pro-

cedural irregularities," "the Department of Education's Office of Civil Rights was engaged in a

systemic investigation of the College's policies," and the "facts of the case cast ... doubt on the

accuracy of the disciplinary proceeding's outcome."); *Doe v. Univ. of Arkansas*, 974 F.3d 858, 865

(8th Cir. 2020) (concluding a "dubious [disciplinary] decision ... taken against the backdrop of

substantial pressure on the University to demonstrate that it was responsive to female complain-

ants" supports "an inference that a university is biased based on sex.")).

---

[19] Under the *Purdue* Standard, Doe does not have to prove articulable doubt as to the accuracy of the disciplinary
proceeding as required by the erroneous outcome test.

**Procedural Flaw 1: TCU's "Trauma Informed" Training.** TCU's flawed trauma training and Dean Steidl's oral training constitute blatant violations of the Title IX regulations. The Title IX regulations mandate that:

> "[a] recipient's grievance process must. . . (ii) . . .provide that credibility determinations may not be based on a person's status as a complainant, respondent, or witness; and (iii) [r]equire that any individual designated by a recipient as a Title IX Coordinator, investigator, decision-maker . . . not have . . . bias for or against complainants or respondents generally or an individual complainant or respondent."

34 C.F.R. § 106.45 (b)(1)(ii). And, while § 106.45 (b)(1)(iii) contains training requirements, trauma informed training is not listed. To the contrary, the regulations require that:

> "[a]ny materials used to train Title IX Coordinators, investigators, decision-makers. . . *must not rely on sex stereotypes and must promote impartial investigations and adjudications of formal complaints of sexual harassment.*"

§ 106.45 (b)(1)(iii) (emphasis added). TCU's admittedly unfair trauma training taught Doe's jurors that Roe was a "Victim" and Doe was guilty. App. 57, 870-872 (Carnahan Dep. 133:8-15, 134:5-135:3). Dean Steidl's oral training taught Jurors Shaw and Jones that the "alleged" Colby Hall incident was true, not alleged. *See, e.g.*, App. 28, 610. Indeed, Juror Jones was so impacted by the training that he would find Doe guilty of digitally penetrating Roe even if she was wearing a suit of armor, as long as "[Roe] claimed that." App. 54, 850-862 (Juror Jones Dep. 60:14–25).

TCU's trauma training and Dean Steidl's oral training further constitute violations of TCU's promise to ensure equitable and impartial proceedings and fundamental fairness to respondents in conduct proceedings. App. 31, 640-674. For example, one of the Student Code of Conduct's ("Code") learning objectives is "[t]o ensure **equitable consistency**" (*Id.*, 640), and guidance is given to the selection of conduct panels "**to ensure fairness for the Complainant and Responding Student and compliance with applicable law.**" *Id.* (¶ 1.19) (emphasis added). The Code also contains provisions that seek to preserve and ensure impartiality throughout the process,

including in sections 3.2.18, 5.3.14, 5.11.2. *Id.*, 652, 660, 673. TCU Policy 1.009 (Responding to Reports of Prohibited Discrimination, Harassment, Sexual Misconduct, and Retaliation) further provides that "TCU is committed to equity, inclusion, and accessibility . . . in the process outlined in this policy for the resolution of Reports and Complaints" and that it seeks [t]o ensure an equitable process and to allow full participation of all parties. . . ." App. 33, 11 (¶ 4).

TCU's admittedly flawed "trauma informed" training is evidence of gender bias. *C.f.*, *Norris v. Univ. of Colorado, Boulder*, 362 F. Supp. 3d 1001, 1013-1014 (D. Colo. 2019) (finding that university's Title IX Coordinator's use of a trauma informed approach, combined with other evidence, constituted evidence sufficient to find a causal connection between gender bias and outcome of disciplinary proceeding). TCU's training was tailor-made for Doe's Title IX hearing.

**Procedural Flaw 2: The Exclusion of Evidence.** TCU admits its trauma informed training placed the burden of proof on Doe to prove his innocence. App. 51, 810-827 (Steidl Dep. Vol. 1, 106:5–11). But at the same time, TCU excluded his exculpatory evidence. In doing so, TCU violated §§ 106.45 (b)(5)(ii)-(iii) of the Title IX regulations. *See Tex. Christian Univ.*, 2022 WL 1573074, at *6–8.[20] The error of TCU's improper and unlawful exclusion of relevant evidence is further supported by the commentary to the Title IX Regulations.[21] *Id.* at *8.

---

[20] The Title IX regulations "[r]equire an objective evaluation of all relevant evidence." *Id.* § 106.45 (b)(1)(ii). They further mandate that "[w]hen investigating a formal complaint and throughout the grievance process, a recipient must . . . (ii) [p]rovide an equal opportunity for the parties to present . . . exculpatory evidence [and] (iii) [n]ot restrict the ability of either party to discuss the allegations under investigation or to gather and present relevant evidence." *Id.* § 106.45 (b)(5)(ii)-(iii) .

[21] "Relevance is the standard that these final regulations require, and any evidentiary rules that a recipient chooses must respect this standard of relevance. For example, a recipient may not adopt a rule excluding relevant evidence because such relevant evidence may be unduly prejudicial...." Nondiscrimination on the Basis of Sex, 85 Fed. Reg. at 30,248.

TCU's exclusion of Doe's evidence likewise constitutes a violation of TCU's promise that TCU will provide and follow certain processes and procedures in conduct proceedings as set forth in the Code and Policy 1.009. In its Motion for Summary Judgment, TCU even claims that "[i]n an attempt to minimize the risk of reaching the wrong result, TCU has adopted policies to adjudicate reports of sexual misconduct, which include *remarkable process protections*. . . ." (ECF. No 94, Pg. 1) (emphasis added). Doe timely submitted his response and rebuttal evidence as required by TCU's rules four (4) days prior to the hearing. *Tex. Christian Univ.*, 2022 WL 1573074, at *7.[22] Despite Doe's compliance with TCU's deadlines, Judge Ruvolo, excluded all of Mr. Roe's documentary evidence, including relevant and exculpatory information, in violation of TCU's Code.[23] *Id.* at *6–8 (finding that TCU violated its own policies when it excluded Doe's evidence). TCU may claim that Doe's jurors heard the excluded evidence anyway. But the Deliberative Report is crystal clear: "…**the Hearing Panel was instructed that they were not to consider any of [the excluded evidence] or the subjects discussed or referenced in them**." App. 22, 490 (emphasis added).

**Procedural Flaw 3: Burden of Proof Reversal.** In violation of § 106.45 (b)(5)(i) of the Regulations, TCU shifted its burden to prove Doe's guilt onto Doe to prove his innocence. App. 51, 810-827 (Steidl Dep. Vol. 1, 106:5–11) ("…if there is a show of evidence that shows that there wasn't a violation, then that would be a non-violation of the act.").

---

[22] The Code provides that the complainant and respondent may continue to submit written responses to the final investigative report, and to the other party's responses, up to forty-eight hours before the hearing. (Code. 5.7.5) Before the hearing begins, the panel chair considers "[a]ny evidentiary responses made . . . during the investigation," and makes "relevancy determinations" about any disputed evidence. (Code 5.7.10 e)).

[23] Only relevant and credible evidence will be admitted during a Title IX Conduct Panel hearing. Relevant evidence includes evidence that is more probative of a material fact than prejudicial.

**Procedural Flaw 4: TCU dictated Doe's conviction**. The actions of Deans Ledbetter and Steidl ensured a conviction against Doe in violation of § 106.45 (b)(1)(iii) of the Title IX regulations, which prohibit "bias for or against complainants or respondents generally or an individual complainant or respondent." 34 C.F.R. § 106.45 (b)(1)(iii). TCU's unlawful actions included implementation of biased and admittedly flawed "trauma informed" training, jury tampering, and influencing the jury during its deliberations. Dean Ledbetter also assisted Dean Russel in upholding Doe's wrongful conviction, even though her conduct was a basis of Doe's appeal.

**Procedural Flaw 5: Improper Consolidation.** TCU violated § 106.45 (b)(4) of the Title IX regulations by improperly consolidating the alleged Colby Hall incident and alleged Austin incident into a single proceeding. *See Tex. Christian Univ.*, 2022 WL 1573074, at *8 (finding that TCU's consolidation of the two allegations violated Title IX regulations).[24]

### 3. Biased TCU officials infected Doe's Title IX proceeding.

Dean Ledbetter's gender bias is evidenced in part by statements in her dissertation in which she claims men are morally inferior. *Tex. Christian Univ.*, 2022 WL 1573074, at *9 ("Ledbetter's dissertation is evidence of gender bias."). Dean Steidl's gender bias is evidenced in part by his oral training of Doe's jurors. And the Deans jointly exposed their gender bias through their design and implementation of admittedly flawed "trauma informed" training and text messaging.

With respect to Dean Ledbetter's dissertation, TCU claims that Doe "cannot link [the] dissertation" to the outcome of the hearing. MSJ, 20. However, the fact that hearing testimony

---

[24] Under the Title IX regulations, universities can only "consolidate formal complaints as to allegations of sexual harassment against more than one respondent, or by more than one complainant against one or more respondents, or by one party against the other party, where the allegations of sexual harassment arise out of the same facts or circumstances." 34 C.F.R. § 106.45(b)(4). The two alleged incidents, however, occurred over a month apart, in different cities, and they arise out of completely different facts as set forth above. *See Tex. Christian Univ.*, 2022 WL 1573074, at *8.

reminded Juror Harty of the dissertation literally in the middle of Doe's panel hearing is direct evidence that the biased dissertation infected the disciplinary proceeding. App. 35, 702.

Although statements alone by pertinent university officials, regardless of their decision-making role, can support an inference of gender bias, Deans Steidl and Ledbetter made decisions that directly impacted the outcome of Doe's proceeding. *See Tex. Christian Univ.*, 2022 WL 1573074, at *9; *Yusuf*, 35 F.3d at 715; *Doe v. Columbia Univ.*, 831 F.3d 46, 58–59 (2d Cir. 2016). The statement by Juror Harty, on behalf of himself and the other jurors, thanking Roe for "*coming forward,*" further reveals the bias of Doe's jury in favor of Roe and against Doe. App. 7, 085 (emphasis added). *C.f. Yusuf*, 35 F.3d at 715 (observing that "statements by members of the disciplinary tribunal" can demonstrate gender bias).

### 4. TCU was pressured to convict Doe.

External pressures can be evidence of gender bias. *See Univ. of Arkansas - Fayetteville*, 974 F.3d at 865; *Purdue*, 928 F.3d at 669; *Menaker*, 935 F.3d at 33. The external pressures here include pressures from Roe's parents and the Department of Education's Office for Civil Rights ("OCR"). First, Roe's parents' pressure on TCU to convict Doe and their harsh criticisms that TCU was not properly trauma informed led to the creation and implementation of the admittedly flawed trauma training, which guaranteed Doe's conviction.

Second, in what is known as the April 2011 Dear Colleague Letter, the OCR issued a direct threat to colleges and universities to handle sexual assault proceedings as the OCR wanted:

> When a recipient does not come into compliance voluntarily, OCR may initiate proceedings to withdraw Federal funding by the Department or refer the case to the U.S. Department of Justice for litigation.

(https://www2.ed.gov/print/about/offices/list/ocr/letters/colleague-201104.html).    In    other words, there is financial motive for a university to discriminate.  Circuit courts have found the Dear

Colleague Letter relevant in determining the plausibility of a Title IX claim. *Purdue*, 928 F.3d at 668-69 (citing *Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018); *Doe v. Miami Univ.*, 882 F.3d 579, 589 (6th Cir. 2018); *Doe v. Columbia Univ.*, 831 F.3d 46, 58 (2d Cir. 2016)). The Dear Colleague Letter "provides a backdrop, that, when combined with other circumstantial evidence of bias in Doe's specific proceeding, gives rise to a plausible claim." *Baum*, 903 F.3d at 586; *see also Purdue*, 928 F.3d at 668; *Doe v. Washington & Lee Univ.*, No. 6:14–CV–00052, 2015 WL 4647996, at *10 (W.D. Va. Aug. 5, 2015). The pressures on TCU give Doe "a story about why" TCU was motivated to discriminate against him because he is male. *See Purdue*, 928 F.3d at 669.

### 5. Roe was motivated to lie.

Doe's jurors ignored Roe's motivations to lie (jealousy and retaliation). Doe's jurors knew that, *after* Colby Hall, Roe was upset and jealous when she saw Doe with Girl 1 and that she told Girl 2 to not go home with Doe. App. 7, 092-94, 095-097, 099-100. Doe's jurors knew that each time Roe's dad called Doe's dad, it was after Roe saw Doe with another girl. App. 7, 103. The panel's disregard of Roe's motive to lie is evidence of an erroneous outcome and gender bias. *Tex. Christian Univ.*, 2022 WL 1573074, at *5 (citing *Klocke*, 938 F.3d at 210). Roe continued to demonstrate her motive to lie after the panel hearing, including her recent behavior in March 2022 when she bullied and harassed Girl 2 in Cabo, Mexico. There is no explanation for why Roe would bully Girl 2 other than sheer jealousy.

### 6. TCU harbors systemic bias against males.

TCU's statistics tell us (i) 100% of the time complainants are females except in male-on-male scenarios; and (ii) 100% of the time respondents are males. App. 26, 521-522. TCU's statistics also reveal that in all cases that went to a live hearing, beginning with Doe's case and after the implementation of the admittedly flawed trauma training in January 2022, 100% of respondents

accused of misconduct by females were convicted of at least one allegation. *Id.* TCU attempts to use its statistics to show a lack of bias against males (MSJ, 26), but TCU ignores the sea change wrought by its new trauma-informed training implemented in January 2022.

In light of TCU's statistics, references to "respondents" in TCU's trauma training equates to "guilty males." TCU also repeatedly refers to complainants as survivors on *both* the respondent and complainant webpage, and Leah Carnahan refers to complainants as "survivors" and "victims" in her trauma informed training. App. 40, 717-729 ; App. 41, 730-742; App. 24, 519; App. 25 (training video). Language matters. As the Court stated in *Doe v. Brandeis Univ.*, "[w]hether someone is a 'victim' is a conclusion to be reached at the end of a fair process, *not an assumption to be made at the beginning.*" 177 F. Supp. 3d 561 (D. Mass. 2016) (emphasis added). The same is true of a "survivor." TCU's choice to refer to complainants as "survivors" and "victims" and the post-training 100% conviction rate reveals a systemic bias against males.

The bottom line is TCU engineered Doe's Title IX conviction because he is male and Roe is female. The Court should deny TCU's motion for summary judgment.

## B.    Doe is entitled to Proceed to Trial on his Breach of Contract Claim.

"To establish a breach of contract, whether expressed or implied, a plaintiff must prove (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages to the plaintiff resulting from that breach." *Doe v. William Marsh Rice Univ.*, No. 4:20-CV-2985, 2021 WL 4215501, at *13 (S.D. Tex. Sept. 16, 2021). In the present case, TCU challenges the first, third and fourth elements. TCU, however, **did not move** for summary judgment on Doe's breach of contract claim that TCU violated Policy 1.009.

TCU is a private college. "The relationship between a private school and its student is based in contract; if such were not the case, neither the school nor the student would have a remedy at a private institution in situations where non-performance caused damage." *Colli v. S. Methodist Univ.*, No. 3:08-CV-1627-P, 2011 WL 3524403, at * 3 (N.D. Tex. Feb. 14, 2011) (slip op.) (citing *Southwell v. Univ. of Incarnate Word*, 974 S.W.2d 351, 356 (Tex. App.–San Antonio 1998, pet. denied)); *see also Villareal v. Chamberlain Coll. of Nursing & Health Scis., Inc.*, No. CV H-19-0300, 2019 WL 4736488, at *3 (S.D. Tex. Sept. 27, 2019); *Pacheco v. St. Mary's Univ.*, No. 15-CV-1131 (RCL), 2017 WL 2670758, at *9 (W.D. Tex. June 20, 2017). A university's academic bulletin, handbook or other policies (collectively "university policies") may constitute express contracts, or their terms may create implied contracts. *C.f. King v. Baylor Univ.*, 46 F.4th 344, 366 (5th Cir. 2022) (acknowledging that Texas law recognizes implied contracts between universities and their students, but holding that because financial responsibility agreement constituted express contract with student, no implied contract existed); *William Marsh Rice Univ.*, 2021 WL 4215501, at *13; *Pacheco*, 2017 WL 2670758, at *9; *Southwell*, 974 S.W.2d at 356; *Univ. of Tex. Health Sci. Ctr. at Houston v. Babb*, 646 S.W.2d 502 (Tex. App.—Houston [1st Dist.] 1982, no writ). The determination of whether university policies create a contract hinges on whether the language of the university polices evinces an intent to be bound. *See Pacheco*, 2017 WL 2670758, at *9; S*outhwell* 974 S.W.2d at 356.

When university policies lack express language evincing an intent to be bound and instead contain provisions that reserve a right to change or alter the policies, there is no express contract as there is no intent to be bound. *See Pacheco*, 2017 WL 2670758, at *9; *see also Southwell*, 974 S.W.2d at 356. Nonetheless, while university policies themselves might not constitute contracts

between a student and a university, an implied contractual relationship may yet exist. *See Pacheco*, 2017 WL 2670758, at *9; *Chamberlain Coll.*, 2019 WL 4736488, at *3; *Southwell*, 974 S.W.2d at 356; *Villarreal v. Art Inst. of Houston, Inc.*, 20 S.W.3d 792, 797 (Tex. App.—Corpus Christi–Edinburg 2000, no pet.). The specific terms of such an implied contract "must logically be defined by" the university's policies, and in the absence of a binding university policy, "the student agrees that those terms are subject to change throughout the course of his or her education." *Southwell*, 974 S.W.2d at 356; *see also Chamberlain*, 2019 WL 4736488, at *3 (S.D. Tex. Sept. 27, 2019) ("the terms of the Academic Catalog form the foundation of the parties' contractual relationship regardless of whether it is the actual contract as they agree or whether it sets forth the terms of an implied contract.").

### 1. TCU's policies constitute an express contract or, at a minimum, form the foundation of an implied contract.

Although the Code contains disclaimer language, which expressly allows TCU "to make changes to [the] Code as necessary," the terms of the Code nevertheless create an implied contract as explained below. Policies 1.008 and 1.009, however, contain no disclaimers and are therefore express contracts because they evince TCU's intent to be bound. App. 32, 675-683; App. 33, 684-697. For example, Policies 1.008 and 1.009 each state that (1) they apply not only to students, but to "employees and administrators; trustees"—i.e. TCU which is comprised of such persons; (2) "TCU is committed to providing a positive learning, living and working environment free from discrimination and harassment" and "[i]n support of this commitment, in this policy TCU prohibits a range of behaviors, including unlawful discrimination, … and other misconduct based on … sex"; (3) "[t]his policy is a part of TCU's framework of efforts to comply with Title IX of the Education Amendments of 1972 (Title IX)…." *Id.* Furthermore, even if those Policies are subject

to change, that would not prevent the Policies from being contracts because they lack an express disclaimer. *C.f. Babb*, 646 S.W.2d at 505-06 (holding that university's catalog constituted a written contract even though university had right to change catalog). And, prior versions of Policies 1.008 and 1.009 are enforced even after they are changed depending on when the alleged misconduct occurred. App. 32, 675 (I.); App. 33, 684 (I).

Unlike Policies 1.008 and 1.009, the student handbook at issue in *Anyadike v. College*—a case on which TCU heavily relies for its no-contract argument—contained significant disclaimers, thus rendering that case inapposite. No. 7:15-CV-00157-O, 2016 WL 7839183, at *6 (N.D. Tex. Mar. 14, 2016). TCU also relies on *Southwell* for its argument that TCU Policies are not contracts, but the Court in *Southwell* actually found that the bulletin's degree requirements at issue were part of an implied contract even though the bulletin was not an express contract. 974 S.W.2d at 356 ("while the bulletin itself does not create a contract between Incarnate Word and Southwell, we find that a contract exists nonetheless"). The plaintiff, however, failed to satisfy her obligations under the implied contract and therefore the university's obligation to award her a degree did not accrue. *Id.*

As further evidence of TCU's intent to be bound by Policies 1.008 and 1.009, those policies use compulsory language to impose mandates on TCU and others who comprise the TCU community. For example, Policy 1.008 states (1) "It is the responsibility of each community member to promptly report violations or concerns about violations of laws, regulations and University policies that come to their attention; (2) "Employees have a mandatory duty to report… any violations related to the prohibitions enumerated in this policy;" and (3) "TCU will take steps to prevent retaliation…and to prevent the recurrence of any harassment…." App. 32, 675-683. Policy

1.009 likewise contains numerous mandates, such as (1) "If the OIE elects to submit a written Complaint, it shall timely inform the Complainant it has elected to do so"; (2) "TCU will make reasonable efforts to investigate and address Reports or Complaints made under this policy"; and (3) "the Dean of Students Office will conduct procedures set forth in the TCU Code of Student Conduct, including providing for a hearing with enhanced processes if required to do so by federal Title IX regulations." App. 33, 684-697. The Code also contains compulsory language, like (1) "The University shall audiotape and/or digitally record all PCB and formal Conduct Panel hearings" (5.5.16); and (2) "the University shall release information to any other college or university who requests information…(5.9.2). App. 31, 671. Why would one use compulsory provisions if there is no intent to enforce or be bound by such provisions?

As for the Bill of Rights, TCU cannot unilaterally change the Bill of Rights nor does the Bill of Rights contain disclaimers. App. 34, 698. Moreover, the Bill of Rights is just that—*rights* that TCU gives to its students in consideration for their performance thereunder, including the payment of tuition. TCU has no authority to impair those rights when a student complies with them. In light of the foregoing, Policies 1.008 and 1.009 and the Bill of Rights each evidence an intent to be bound and therefore constitute binding contracts between TCU and Doe. One authority has suggested:

> Case law and the growing acceptance of education as a consumer product suggest that the judiciary has become more receptive to student breach of contract suits that allege specific, identifiable, and objective promises. Student bills of rights could provide students with an additional source on which to base breach of contract cases against colleges and universities.

*Academic Bills of Rights: Conflict in the Classroom*, 31 J.C. & U.L. 243, 247 (2005).

Even if TCU's Policies are not express contracts, their terms form the basis of an implied contract. *See Southwell*, 974 S.W.2d at 356; *see also Chamberlain*, 2019 WL 4736488, at *3. TCU impliedly agreed to provide educational opportunities and confer a degree in consideration for Doe's successful completion of degree requirements, while paying for tuition and abiding by TCU's Policies. *C.f. Southwell*, 974 S.W.2d at 356; *Pacheco*, 2017 WL 2670758, at *9; *Art Inst. of Houston*, 20 S.W.3d at 797. The following cases held that although the university policies at issue lacked express language evidencing an intent to be bound and thus were not express contracts, the terms of such university policies created an implied contract: *Pacheco*, 2017 WL 2670758, at *9 (although code of conduct expressly reserved right to change or alter policies and was therefore not an express contract, it likely was part of an implied contract between St. Mary's and the student who was found responsible for sexual harassment); *Southwell*, 974 S.W.2d at 356 (although bulletin in and of itself did not create a contract because it was "for informational purposes only" and subject to unilateral change, the bulletin's degree requirements were part of an implied contract); *Chamberlain*, 2019 WL 4736488, at *3 (S.D. Tex. Sept. 27, 2019) (although university's academic catalogue contained a disclaimer that university could change the terms at any time without notice and therefore university was not bound by the catalogue, "the terms of the Academic Catalog form the foundation of the parties' contractual relationship regardless of whether it is the actual contract as they agree or whether it sets forth the terms of an implied contract."). Likewise, the specific terms of an implied contract between TCU and Doe are logically defined by TCU's Policies. *C.f. Southwell*, 974 S.W.2d at 356.

### 2. TCU Breached its Contract with Doe.

TCU breached its contract with Doe (whether express or implied) by violating its own policies, including the promise to follow the Title IX regulations and TCU's procedures in Title IX

cases. First, the Code and Policies 1.008 and 1.009 incorporate by reference the Title IX regulations and indicate that TCU agrees to abide by those regulations. For example, Policies 1.008 and 1.009 each state that "[t]his policy is a part of TCU's framework of efforts to comply with Title IX of the Education Amendments of 1972 (Title IX)...." (App. 32, 676; App. 33, 685). Policy 1.009, which TCU failed to challenge in it motion for summary judgment, further states:

> **Enhanced process required to resolve certain Complaints**. <u>Under applicable federal Title IX regulations . . . the resolution of Complaints involving allegations of Sexual Harassment requires a hearing with certain enhanced processes as prescribed by the regulations</u>. In any Investigative Report, the Investigator will include a determination of whether 2020 <u>Title IX Regulations</u> would require a hearing with enhanced processes to resolve one or more of the allegations in the Complaint. TCU reserves the right to take action without a resolution through a hearing with enhanced processes prescribed by federal 2020 <u>Title IX Regulations</u> if TCU concludes it has a legal duty to do so.
>
> **Formal Resolution where the Respondent is a student**. If the Complaint involves a Respondent(s) who primarily relates to the University as a student, the Investigative Report will not include any investigative findings or determination of responsibility, and the OIE will deliver the Investigative Report to the Dean of Students Office for determination of responsibility and appropriate sanctions and/or remedies. In making such determinations, <u>the Dean of Students Office will follow applicable student conduct procedures set forth in the TCU Code of Student Conduct, including providing for a hearing with enhanced processes if required to do so by federal Title IX regulations</u>.

App. 33, 689-690 (Footnotes omitted, underlined emphasis added). The Code references Policies 1.008 and 1.009 (*see e.g.* Code §§ 1.6, 5.1.1, 5.5.1), and likewise incorporates by reference "Title IX law" (Code §§ 1.20, 5.3.13, 5.4.1, 5.5.1, 5.6, 5.8.13, 1.14). App. 31, 640-674.

As detailed above, TCU repeatedly and blatantly violated the Title IX regulations—and therefore breached its contract with Doe to abide by those regulations. Those violations include the use of TCU's biased trauma training to condition panelists prior to conduct panel hearings, the improper exclusion of all of Doe's evidence, and the improper consolidation of the two allegations.

Moreover, TCU's shifting of its burden to prove Doe's guilt onto Doe to prove his innocence violates Title IX. 34 C.F.R. § 106.45 (b)(5)(i); App. 51, 810-827 (Steidl Dep. Vol. 1, 106:5-11).

TCU further breached its promise to ensure equitable and impartial proceedings and fundamental fairness to respondents in conduct proceedings by using the "trauma informed" training to indoctrinate Doe's jurors. As part of its contractual relationship with Doe, the terms of the Code and Policy 1.009 promise that TCU will ensure equitable and impartial proceedings and fundamental fairness. *C.f. Goodman v. President & Trustees of Bowdoin Coll.*, 135 F. Supp. 2d 40, 58 (D. Me. 2001) (holding that "Plaintiff's contractual relationship with Bowdoin includes the Handbook term promising that Bowdoin would abide by certain procedures to ensure impartial proceedings and fundamental fairness"). Examples of such terms set forth in the Code and Policy 1.009 are detailed above.

In *Colli v. Southern Methodist University*, a student basketball player sued SMU for breach of contract (among other claims) after SMU cancelled the student's scholarship in response to the student submitting a list of complaints against the coach to SMU's athletic director. No. 3:08-CV-1627-P, 2010 WL 7206216, at *4-6 (N.D. Tex. Aug. 17, 2010). The Court denied SMU's motion for summary judgment on the student's breach of contract claim, in part because SMU breached its responsibilities under the student code of conduct, which gave students the right to a "fair hearing before an impartial judiciary body…." *Id.* Specifically, and like TCU, SMU failed to follow the proper disciplinary process and "did not maintain the right of the accused as established under the Code." *Id.* The *Colli* Court denied SMU's motion for reconsideration in the Order set forth in *Colli v. Southern Methodist University*, No. 3:08-CV-1627-P, 2011 WL 3524403 (N.D. Tex. Feb. 14, 2011). TCU's exclusion of Doe's evidence likewise constitutes a breach of TCU's promise that

46

TCU will provide and follow certain processes and procedures in conduct proceedings as set forth in the Code and Policy 1.009.[25] *C.f. Colli*, 2010 WL 7206216, at *4-5 (denying SMU's motion for summary judgment on student's breach of contract claim in part because SMU failed to adhere to its deadlines set forth in its compliance manual).

With respect to the Bill of Rights, TCU promises certain rights and freedoms to its students, including the right to access higher education at TCU, the right to use all appropriate facilities and services of TCU, and the right to register for and attend any class for which a student has met the prerequisites. App. 34 (I.1.-2, II.1). TCU, however, breached those promises by erroneously and unlawfully suspending Doe until the Maymester of 2023, thus blocking him from enjoying the benefits conferred by the Bill of Rights.

### 3. Doe has Established Damages.

Under Texas law, there are generally two types of remedies available for a contractual breach—legal remedies and equitable remedies—and Doe seeks both. ECF No. 43, pg. 37 (First Am. Compl.).To recover monetary damages, the plaintiff must prove that he suffered some pecuniary loss as a result of the breach. *Abraxas Petroleum Corp. v. Hornburg*, 20 S.W.3d 741, 758 (Tex. App.—El Paso 2000, no pet.) (citing *Stewart v. Basey*, 245 S.W.2d 484, 486 (Tex. 1952). Equitable remedies are non-monetary relief available when a monetary remedy is insufficient to make the injured party whole. The Court can grant both equitable and legal relief. In Texas, "legal and equitable rights are blended and a choice of remedies for either equitable or legal relief is not required. . . ." *Marin Real Estate Ptnrs., L.P. v. Vogt*, 373 S.W.3d 57, 77 (Tex. App.—San Antonio

---

[25] The Code is defined as "the rule structure that outlines the rights and responsibilities of TCU students. It also contains the procedures for reporting student misconduct, the conduct process for alleged student misconduct, and possible consequences for student misconduct" App. 31, 641 (¶ 1.5).

2011, no pet.) (citing *City of Wichita Falls v. Bruner*, 191 S.W.2d 912, 920 (Tex. Civ. App.—Fort Worth 1945, writ ref'd w.o.m.).[26]

In the present case, Doe has asserted economic damages in the form of lost future earnings, which is evidenced by his Designation of Expert Witnesses ("Designation") filed on July 21, 2022 (ECF No. 65) and by expert deposition testimony and exhibits.[27] Doe's economic damages range from $158,909-$246,973. App. 60, 921-922. Doe seeks equitable relief, including a request that the Court "[o]rder TCU to expunge Doe's transcript and college record of any reference to his wrongful sanctions and finding of his violation of sexual misconduct." ECF No. 65, pg. 37. TCU claims that if Doe prevails on his Title IX claim, Doe's "feared damages would not exist." That statement might be true if the Court awards Doe the foregoing equitable relief he seeks—expunction of his record. Because a decision to award equitable relief is discretionary, it is possible that the Court may not award the equitable relief he seeks. *See, e.g., TiVo Inc. v. DISH Network Corp.*, No. 2:04-CV-01 (DF), 2009 WL 10677749, at *2 (E.D. Tex. June 2, 2009) ("Although such an award may take the form of monetary damages, an award that remedies a stay is equitable in nature and entrusted to the discretion of the court."). If that happened, then Doe's economic damages would be limited to those supported by expert testimony.

With respect to Doe's claim for mental anguish damages, he seeks to recover those damages under his claim for breach of contract.[28] TCU simply asserts that Texas law generally does not allow recovery of those damages,[29] yet ignores Texas law that carves out a narrow exception to

---

[26] "[O]nly when a judgment awards 'both an injunction and damages as to future effects' is there an impermissible double recovery. *Id.* (quoting *Schneider Nat'l Carriers, Inc. v. Bates*, 147 S.W.3d 264, 284 (Tex. 2004)).

[27] App. 59, 877-908 (Shedlin Dep. 4:6-20, 28:19-29:11 and Exh. 105); App. 60, 909-955 (Roney Dep. 35:14-36:5 and Exh. 103).

[28] Doe concedes that he cannot recover mental anguish damages under Title IX.

[29] TCU does not challenge or allege that Mr. Doe has not suffered mental anguish damages as a result of a breach.

the general rule. *C.f. Dean v. Dean*, 821 F.2d 279, 281-82 (5th Cir. 1987) (explaining that Texas courts recognize an exception to the general that mental anguish damages cannot be recovered under breach of contract). That exception provides that "it must be shown that the mental perturbation was more than ordinary regret or annoyance but is of a type commonly denominated as mental anguish, and the mental anguish was such a necessary and natural result of the breach of contract as to have been within the contemplation of the defendant at the time the contract was made." *Delgado v. Methodist Hosp.*, 936 S.W.2d 479 (Tex. App.—Houston [14th Dist.] 1996, no writ); *see also Pat H. Foley & Co. v. Wyatt*, 442 S.W.2d 904 (Tex. Civ. App.—Houston [14th Dist.] 1969, writ ref'd n.r.e.) (finding that award of mental anguish damages was based in part upon the contractual relationship between funeral home and plaintiff); *Gulf C. & S.F.Ry. Co. v. Coopwood*, 96 S.W. 102, 104 (Tex. Civ. App. 1906, writ denied) (mother recovered damages for mental anguish against railroad resulting from mistreatment of a sick child when the railroad "accepted appellee and her daughter as passengers knowing the relationship existing between them and the helpless condition of the daughter"); *Boyles v. Kerr*, 855 S.W.2d 593, 597 (Tex. 1993) ("Our decision does not affect a claimant's right to recover mental anguish damages caused by defendant's breach of some other legal duty.") (citing *Wyatt*, 442 S.W.2d 904).

In the present case, Doe's mental anguish resulting from TCU's multiple breaches of contract was foreseeable by TCU. The contract between a student and school with respect to sexual misconduct disciplinary procedures is inherently the kind of contract that puts the university on notice that mental anguish is a foreseeable result of a breach. *C.f. Brandeis Univ.*, 177 F. Supp. 3d at 602 (describing "substantial social and personal repercussions" of being labeled a sex offender). In fact, TCU recognized and warned Doe of the "emotionally challenging" experience of learning

the panel decision and the result of his appeal. App. 36, 705-708. TCU cautioned Doe to be in a "safe space" when he learned of the result. *Id.* Doe's mental anguish is a necessary and natural result of TCU's breaches as set forth above and was contemplated by TCU at the time Doe and TCU entered into a contractual relationship. TCU—who is acutely "trauma informed"—knew its conduct would result in false rape convictions against respondents and ultimately severe mental anguish for those respondents.

## IV.   CONCLUSION

A reasonable jury would likely believe that with TCU's Title IX process and jury tampering, truth was the enemy and the first fatality in TCU's rigged Title IX process targeting Doe. TCU's Motion for Summary Judgment should be denied.

Respectfully submitted,

*/s/ Brian Roark*
Brian Roark
State Bar No. 00794536
brian@brianroark.com
Botsford & Roark
1307 West Avenue
Austin, Texas 78701
Telephone: (512) 476-1900
Fax: (512) 476-8040
*Admitted pro hac vice*

*/s/ Bryan D. Bruner*
Bryan D. Bruner
State Bar No. 03252475
bbruner@brunerpc.com
Lynne B. Frank
State Bar No. 24087215
lfrank@brunerpc.com
Bruner & Bruner, P.C.
3700 West 7th Street
Fort Worth, Texas 76107
Telephone: (817) 332-6633
Fax: (817) 332-6619

*/s/ H. Dustin Fillmore III*
H. Dustin Fillmore III
State Bar No. 06996010
dusty@fillmorefirm.com
The Fillmore Law Firm, L.L.P.
201 Main Street, Suite 700
Fort Worth, Texas 76102
Telephone: (817) 332-2351
Fax: (817) 870-1859

**Attorneys for John Doe**

## <u>CERTIFICATE OF SERVICE</u>

On November 21, 2022, the foregoing document was served on TCU via CMECF through its attorneys of record as follows:

> Scott D. Schneider ([scott.schneider@huschblackwell.com](mailto:scott.schneider@huschblackwell.com))
> Aleks Rushing ([Aleks.Rushing@huschblackwell.com](mailto:Aleks.Rushing@huschblackwell.com))
> Alex E. Brakefield ([alex.brakefield@huschblackwell.com](mailto:alex.brakefield@huschblackwell.com))
> Samuel P. Rajaratnam ([Sammy.rajaratnam@huschblackwell.com](mailto:Sammy.rajaratnam@huschblackwell.com))
> Caidi Davis ([Caidi.davis@huschblackwell.com](mailto:Caidi.davis@huschblackwell.com))
> HUSCH BLACKWELL LLP
> 1900 N. Pearl Street, Suite 1800
> Dallas, Texas 75201

**ATTORNEYS FOR TCU**

*/s/ Bryan D. Bruner*
Bryan D. Bruner
